**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DEBRA SPERO**, as Natural Mother of
**V.S**., an infant,

                Plaintiff,

      -against-                  **Civil Action No.**: 3:17:CV-7 (GTS-DEP)


**VESTAL CENTRAL SCHOOL DISTRICT**
**BOARD OF EDUATION, VESTAL CENTRAL SCHOOL**
**DISTRICT, JEFFREY AHEARN**, Superintendent of Schools,
**ALBERT A. PENNA**, Interim Principal Vestal
High School, **DEBORAH CADDICK and CLIFFORD**
**KASSON**, in their Individual and Official capacities.

                Defendants.
_____




<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**</u>
<u>**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>




**SUBMITTED BY:**

                                  **LEGAL SERVICES OF CNY, INC.**
                                  Attorneys for Plaintiffs
                                  Willa S. Payne, Esq. (Bar No: 517751)
                                  Susan M. Young, Esq. (Bar No: 102862)
                                  Joshua Cotter, Esq. (Bar No: 518217)
                                  189 Main Street, Suite 301
                                  Oneonta, NY 13820
                                  Telephone: 607-766-8118
                                  Facsimile: 607-386-4176
                                  wpayne@lscny.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………… iii

PRELIMINARY STATEMENT…………………....………..……………………....1

STATEMENT OF FACTS…………………….......……………………….............. 1

ARGUMENT………………………………………...……………………………...9

    V.S. IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND

    PRELIMINARY INJUCTION REINSTATING HIM TO INSTRUCTION AT

    VESTAL HIGH SCHOOL……………………………………………………..9

    1)  PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF

        PRELIMINARY INJUNCTIVE RELIF……………………………………10

    2)  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

        a.  FIRST AMENDMENT CLAIM…………………………………………11

        b.  SUBSTANTIVE DUE PROCESS CLAIM…………………………………22

    3)  THE BALANCE OF HARDHIPS TIPS DECIDEDLY IN PLAINTIFF'S

        FAVOR AND THE ISSUANCE OF AN INJUNCTION IS IN THE PUBLIC

        INTEREST……………………………………………………………....…..24


CONCLUSION……………………………………………………………………25

## **TABLE OF AUTHORITIES**

**CASES**

*Abdul Wali v. Coughlin,* 754 F.2d 1015 (2d Cir. 1985) …………………………..................... 10

*Ashcroft v. Am. Cvil Liberties Union,* 535 U.S. 564, (2002) ……………………………………12

*Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir. 1996) ……………………………………11

*Chaplinsky v. N.H.,* 315 U.S. 568  (1942) …………………………………………………... 12

*Connick v. Myers,* 461 U.S. 138 (1983) …………………………………………………... 12, 14, 18

*Cuff v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 113 (2d Cir. 2012)……………....13- 14, 17, 19, 23

*DeFabio v. E. Hampton Union Free Sch. Dist.,* 658 F. Supp. 2d 461 (E.D.N.Y 2009)……….. 22

*Donniger v. Niehoff,* 572 F. 3d 41, (2d Cir. 2011) …………………………………………… passim

*Elrod v. Burns,* 427 U.S. 347, 373 (1976) ………………………………………………………... 10

*Freedom Holdings, Inc. v. Spitzer,* 408 F. 3d 112, (2d Cir. 2005) ………………………… 10, 11

*Horton v. Bd. Of Educ.,* 2017 U.S. Dist. LEXIS 60719 (N.D.N.Y 2017) ……………………... 22

*J.S. v. Blue Mt. Sch. Dist.,* 650 F.3d 915 (3d Cir. 2011) …………………………………………14, 15

*Karp v. Becken,* 477 F2d 171, (9th Cir 1973) …………………………………………………... 16

*N.J. v. New York,* 872 F. Supp. 2d 204  (E.D.N.Y. 2011) …………………………..................... 11

*N.Y. ex rel. Schneiderman v. Actavis PLC,* 787 F. 3d 638  (2d Cir. 2015) ……………….........10

*O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) ……………………………………………… 10

*Pappas v. Giuliani,* 290 F. 3d 143, (2d Cir. 2002) ……………………………….......... 12, 14, 18

*R.O. v. Ithaca City Sch. Dist.,* 645 F. 3d 533, (2d Cir. 2011) ………………………………….. 13

*Rosenberger v. Rector and Visitors of Univ. of Va.,* 519 U.S. 819  (1995) ……………………. 12

*Snyder v. Phelps,* 562 U.S. 443, 453 (2011) …………………………………………….. 12, 18

*Tinker v. Des Moines Independent Comm. Sch. Dist.,* 393 U.S. 503 (1969) ……………… passim

*Turner Broadcasting Sys. V. FCC,* 512 U.S. 622 (1994) ………………………………………… 12

*V.W. v. Conway,* No. 9-16-CV-1150, 2017 U.S. Dist. LEXIS 24395 (N.D.N.Y 2017) ……….. 11

*Wisdom Import Sales Co. v. Labatt Brewing Co.,* 339 F. 3d 101 (2d Cir. 2003) ……………… 10

*Wisniewski v. Bd. Of Educ.*, 494 F.3d 34 (2d Cir. 2007) …………………………..… passim

**STATUTES AND REGULATIONS**

20 U.S.C. § 1232(g)…………………………………………………………………….6

34 C.F.R. Part 99 …………………………………………………………………….... 6

N.Y. Educ. Law. § 10 ……………………………………………………………..…. 3

**OTHER**

2012 Op Comm Ed. No 16,439……………………………………………………………23

2008 Op Comm Ed. No 15,849 ……………………….……………………………….... 23

2008 Op Comm Ed. No. 14,681……………………………………………………………23

## PRELIMINARY STATEMENT

Plaintiff V.S. is a seventeen-year-old student of color at the Vestal Central School District ("District").  In December 2016, V.S. spoke out on social media about the racism he experienced at his high school.  In retaliation for V.S.'s exercise of his constitutionally protected rights, Defendants suspended him from February 8, 2017, through the end of this school year and for the entire 2017-2018 school year.

Immediate injunctive relief is necessary to put an end to the irreparable harm V.S. has suffered and continues to suffer from the District's draconian and unconstitutional suspension. Past, continuing, and imminent future harm includes: (1) loss of his First Amendment right to speak out on a matter of public concern without retaliation; (2) loss of over 50 (and counting) days of educational instruction; (3) loss of the opportunity to graduate from high school with his class; (4) loss of opportunity to graduate from college and the accompanying financial aid package; and (5) emotional harm resulting from the constitutional violation. Further, in the absence of injunctive relief, Defendants' actions will continue to injure the public interest in free speech because of the intimidating effect of V.S.'s suspension.

V.S. seeks an order pending a final decision on the merits that requires (1) his reinstatement to Vestal High School, (2) the provision of a tutor who can bring him up to date in his course work and prepare him for his Regents Exams, and (3) an alternative classroom setting to complete his math course.

## STATEMENT OF FACTS

Defendants suspended V.S., a senior at Vestal High School, following his social media posts of accusations that Defendants both perpetrated racist acts and did nothing to stop the racism V.S. and other students of color experienced from fellow students and from a teacher. At

the time of his suspension, he was four months from his June 2017 graduation and had been accepted to State University of New York Broome Community College. (Decl. of V.S. ("V.S. Decl.") ¶ 33 (May 3, 2017), attached to Decl. of Willa Payne ("Payne Decl") as Ex. A.)

### Racism at Vestal High School

Since V.S.'s enrollment in Vestal High School in 2012, other students have repeatedly called him the "N" word. (V.S. Decl. ¶ 4.)  On numerous occasions he felt that he was treated differently or singled out because he is not white like the vast majority of the students at the school. (*Id*.)

One incident of differential treatment aimed at V.S. occurred on October 13, 2015. (V.S. Decl. ¶ 5.)  On that date, a group of white male students falsely accused him of stealing money from another student's backpack in the locker room. (*Id*.)  V.S. told both the physical education teacher and Assistant Principal Deborah Caddick that those students had regularly called him the "N" word and also ridiculed another student of color for wearing a turban. (*Id.* ¶ 5.)  Defendants did not discipline these students for their use of a racial epithet or for ridiculing another student. (*Id.*)  However, V.S. was searched, and this incident was added to his disciplinary record even though no money was found on his person. (*Id.*¶ 5; V.S.'s Student Disciplinary Incident 27008 (10/13/2015), Payne Decl. Ex. B.)

During the fall 2016 semester, V.S. was enrolled in Katherine Dyer's math class. (V.S. Decl. ¶ 6.)  Early in the semester, Dyer placed a group of minority students in the back of the room, segregating them from the white students. V.S. complained to Dyer, saying "separate is not equal." (*Id*..) Multiple students present in the class support V.S.'s claim that students of color were all seated together by Dyer. (*See* Questions posed by Defendants and written answers given by students in Dyer's math class on 12/9/16 and 12/12/16, attached to Payne Decl. as Ex. C.)

2

("Q&A Forms") Dyer then moved a student of color to the front of the room but took no further action. (V.S. Decl.¶ 6.)  V.S. complained to Assistant Principal Kasson, the administrator charged with handling all complaints made under the New York Dignity for All Students Act. [N.Y. Education Law §10] Kasson failed to take any action. (*Id*. ¶ 7.)

Later in the semester, on November 22, 2016, Dyer removed an African-American student from her class because she believed he was "vaping".[1] (*Id*.¶ 8.) After directing this student to go to the office, Dyer turned to come back into the classroom and commented to herself "I am tired of dealing with you fucking niggers". (*Id*. ¶ 9.) V.S. overheard this statement and said to Dyer "What?" "You are fucking racist." (*Id*.)

### First Short Term Suspension

On December 2, 2016, Kasson pulled V.S from class and questioned him regarding the origins of his ancestors. (V.S. Decl. ¶11.) Kasson then brought V.S. to the assistant principals' office and told V.S. to sit down. (*Id*. ¶ 12.) Caddick, who was also present in the office, informed V.S. that he was suspended for "intimidating" Dyer. [2] (*Id*.) In a suspension letter dated the same day, Defendant Alfred Penna, then interim high school principal, charged that V.S. was playing a video loudly during group work on November 22, 2016, and that, when asked twice to put the phone away, V.S. began mocking the teacher and called her a "fucking racist." (Suspension letter from Penna dated 12/2/2016, attached to Payne Decl. Ex. D.) Penna also claimed that V.S. mentioned "Drexel" the street on which Dyer lives as well as the first and middle names of her husband and that someone said "4205", the teacher's house number. (*Id*.)

---

[1] "Vaping" is the act of inhaling and exhaling the water vapor produced by an electric device called a vaporizer and is commonly used in place of cigarettes.
[2] N.Y. Education Law § 3214 prohibits anyone but the principal from imposing a short term suspension.

3

When V.S. did not admit to Caddick's accusations she began screaming at him. (V.S. Decl. ¶ 13.) While in her office, V.S. called his mother to ask her to come to the school because he was being suspended. (*Id*. ¶ 14) His mother, who heard a female screaming at her son over the telephone told her son to go to the main office and wait because she was on her way. (Decl. of Debra Spero ¶ 9, annexed to Payne Decl. as Ex. E.) A meeting was then held between V.S., his parents, his sister, Penna, Kasson, and Caddick. (V.S. Decl ¶ 15.)  The Defendants allege that pursuant to district policy, V.S. was not to discuss his suspension or discipline and to "stay off his phone". (*See* Kasson hearing testimony dated 1/25/2017, pp. 61-62 annexed to Payne Decl as Ex F.) On December 5, 2016, while V.S. was serving his out-of-school suspension, the administration decided to also suspend him from senior activities. (Ltr. of Caddick (Dec. 5, 2016), attached to Payne Decl. as Ex. G.)  Defendants provided no home tutoring during this suspension. (V.S. Decl. ¶ 31.)

## V.S.'s Social Media Postings

While home on suspension, and in alleged violation of District policy to not discuss disciplinary matters, V.S. expressed his belief that he and other students had been subjected to racist actions by the District in a series of tweets from December 2nd to December 5th. (*Id.* ¶ 19.)[3]

Because of the public importance of the District's racist actions, V.S. directed two tweets to the local news media. (*Id.* ¶ 20.) The remaining tweets were not directed at any one individual or entity.  V.S. tweets follow:

- "I love being discriminated and prejudiced in the vestal high school system."
- "Crazy how racism will never fade away, we are stuck."
- "How can you allow racism to brew within your staff and discipline the one trying to shine attention to the racism that is going on #truthwillprevail."
- "@WBNG12NEWS suspended from school for calling my teacher a racist after being separated with 4 other students because of our color"

---

[3] A tweet is a statement of up to 140 characters that is available to followers of the person tweeting on that social media platform.

- "@WBNG12NEWS then she reported me after a day for feeling threatened by me after I attempted to report her, and I was told I wasn't going to be acknowledged because I have no say. Vestal High School is corrupt and unfair to its colored students. And we need help."
- "End racism within our schools, how are you supposed to teach the young minds while (yours) is stuck in such an evil way #vestalhighschool" (*Id.* ¶20)

Not all of V.S.'s tweets concerned the racism at Vestal High School. On December 2, 2016, V.S. also tweeted a video of a young man doing a magic card trick. (*Id.* ¶ 21.)

On December 7, 2016, two days after his last tweet about Vestal High School and on a day when V.S. did not post anything on Twitter, he posted on an entirely different social media platform, Snapchat. (*Id.* ¶ 22.) He posted a 10-second video of his sister, a licensed firearm owner, demonstrating how to unload a firearm and safely store it as well as a "snap" of him with his girlfriend in the hospital as she recovered from surgery. (*Id.*; the "snap" posted by V.S. annexed to Payne Decl. as Ex. H.) These images, like all images on Snapchat, disappeared after a short period of time and were only accessible to followers of the poster. Nothing on V.S.'s Snapchat account made any reference to the allegations of racism, V.S.'s suspension, the District, or any student, teacher or administrator in the District. V.S. posted the "snap" of his sister that day because he was excited and proud of her and he thought she was cool. (*Id.*)

**School Investigation and Manufactured Disruption**

On December 8, 2016, a friend told V.S. that two girls were going to try to get out of school early by reporting his social media postings. (V.S. Decl. ¶ 23.) V.S.'s father alerted the school of the students' activities. (Caddick's notes from call between Penna and Mr. Spero and V.S.'s sister (Dec. 8, 2016), annexed to Payne Decl. as Exhibit I.) ("Caddick Phone Notes").) Defendants were already aware of the postings because at 11:11 a.m. on December 8, 2016, two female students who had preserved the video and tweets on a cell phone, brought them to School Resource Officer ("SRO") Conor Talbut. (Incident Report of SRO Talbut (Dec. 8, 2016)

5

attached to Payne Decl. as Ex. J.) ("Incident Report") SRO Talbut provided them to all of the

Defendants at 12:21 p.m. (Email from SRO Talbut (12/8/2016) and attached to Payne Decl. as

Exhibit K.)  By 12:45 on the 8th when Penna spoke to V.S.'s father, Defendants had already

made the determination to suspend V.S. (*See* Caddick Phone Notes.)

   Instead of addressing Mr. Spero's concerns that students were spreading rumors about

V.S., Penna notified V.S.'s father that he would suspend V.S. for an additional five days because

(1) the posting of the firearm snap showed that V.S. was violent; (2) V.S. had violated Penna's

directive not to speak about his suspension and violated FERPA [The Family Educational Rights

and Privacy Act, 20 U.S.C. § 1232(g); 34 C.F.R. Part 99], by discussing his suspension and (3)

V.S. was accusing the school of racism on social media. (Caddick Phone Notes.)

   Despite already having been informed by both Mr. Spero and V.S.'s sister that (1) the

gun was in their home under lock and key; (2) the female in the video was V.S.'s sister; (3) the

gun belonged to V.S.'s sister who had a concealed carry permit; and (4) the reference was to

V.S.'s adult sister and not a reference to the school, SRO Talbut told Mr. Spero that he wanted to

speak to V.S. in person. (Caddick Phone Notes.) Before hanging up with Mr. Spero, Penna

directed Mr. Spero to "Get the cell phone away from [VS]". (*Id*.)  SRO Talbut went to the Spero

home to inquire about the tweets and video. (Incident Report.) The Speros fully cooperated. (*See*

1/25/17 Hearing Trscpt p. 53 annexed to Payne Decl as Ex. L.) SRO Talbut confirmed that

V.S.'s sister had a valid permit and that the firearm was securely locked in a finger print case.

(*See* Incident Report) According to him, there was nothing criminal about the video or V.S.'s

sister's possession of her legally acquired licensed firearm, and no charges were pressed against

either V.S. or his sister. (*See* p. 54 of 1/25/17 hearing transcript annexed to Payne Dec. as Ex. M)

SRO Talbut then returned to the school and reported his findings to the administration. (*See* id.)

Very shortly after they had viewed the postings on December 8, 2016, the Defendants and their counsel held a meeting. During this meeting, Caddick took notes. She noted that the video and tweets were "No threats really?"; there was a "lot of complaining" and that V.S. "does have some First Amendment rights." (12/8/17 notes from conversation between Defendants annexed to Payne Decl. as Ex. N.) ("Mtng Notes") She noted that their attorney needed to do some "thought and research". (*Id*.)

After being told he was going to be suspended for another five days, V.S. tweeted:

- "Me trying to spread awareness to the racism I had to face is nothing wrong. I would never hurt a soul, I just wanted to help. I love everyone."
- "We are all equal, because of the pigmentation of my skin means I'm a danger to the school? You are racist, face it you are a horrible being"
- "[Defamation] of character is a crime, because of my skin color you are gonna say I'm going to kill people that's outrageous, you are a racist.

(V.S. Decl. ¶ 26.)

### Suspension For Social Media Posts and V.S.'s Comment That His Suspension Was "Unfair"

In a letter to V.S.'s parents dated December 9, 2016, Penna began by stating he was *considering* suspending V.S. but ended by stating, "due to the violent nature of V.S.'s behavior, an immediate suspension is implemented, effective December 9, 2016." (Penna letter dated. 12/9/16, annexed to Payne Decl. as Ex. O.) Penna alleged that V.S. substantially disrupted the school day at Vestal High School on December 8, 2016, by multiple posts made on social media "over the past few days." (*Id*.)

Based on their anger over the social media postings Defendants decided on December 8 --- shortly after they saw the postings --- that they wanted to suspend V.S. further, which would require a Superintendent's hearing. (*See* Mtng Notes) Penna had already outlined his case against V.S. on December 8th and 9th, 2017. (Penna notes dated 12/9/16 annexed to Payne Decl. as Ex. P.) However, Penna waited until December 12, 2016, to notify the Spero family by telephone

7

that the District would hold a Superintendent's hearing to determine what further discipline was

warranted, "for V.S.'s "acts on December 8th; postings on social media". (Penna notes dated

12/12/16 annexed to Payne Decl. as Exhibit Q.)

On December 14, 2016, V.S. was served with the Notice of Superintendent's Hearing.

The notice, based upon his social media postings (for which he had already been disciplined

twice), charged V.S. with being "insubordinate or disorderly or engaged in conduct which

endangered the safety, morals, health or welfare of others or some or all of the above."

Specifically, Respondent's notice alleged that V.S. engaged in the following conduct:

> a.      "On December 2, 2016, you were involved in an incident in Math class. At
> the time, you were instructed not to discuss the incident. Several students came to
> speak with administrators regarding the incident because you shared with those
> students that you were being suspended for 'no reason' and 'it was unfair.'"
> b.      "On December 8, 2016, you posted a number of posts on social media which
> were retaliatory in nature against the teacher and the administration."

(December 14, 2016 notice of Superintendent's Hrng' annexed to Payne Decl. as Ex. R)

The December 14, 2016, notice further alleged that:

> (1) the New York State Police contacted the District with concerns about student safety, (2)
> the SRO and school administration received concerns from parents and students about
> student safety, and (3) as a result of V.S.'s social media activity a lockdown drill had to be
> cancelled on December 9, 2016.  (*Id.*)

### Superintendent's Hearing

A Superintendent's Hearing was scheduled and was held over the course of five days

between December 20, 2016, to January 31, 2017. During the hearing process, both sides agreed

that V.S. would return to school on January 13, 2017 after the holiday break. V.S. attended

school pursuant to a contract of conduct. (Contract annexed to Payne Decl as Ex. S.)

In a recommendation dated February 3, 2017, the hearing officer found V.S. guilty as

charged, specifying that (1) V.S.'s postings on Twitter complaining about racism in the District

and the Snapchat video of his sister were disruptive and caused the cancellation of an

unannounced lock-down drill; (2) V.S. failed to comply with the directives of a school official when he said his punishment was "unfair"; and (3) V.S. had engaged in conduct that was violent, defamatory, harassing, intimidating and disruptive to the school community. The recommended punishment was suspension for the remainder of the 2016-2017 school year and the entire 2017-2018 school year. (Hearing Officer Recommendations annexed to Payne Decl. as Ex. T.)

## Superintendent's Decision and Subsequent Appeals

On February 4, 2017, Defendant Superintendent Ahearn issued a Notice of Decision affirming the hearing officer's findings and full suspension recommendation. (Supt's Dec. dtd. 2/4/17, annexed to Payne Decl. as Exhibit U.)  Represented by Legal Services of Central New York, plaintiffs appealed V.S.'s suspension to the District's Board on February 23, 2017.  On March 18, 2017, the Board upheld the suspension. (Ltr. dtd 3/14/17 annexed to Payne Decl. as Exhibit V.) Plaintiffs appealed to the Commissioner of Education. The Commissioner denied V.S.'s request for a stay by letter dated April 21, 2017. (Comm. Ltr. dtd 4/21/17 annexed to Payne Decl. as Exhibit W.)  It is likely that the appeal will not be decided until after V.S. has served the entirety of his disproportionately long suspension, and has regressed significantly in his education, rendering the administrative appeal process futile.

## <u>ARGUMENT</u>

### V.S. IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION REQUIRING THE DEFENDANTS TO REINSTATE HIM TO VESTAL HIGH SCHOOL

V.S. seeks a preliminary injunction requiring the Defendants to (1) reinstate him to Vestal High School; (2) provide him with a tutor for any and all additional instruction that will be necessary to bring him up to date in his course work; and (3) provide him with either an alternative classroom setting or alternative math class to complete his math requirement.

"A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, plus a balance of hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *N.Y. ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted).

Likelihood of success requires a demonstration of a greater than 50% probability of success; however, "considerable room for doubt" may remain. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n.2 (1987).

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.,* 339 F.3d 101, 113 (2d Cir. 2003).  To establish irreparable harm, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotes omitted).[4]

## 1.  Plaintiff Will Suffer Irreparable Harm in the Absence of Preliminary Injunctive Relief

 "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  V.S. exercised his First Amendment rights by posting a series of tweets that encouraged public

---

[4] The temporary restraining order standard is the same as the standard for a preliminary injunction. See, e.g., Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, 965 F.2d 1224, 1228 (2d Cir.1992)

discourse on racism in the District.  By harshly disciplining V.S. for his constitutionally

protected posts, the District shut down V.S.'s speech and violated his first amendment rights.

This punishment for exercising his First Amendment rights is an irreparable injury. *See Bery v.*

*City of New York*, 97 F.3d 689, 693 (2d Cir. 1996) (holding that because plaintiffs alleged a

deprivation of their First Amendment Rights irreparable harm is presumed.)

In addition, V.S.'s loss of any form of education instruction for eighteen months is

undoubtedly an irreparable harm. *See V.W. v. Conway*, 2017 U.S. Dist. LEXIS 24395, at * 63

(N.D.N.Y.2017) (finding a showing of irreparable harm where defendants, inter alia, deprived

juveniles of educational instruction); *N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y.

2011) ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education

but also in other social and psychological developmental processes that take place during the

child's school, raises a strong possibility of irreparable injury.").

V.S. more than satisfies the test for irreparable harm set out in *V.W.* and, *N.J.*. He will not

only be deprived of *any* educational instruction needed to receive a high school diploma for

approximately 540 days, but he will also lose his ability to timely graduate from college and

receive financial aid because he will not have earned a high school diploma. He will regress

academically during this period of time. (V.S. Decl. ¶ ¶ 31, 33, 34, 35.) The bleakness of his

future without an education has caused V.S. to become hopeless. (*Id*. ¶ 38) He has had thoughts

about ending his life related to this incident. (*Id*.¶ 38.) The harms that V.S. continues to suffer are

irreparable because they are not speculative and they cannot be remedied by monetary damages.

*See Freedom Holdings*, 408 F.3d at 114.  There is no monetary amount that Defendants could

offer that would buy V.S. a Regents Diploma, restore his ability to graduate from college, or

compensate for the loss of his First Amendment rights.

**2. Plaintiff Is Likely to Succeed On the Merits of their Claims**

      **a. First Amendment Claim**

The Defendants' harsh disciplinary action violated the First Amendment because: (1) V.S.'s off campus speech concerned a matter of public importance, racism and (2) the speech had no inherent tendency to disrupt the operation of the high school.

      **(i)    General Principles Governing Free Speech Place Special Emphasis on Speech Concerning Public Issues**

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. Cvil Liberties Union*, 535 U.S. 564, 573 (2002).  Only narrow categories of speech and expression --- "includ[ing] the lewd and obscene, the profane, the libelous, and . . . insulting or 'fighting words'…which by their very utterance inflict injury or tend to incite an immediate breach of the peace" --- lack protection under the First Amendment. *Chaplinsky v. N.H.*, 315 U.S. 568, 572 (1942). "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 641-43 (1994)).

Not only may government not discriminate based on viewpoint, but it must also grant heightened protection to speech on matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("Speech on public issues occupies the highest rung of the hierarchy of First Amendment value, and is entitled to special protection) (internal quotes omitted); *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002) ("[F]ew values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by government.").  Speech is a matter of public concern when it can "be fairly considered as relating to any matter of political, social or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value

and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal citations omitted).

      **(ii)**     **The First Amendment Protects School Children from Discipline for Off-Campus Speech that Administrators Do Not Like but that Does Not Seriously and Foreseeably Threaten Classroom Order or Discipline.**

     School children do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 506 (1969). However, the free speech of the students is balanced against "the comprehensive authority of …school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507. Importantly, "where there is no . . . showing that engaging in the [speech or conduct] would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition [against expressive speech or conduct] cannot be sustained." *Id.* at 509. We have discovered no Supreme Court case addressing whether the *Tinker* test is appropriate when a student speaks off-campus.

     However, the Second Circuit has applied a modified version of *Tinker* to off-campus speech. School authorities may discipline a student for out-of-school speech or other expressive conduct if the conduct "'would foreseeably create a risk of substantial disruption within the school environment' at least when it was similarly foreseeable that the off-campus expression might also reach campus," *Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir 2008) (quoting *Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 40 (2d Cir. 2007)). "Speech that is neither vulgar, lewd, indecent or plainly offensive under Fraser, nor school-sponsored under Hazelwood . . . may not be regulated . . . unless it would materially and substantially disrupt classwork and discipline in the school." *R.O. v. Ithaca City Sch Dist.*, 645 F.3d 533, 541 (2d Cir. 2011).

"The test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Cuff v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 113 (2d Cir. 2012) (internal citations omitted). Although an actual disruption is not required, school officials must have more than an "undifferentiated fear or apprehension of disturbance" to overcome students' First Amendment freedom of expression. *Tinker*, 393 U.S. at 508; see also *Doninger* 527 F.3d at 51 ("The question is not whether there has been actual disruption, but whether school officials 'might reasonably portend disruption' from the student expression at issue."). School officials must show that the regulation or prohibition of student speech was caused by something more than a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Further, whenever school officials make a content-based prohibition of speech they must have "evidence that it is necessary to avoid material and substantial interference with schoolwork and discipline. *Id*. at 511.

    (iii)    **Where Speech Is on An Important Public Issue, That Should Weigh Heavily in Assessing Whether a District may Penalize a Student for that Speech.**

The Second Circuit test for off-campus speech was articulated in cases where the expression not only did not concern major public issues such as racism, sexism, or corruption but also was patently offensive. *See Doninger* 527 F.3d at 45 (student posted a false message on her publicly accessible blog that a scheduled activity had been canceled "due to douchebags in central office"); *Wisniewski,* 494 F.3d at 36 (student sent IM to his "buddy" group that showed "a small drawing of a pistol firing a bullet at a person's head . . . with the message "Kill Mr. VandeMolen," the student's English teacher). Because the Second Circuit has not decided whether discipline based on off-campus speech of public concern should require a heightened showing, this court must decide the question in the first instance. It should hold that speech on a

14

matter of public interest, such as racism, merits a heightened protection under the First

Amendment *See Connick*, 461 U.S. at 145; *Pappas,* 290 F.3d at 146.  As the concurrence in *J.S.*

*v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 939 (3d Cir. 2011) (en banc) (concurring opinion of Smith

*J*.) reasoned:

> Suppose a high school student, while at home after school hours, were to write a blog
> entry defending gay marriage.  Suppose further that several of the student's classmates
> got wind of the entry, took issue with it, and caused a significant disturbance at school.
> While the school could clearly punish the students who acted disruptively, if *Tinker* were
> held to apply to off-campus speech, the school could also punish the student whose blog
> entry brought about the disruption. That cannot be, nor is it, the law.

Quite simply, speech raising the concern of racism in a public forum must enjoy greater

protection than speech calling administrators "douchebags" or suggesting that a teacher be killed.

### (iv) Assessment of *Doninger* Factors and Public Interest as they Affect V.S.'s Three Different Forms of Speech

The District premised its punishment of VS on three different forms of speech: (1) a

private, off-campus conversation with a friend in which V.S. allegedly said his suspension was

unfair and for no reason; (2) a Snapchat video of his sister demonstrating how to unload and

safely store a firearm; and (3) numerous tweets accusing the District of racism.

### *The Private Conversation*

Defendants violated the First Amendment by disciplining V.S. for his conversation with

one friend off-campus. Had administrators not interrogated students following V.S. claims of

racism, there is almost no likelihood that the conversation would have reached campus.

Therefore, the first prong of the *Donniger/Wisniewski* analysis is not satisfied.

But even if it were possible to find that the conversation was reasonably likely to reach

campus, it is hard to imagine more innocuous speech than a claim that a suspension was unfair or

unreasonable.  Breathes there a student with soul so dead that he has not complained to his

buddies that disciplinary action taken by his parent or teacher or coach or school administrator was unfair?  In fact, if such speech were likely to lead to a substantial disruption of school activities or discipline, schools would be in a state of constant riot. Thus, the discipline imposed by the District for an innocuous comment during a private conversation was in clear violation of V.S.'s First Amendment rights.

As it would be impossible to now determine what portion of his suspension was for this speech and what was attributed to the other instances of speech, the entire suspension must be invalidated as constitutionally impermissible. *See Karp v Becken*, 477 F2d 171, 176 (9th Cir 1973).

### *The Snapchat Video*

V.S. was also punished for a video of his sister demonstrating how to unload and safely store in her fingerprint safe a legally licensed firearm that he posted on Snapchat ("snap"), an evanescent forum on which images are accessible only to followers and disappear quickly.  His sister had just received the firearm that day. The only other "snap" posted close in time to the video was a "snap" of V.S. with his girlfriend who was recovering from surgery in the hospital. Neither of these "snaps" related to the school or referenced the school. (V.S. Decl. ¶ 22.) The "snap" was posted for the sole reason that V.S. was proud of his older sister and thought it was cool. (*Id.* ¶22; the "snap" posted by V.S. annexed to Payne Decl. as Ex. H.)

Given the evanescent nature of the forum and the lack of any nexus to the District or its actions, it was not reasonably foreseeable to V.S. that the "snap" would be shared on campus. There is absolutely no indication that V.S. had the District's actions on his mind when he posted this video immediately prior to posting a video of his girlfriend recovering from surgery.  The gun unloading and storage video did not refer to the school, racism or V.S.'s discipline and it

16

was on an entirely different day on a different social media platform from the tweets he made regarding racism. It therefore stands in stark contrast to forms of communication that the Second Circuit has held suggested reasonable foreseeability that a communication would reach campus. *Cf. Doninger*, 527 F.3d at 45 (discussing a blog post whose very content suggested that the plaintiff's purpose was "to encourage her fellow students to read and respond to the blog"); *Wisniewski*, 494 F.3d at 39-40 ("The potentially threatening content of the icon and the extensive distribution of it, which encompassed 15 recipients, including some of [the infant plaintiff's] classmates, during a three-week circulation period, made this risk at least foreseeable to a reasonable person.")

Nor is there anything connected with the "snap" that would lead a reasonable person to conclude that it would lead to substantial disruption at the school.   Unlike the explicit threats of violence found to justify discipline in *Wisniewski* and *Cuff*, the video in this case did not urge, favor or threaten violent conduct. *See Cuff*, 677 F.3d at 111 (addressing a crayon drawing accompanied by an expressed "desire to blow up the school with the teachers in it"); *Wisniewski,* 494 F.3d at 36 (discipline premised on sending an instant message to fellow students with a message saying "Kill Mr. VanderMolen," the student's English teacher).   Rather the "snap" depicted a firearm being unloaded and stored by a licensed gun owner.  The "snap" contains no written, verbal or symbolic connection to the District.  It does not depict V.S. holding a firearm; there is no mention of the District or District personnel; the firearm is not pointing at the camera; and the adult female handling the firearm is handling it in a proper and safe manner, in effect depicting the proper way to store a firearm. Because the "snap" did not even indirectly suggest violence against the District or any of its personnel, V.S. had no reason to believe it would disrupt anything in the District.   No reasonable viewing of V.S.'s "snap" would produce the

impression that it urged or favored violent conduct.

In fact, Instagram posts by Vestal students with much more violent content went undisciplined by the District.  Instagram posts of Vestal students with firearms, including assault weapons were commonplace. One such post included students with firearms with their faces partially obscured by masks and bandanas. The difference between those posts and V.S.'s posts --- in addition to the more violent content of the Caucasian students' Instagram posts and the longer lifespan of an Instagram post --- is that those students are Caucasian. If anything, the over-reaction of the two students who saw the video and preserved it and of the administration to V.S.'s "snap" lends credence to his allegations of racism and bias, whether conscious or unconscious, within the District. (*See* photos admitted into evidence at V.S.'s Suspension hearing annexed to Payne Declaration as Exhibit X.) Thus, it is not credibly argued that it was reasonably foreseeable that the "snap" would come to the school officials' attention or that the officials had any rational basis to believe any harm was going to come to anyone based upon its content.

### The Tweets

All of V.S.'s tweets addressed the problem of racism in the District.  Most addressed systemic racism (e.g., "How can you allow racism to brew within your staff and discipline the one trying to shine attention to the racism that is going on"; "End racism within our schools, how are you supposed to teach the young minds while (yours) is stuck in such an evil way," (V.S. Decl. ¶20.)   Racism --- especially where children are educated --- is clearly a matter of public concern.   *See Snyder,* 562 U.S. at 453 (defining speech of public concern as speech on "a subject of general interest and of value and concern to the public"). Thus, under the First Amendment, the tweets are entitled to the highest degree of protection.   *See Connick*, 461 U.S. at 145; *Pappas*, 290 F.3d at 146.

Because some of V.S.'s tweets were directed to the media, it is at least arguable that it

18

was foreseeable that they would reach the school.  However, it is also important to note that V.S.'s tweets were directed toward the school solely because the school had failed for at least two years, to address his concerns of racism.  Moreover, very little importance attaches to the likelihood that V.S.'s speech would reach the school, because V.S.'s First Amendment protected goal was to change the racist treatment of students of color at the high school and to engage the public in debate (not disruptive conduct) on the issue of racism in the District.

It was not reasonably foreseeable, however, that the tweets would lead to disruption at the school.  V.S. did not urge people who received the tweets to engage in disruptive or violent conduct, *compare Cuff*, 677 F.3d at 111 (discussing in-class drawing of astronaut with text expressing a desire "to blow up the school with the teachers in it" that other students and teacher saw); *Doninger*, 527 F.3d at 50-51 (holding that record supported reasonable foreseeability of substantial disruption where student suggested "others should call the 'douchebags' in the central office to 'piss them off more'" and her communication contained misleading --- and perhaps outright false information); *Wisniewski*, 494 F.3d at 39-40 (holding that depiction of a gun firing accompanied by words, "Kill Mr. VanderMolen" made it reasonably foreseeable that once the teacher and administration learned of the picture and words, substantial disruption would result).  The only thing reasonably foreseeable from V.S.'s tweets was a discussion of whether decisions at the high school were infected with racism, and an investigation of V.S.'s allegations.  Instead the District chose to go into a defensive crouch and try to "light the fire" under V.S. (*See* Caddick Notes from 12/12/16 discussing purpose of the 10 days V.S. had already been out of school annexed to Payne Decl. as Ex. Y.) That action would not have been taken by a reasonable school district and therefore was not reasonably foreseeable to a student in V.S.'s position.

     (v)     **The Illusory Disruption Defendants Manufactured Does Not Excuse Their Violation of the First Amendment.**

We have demonstrated that there was no reasonably foreseeable disruption flowing from V.S.'s speech.  The District relies on a "crisis" it manufactured to argue to the contrary.  From the suspension notice, it appears that Defendants claim three forms of disruption: (1) school officials were contacted by the New York State Police; (2) "concerned parents and students" contacted the school; and (3) a state mandated emergency lockdown drill was canceled as a result of V.S.'s social media activity. [5] (Payne Decl. Ex. O, P and R)

In fact, only two students brought V.S.'s tweets and "snap" posting to the attention of school officials. And, Caddick testified at the hearing that the state police officer who called the District was the father of one of the girls who made the initial complaint. (See Hrn'g Tscrpt. date 1/25/17, p. 24 annexed to Payne Decl. as Ex. Z.) Unlike the situation in *Doninger*, when the decision to suspend was made, there had been no mass influx of emails or calls.  More important, even if there had been mass concern, V.S.'s activities could not reasonably have triggered it. Tweets about racism and an unconnected video of a young woman unloading and safely storing her gun --- especially in light of the instances of pictures of Caucasian students holding weapons posted on Instagram --- did not justify a reasonable concern that there would be violence or disruption at the school.  Only by viewing these statements of opinion on a matter of public concern, the private conversations, and the innocuous snap video through a lens that assumes students of color are inherently dangerous could one reach the conclusion that disruption was to be feared.

The sequence of events in defendants' "investigation" also shows that they had no

---

[5] There is a notation by Defendant Caddick that there was discussion of V.S.'s social media activity in the Commons but no classes or regularly scheduled activities were disturbed in any way.  General discussion of a student's speech within the student body is not enough to establish a legally significant disruption.  *See J.S..,*650 F.3d at 929.

reasonable basis for anticipating trouble.  The SRO received the video and tweets from the two female students at 11:11 a.m.  He provided these materials to defendants at 12:21 p.m.  At 12:45 p.m, Defendant Penna spoke with V.S.'s father and told them there would be a further suspension because the "snap" showed that V.S. was violent.  (*See* Caddick Phone Notes) By this time, school personnel had already spoken with V.S's sister and knew that the gun was hers and had no connection with the school. (*Id.*) The video and tweets, as outlined above, gave Penna no reasonable basis to anticipate any disruption of school activities.

The same day the video and tweets were brought to the administration's attention, the SRO visited V.S.'s home and determined there was no threat posed. (*See* Incident Report) The SRO's sole purpose of being at the school is to deal with student discipline issues so the time he spent investigating V.S.'s postings did not take away from or substantially disrupt his workday or job responsibilities.  Again though, the more important fact is that the innocuous video and the tweets did not provide Defendants with a reasonable basis to fear a significant disruption**.**

Once the SRO had completed his investigation on December 8th, the school officials knew that V.S. posed no threat to the school community.  Yet, they proceeded with V.S.'s suspension and the cancellation of an unannounced school lock-down drill. (*See* Caddick Notes.) The lack of any objective threat, *see* Cuff, 677 F.3d at 113 (holding that test of foreseeability of disruption is reasonability of administrator's response, not the student's intent), means that canceling the lockdown drill was unreasonable, and any disruption that occurred was a manufactured one.  Even had there been no S.R.O. report, the tweets and innocuous video were completely insufficient to form a reasonable basis for cancelling the drill.  It is apparent that Defendants' decision to cancel the drill stemmed from the anger and emotion that V.S.'s speech raised and was not a reasonable response to any alleged safety concern.

Moreover, even if the cancellation of the drill had been reasonably premised on V.S.'s speech, which it was not, cancelation of the drill did not constitute a substantial disruption. A lockdown drill is an unannounced drill that no one knows about in advance. The only persons who would have known about it were a few of the school administrators and possibly outside law enforcement. Thus, the cancelling of an event that no one in the school district---including teachers and staff---was aware was going to happen did nothing to disrupt the school day, classes or activities. In fact, as far as all the students and staff were concerned the school day went on unimpeded because they never knew the drill was scheduled in the first place.

Here, there was no reason for the school to believe that anyone's safety was in jeopardy or that V.S. was planning to harm any student, teacher or administrator. The overblown and harsh response by the District may be explained by the District's being angry and uncomfortable with V.S.' allegations of racism. However angry or uncomfortable the District was with V.S.'s speech, they had no basis to suspend him from school.

Because V.S. was suspended solely for speech, most of it on a matter of public concern, without a reasonable basis for believing that speech would cause a significant disruption in the school, Defendants violated the First Amendment and Plaintiff has demonstrated a reasonable likelihood of success on this claim.

### B. Reasonable Likelihood of Success on Substantive Due Process Claim

"Generally, to establish a substantive due process violation, a plaintiff must (1) identify the constitutional right at stake and (2) demonstrate that the government's action was conscience-shocking or arbitrary in the constitutional sense." *Horton v. Bd. of Educ*., 2017 U.S. Dist. LEXIS 60719 * 13 (N.D.N.Y. Apr 21, 2017) A school administrator's suspension of a student violates substantive due process where there is "no rational relationship between the punishment and the

offense." *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 486 (E.D.N.Y. 2009).

Viewing the punishment imposed on V.S. as a whole it is clear that there is no rational relationship between his speech and the punishment imposed by the District. V.S. was suspended for 18 months, in effect, a permanent suspension or expulsion, *see* 2008 Op Comm Ed. No 15,849, for accusing the district of being unfair and racist to him and other students of color. Expulsion for tweeting his disagreements is not a rational response to V.S.'s speech and is grossly disproportionate when compared to discipline imposed on students for far more serious offenses. *see Cuff*, 677 F.3d at 111-12 (five-day out-of-school and one-day in-school suspension for expressing a desire to bomb his school with all the teachers in it); *Wisniewski,* 494 F.3d at 37 (one semester suspension for sending a threatening message suggesting that a teacher be killed).[6]

Finally, the District itself apparently considered the conduct of a student who participated in a "Kick-a-Jew" day on which students kicked Jewish students less grave than V.S.'s claims of racism and SnapChat video because it imposed a suspension of only three days for the former conduct.  *See Appeal of C.M, ex rel T.M., from the Acton of the Board of Education of the Vestal Central School District,*  http://www.counsel.nysed.gov/Decisions/volume52/d16439. (expungement of suspension subsequently overturned on other grounds but no change made to the length of the suspension)

The District's actions against V.S. are precisely the type of egregious overreach the Second Circuit likely had in mind when it left open the issue of whether an extremely harsh

---

[6] The New York State Commissioner of Education has disapproved suspensions of the same or lesser length for far more grave conduct.  See 2008 Op Comm Ed. No. 14681 (finding 307-day suspension of Seventh Grader too long where student admitted to making bomb threat given procedural shortcomings of districts procedure (http://www.counsel nysed.gov/Decisions/volume41/d14681); 2008 Op Comm Ed No. 15,849 (finding excessive suspension of student for remainder of his junior year and all of senior year for having oral sex with another student on the school grounds and student had only minor disciplinary offenses previously (http://www.counsel nysed.gov/Decisions/volume48/d15849).

suspension for speech made outside of school could violate the constitution. *See Doninger*, 527 F.3d at 53 ("[W]e have no occasion to consider whether a different, more serious consequence than disqualification from student office would raise constitutional concerns."); *Wisniewski*, 494 F.3d at 40 (declining to decide whether a challenge to the length of a six-month suspension would offend either the First Amendment or substantive due process because plaintiff made no such challenge and did not challenge the length of the suspension.)

Because the Second Circuit has not yet decided whether disproportionately harsh punishment for speech may offend either the First Amendment or the substantive component of the Due Process clause, we note that our analysis under Substantive Due Process is equally applicable to a First Amendment challenge due to the chilling effect of such a harsh punishment. Therefore, the eighteen-month punishment imposed by the District violates Substantive Due Process and the First Amendment as well.

**3.     The Balance of Hardships Tips in the Plaintiff's Favor and the Issuance of an Injunction is in the Public Interest.**

As outlined above, the harm suffered by Plaintiff here is incalculable and as such the hardships tip in the Plaintiff's favor.  The harm to V.S., losing over 50 days of education and counting, being out of touch with his peers and classes, significant educational regress, isolation and being punished for speaking out on issues of race and racism are causing significant trauma. His educational regress will be significant if he is not re-instated to school immediately.

On the other hand, the District faces no hardship if an injunction is issued and V.S. is allowed to return to school.  In fact, during the pendency of his Superintendent's hearing V.S. attended classes at the high school without incident. The District's sole purpose is to educate students. Educating V.S. for the remainder of the school year and through summer school so he can graduate does not compel the District to do anything other than exactly what it was created

to do.  Finally, it is clearly the public interest to allow V.S. to return to school. The public undoubtedly has an interest in ensuring young people receive an education and are not punished for speaking out for their beliefs. To allow the District to expel V.S. for expressing his valid concerns about racism in a non-threatening and non-vulgar way would signal that students do, in fact, shed their First Amendment rights at the schoolhouse door. That result is untenable and should not be upheld by this Court.

## **CONCLUSION**

Plaintiff having demonstrated both irreparable harm and the likelihood of success, this Court should enter an injunction (1) reinstating V.S. to Vestal High School, (2) providing him with a tutor who can bring him up to date in his course work and prepare him for the Regents Exams, and (3) providing him with an alternative classroom setting to complete his math course if necessary for his Regents Diploma.

Dated: May 8, 2017                    Respectfully submitted,
Oneonta, New York

                                      S/Willa S. Payne
                                      Willa S. Payne, Esq. (Bar No: 517751)
                                      Susan M. Young, Esq. (Bar No: 102862)
                                      Joshua Cotter, Esq.  (Bar No:518217)
                                      LEGAL SERVICES OF CENTRAL NEW YORK
                                      189 Main Street, Suite 301
                                      Oneonta, NY 13820
                                      wpayne@lscny.org