UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**DEBRA SPERO, as Natural Mother of V.S., an infant,**

                 Plaintiffs,

v.

**VESTAL CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION, VESTAL CENTRAL SCHOOL DISTRICT, JEFFREY AHEARN, Superintendent of Schools, ALBERT A. PENNA, Interim Principal of Vestal High School, DEBORAH CADDICK and CLIFFORD KASSON, in their Individual and Official Capacities,**

                 Defendants,

**AFFIDAVIT OF JEFFERY AHEARN**
Civil Action No.: 3:17-cv-00007

---

STATE OF NEW YORK  )
COUNTY OF BROOME   ) ss.:

I, **JEFFREY AHEARN**, being duly sworn, depose and say:

1. I am the Superintendent of Schools for the Vestal Central School District. I submit this affidavit in opposition to the motion of Plaintiffs Deborah Spero and her son, V.S., for a preliminary injunction in this matter.

2. I am a career educator. I hold certifications as a School District Administrator and School Business Administrator. I served 13 years at Alfred State College as a Director of Student Accounts. I served 3 years as School Business Administrator at Addison Central School District, and 5 years as the School Business Administrator for the Hornell City School District through Greater Southern Tier BOCES. I then served 3 years as School Business Administrator and one year as Assistant Superintendent for Finance and Interim Superintendent of Schools at Vestal Central School District before receiving a permanent appointment as Superintendent of Schools effective May 31, 2016.

3. I am a defendant in the within action. I make this affidavit based upon my own personal knowledge and/or knowledge supplied to me in my capacity as Superintendent of Schools of the Vestal Central School District.

4. The Vestal Central School District has 3,300 students grades K – 12 in attendance. It has a reputation for academic excellence, and has been the recipient of numerous awards for its academic and athletic achievements of it students.

5. Prior to the episodes involved in this case, the Vestal Central School District enjoyed a reputation for diversity and inclusion, as well as outstanding academic and athletic programs.

### THE CIRCUMSTANCES LEADING TO THE SUSPENSION OF V.S.

6. The current litigation arises from events that occurred between September and December of 2016, during Plaintiff V.S.'s senior year as a Vestal student. V.S. is a student in a mathematics class taught by Mrs. Katharine Dyer and in November of 2016, he accused Mrs. Dyer of allegedly creating classroom seating assignments that segregated students of color.

7. V.S. reported his claim that Mrs. Dyer's seating arrangement discriminated against students of color to Assistant Principal Deborah Caddick, who prepared a report of possible discrimination for investigation. I am reliably informed that Assistant Principal Cliff Kasson's investigation included a review of Mrs. Dyer's seating charts for V.S.'s class, as well as interviews with other students in the class.

8. During this episode, V.S. engaged in a variety of insubordinate and extremely disruptive actions. Aside from making unsubstantiated allegations via Facebook and Twitter against a well-qualified math teacher, he posted a short video depicting a person unloading a handgun on his Snapchat account on or about December 7, 2016. V.S.'s various social media activities were viewed by many Vestal students and parents, who upon information and belief, reasonably perceived V.S.'s actions as threatening.

9. My belief stems, in part, from numerous telephone calls the District received from parents in the 24 hours following V.S.'s snapchat post expressing concern for the safety of the school. It certainly appeared from the video that V.S. either had access to firearms, or at least wished to create the impression that he had access to a handgun.

10. One such call was received on December 8, 2016, from State Police Captain Erik Dauber, who resides in our district and whose daughter attends our high school. Captain Dauber had been advised of V.S.'s post by his daughter, and called to express his concern and requested an immediate inquiry into the matter.

11. Upon information and belief, our school resource officer, Conor Talbut, who is a member of the Vestal Police Department, was immediately dispatched to investigate Captain Dauber's report. While Officer Talbut was investigating the matter, the atmosphere in the high school was very tense, as students appeared uncertain as to V.S.'s intentions. School operations were significantly disrupted, as students and parents continued to report concerns about possible violence due to V.S.'s social media posts.

12. The atmosphere of uncertainty and fear that we perceived to exist amongst the high school community on the afternoon of December 8, 2016, led to the decision to cancel the unannounced lockdown drill that was scheduled to occur the next day, December 9, 2016. I and my administrative team believed that the climate of fear created by V.S.'s activities, as manifested in the reports of parents and students of such concerns, presented a substantial risk that an unannounced lockdown "drill" could prompt panic and confusion amongst the student body. In order to ensure the safety of the students and avoid worsening the disruption of the educational environment in the high school, the lockdown drill was cancelled to be rescheduled. These actions had a very serious and direct impact upon District operations, as the drill was required to be conducted pursuant to direction from the State Education Department.

13. V.S.'s actions further required the District to consider disciplinary action to address the disruption that his social media activities had created. Accordingly, a notice was sent to Plaintiffs on December 14, 2016, that a long-term suspension hearing regarding those activities was to commence on December 20, 2016.

14. In the period of time between issuance of the hearing notice and the commencement of V.S.'s hearing, Plaintiffs made public allegations of racial discrimination against the District through social media and press conferences where Plaintiffs appeared with their attorney, Ronald Benjamin. In fact, on the first day of V.S.'s disciplinary hearing, attorney Benjamin arrived at the school with several members of the local media and attempted to force their presence at the hearing.

15. Plaintiffs' allegations during this period of time came as a surprise, considering that the District had investigated V.S.'s claims of discrimination and determined they were unfounded.

16. Upon information and belief, even more curious, was the allegation that V.S. had been treated in a discriminatory manner because of his status as a minority. This assertion was unusual because V.S.

was registered in our school as a Caucasian student. I understand that V.S. now asserts that he self-identifies as a minority student. We are unaware of any factual basis for his allegation, and have never been presented with any evidence that would support his claim of being discriminated against due to his race, color or any other protected characteristic.

17. Upon information and belief, Plaintiffs' offensive attack alleging racism in Vestal schools caused the District to be besieged by an avalanche of negative press and publicity, which further substantially disrupted school operations.

18. The District became the subject of threats and intimidation though various social media postings and elsewhere. Upon information and belief, Mrs. Dyer was the subject of repeated social media threats, so much so that it became an issue of security within the building. Mrs. Dyer subsequently asked to be relieved of her teaching duties, as she was devastated by Plaintiffs' baseless allegations.

19. When V.S.'s disciplinary hearing commenced on December 20th, Attorney Benjamin invited the media to the otherwise-private hearing, created an even greater disruption to District activities. While we recognize that V.S. and his attorney have the right to speak publicly on their perceived issues, their actions created a significant disruption in the School District.

20. The hearing proceeded hearing officer Michael Sherwood, Esquire. Attorney Sherwood of Vestal, New York is also a Vestal Town Judge, and has, upon information and belief, presided over many student discipline hearings. The hearing was timely commenced and was conducted over 5 days, ending on February 7, 2017. Evidence was presented that contradicted V.S.'s allegations of racial discrimination.

21. I have reviewed the hearing record, and it contains no evidence to substantiate V.S.'s baseless allegations of racism and similar conduct. Notably, V.S. did not testify at the hearing in his own defense, and produced only one witness in his defense. The hearing officer found V.S. guilty of violations of the District's Code of Conduct and recommended a long-term suspension for V.S., who, at 17 years of age, was over the compulsory attendance age.

22. Having reviewed the hearing record, I believe that V.S. was afforded a hearing that was eminently fair and, based on evidence presented, resulted in a decision which was in keeping with the recorded evidence and penalties imposed in other cases.

## THE EVIDENCE PLAINTIFF WITHHELD FROM HIS SUSPENSION HEARING

23. I have read with interest the detailed, sworn declaration submitted by V.S. in support of his request to overturn his suspension. It is shocking and distressing that V.S. now submits a 45-paragraph affidavit asserting his version of events and explanation for his conduct, when no such information was presented to the hearing officer in his suspension hearing. V.S.'s decision to withhold this evidence from the hearing also prevented me from considering his explanation in deciding upon an appropriate penalty for his misconduct.

24. I respectfully submit that it is grossly unfair to the District for Plaintiffs to attack the propriety of V.S.'s suspension, which was imposed after a hearing that afforded him a full and fair opportunity to present any evidence and arguments he believed were relevant, with evidence that the hearing officer would have heard and considered.

25. For example, while we view V.S.'s declaration as a self-serving document designed to distract from the facts that led to his suspension, the document nonetheless presents the student's explanation of his conduct. However, this same evidence was not presented at the hearing. V.S. chose not to testify. In fact, I am reliably informed that V.S. was only present for the first day of the hearing. After the first day, he did not show up at all, nor did he testify. I have reviewed the entire record of V.S.'s hearing, and find that almost none of the evidence referenced in V.S.'s declaration, or his mother's, declaration, was presented in the hearing.

26. While I cannot determine what the hearing officer might have done with this information because it wasn't presented, certainly V.S. and his parent would have had an opportunity to explain his actions in an effort to either prove that the conduct was not a deliberate violation of the school rules, or to have offered the evidence in mitigation of any possible penalty or discipline that might be imposed.

27. I wish the Court to take note of the fact that neither I nor the hearing officer had the "benefit" of this additional evidence or testimony which the plaintiffs now seek to present to attempt to persuade this Court that our hearing was conducted in an unfair and/or improper manner.

28. I submit that it is grossly unfair to the School District, and the named defendants, to have our hearing process challenged in this manner.

29. The Court has before it evidence that the plaintiffs never bothered to present in the actual discipline hearing. Whether that evidence might have persuaded the hearing officer or me in any respect will never be known. However, it is unfair to judge our hearing and the result that was derived from it, by evidence that was never presented.

30. In particular, I note that V.S. has produced evidence of other students who have photos on their Facebook pages regarding the use of guns and/or hunting. Upon information and belief, this evidence was never presented in his disciplinary hearing.

31. This evidence which appears to be offered for the purpose of endeavoring to establish a claim of "selective prosecution" was not presented in the hearing. This evidence should not be considered now to determine whether our hearing was conducted fairly. Upon information and belief, there was no "selective prosecution" of the plaintiff.

32. Furthermore, the evidence which the plaintiff seeks to introduce shows a series of innocuous photographs of students involved in hunting and other innocent activities. That is a far cry from the circumstances presented in this case where the plaintiff was himself involved in a serious dispute with the District making many high-profile claims and contentions against the District while at the same time claiming that he was the victim of race discrimination at the hands of various District personnel. Upon information and belief, in that context, his posting of the "gun video" on snapchat took on a different and sinister meaning and import. None of those circumstances were present with respect to the various videos which the plaintiff now seeks for this Court to consider. Furthermore, no explanation was offered for why this evidence was not presented at the hearing itself. If this evidence was so compelling, then one wonders why it was never submitted in the first place.

33. Upon information and belief, this information was not submitted in the original hearing because it is utterly irrelevant and proves nothing. Plaintiff now seeks to justify his wrongful conduct by blaming others for engaging in innocent behaviors. This claimed "evidence" should not be permitted into the record.

## PLAINTIFFS' CLAIMS OF IRREPARABLE HARM ARE BASELESS

34. Plaintiffs' claims that V.S. will suffer "irreparable harm" if he is not returned to school immediately. This claim ignores both the seriousness of his conduct as proven at his suspension hearing, and the reality of his academic record.

35. Initially, I note that Plaintiffs have utterly failed to explain, as the Court observed in its decision denying their request for immediate relief, to the delay in seeking injunctive relief in this matter.

36. V.S.'s suspension took effect on February 8, 2017. The time between the commencement of the suspension on February 8, 2017, to the filing date of Plaintiff's present motion on May 8, 2017, is 89 days. During this 89-day period of time, Plaintiffs appear to have made little effort to pursue the education that V.S. states he values so highly. Instead, upon information and belief, they have dedicated the majority of their energy to challenging the outcome of the suspension hearing, without regard for the impact those efforts would have on V.S.'s stated goal of attending college next year.

37. I believe Plaintiffs have created a rather misleading impression of what has occurred in this case in regard to V.S.'s education. V.S. was first suspended from school on or about December 1, 2016, and remained out of school from December 2nd to the 23rd (the start of the winter vacation). The District's records, which are attached to the affidavit of Deborah Caddick, show that during this period of time, daily work assignments were provided for V.S., which his father picked up from the school. Thus, V.S. continued to receive his education despite being suspended out of school through the provision of these regular daily assignments classwork.

38. On January 3, 2017 (the day students were to return from winter vacation), V.S. was given a plan to receive two hours per day of tutoring, which is the norm for suspended students under the regulations of the Commissioner of Education. The tutoring program lasted only two days, because on January 5, 2017, V.S. was reinstated as a student while the outcome of his suspension hearing was pending. V.S. remained a full-time student at Vestal High School until February 8, 2017, when my decision imposing his present suspension was issued.

39. Upon information and belief, from that time forward, neither V.S. nor his parents have contacted the District seeking any substitute educational opportunities. I personally have received no such requests from V.S. or his parents, and I am reliably informed that the district has no record of such

a request.

40. Had Plaintiffs made such a request, there are several opportunities which would have been available to maintain V.S.'s progress toward his diploma had Plaintiffs elected to pursue them. For example, V.S. could have continued his education through homeschooling, even while on suspension from school.

41. Any student can be homeschooled after making a proper application. There are numerous resources available to assist parents in developing an appropriate educational curriculum and materials for a homeschooling program. The District has a homeschool liaison available who contacts BOCES to work with families to set up a homeschooling program.

42. I am reliably informed that the homeschooling liaison for the Vestal Central School District was not contacted by the Spero family to arrange homeschooling and instruction.

43. Upon information and belief, through a diligent effort, the plaintiff could have completed his high school requirements through a homeschooling program. We have numerous families who are enrolled in and involved in the homeschooling program.

44. In addition to the above, the plaintiff could have pursued a GED, or TASC Diploma. This option is available to any student who has not already received a high school diploma. The plaintiff would have to apply for it and seek permission from the District to pursue that program. This the plaintiff did not do. I have contacted the counseling office of the Vestal Central High School and I am reliably informed that no contact has been made by the plaintiff or his family for the plaintiff to be enrolled in a GED Program.

45. We note with particular interest the statements contained in Debra Spero's Declaration in which she asserts that the District and/or its counsel did not respond to requests for information about her son's status as a student or his options to make progress. Upon information and belief, these claims are utterly false. The District has an extensive history in this case of answering inquiries from the plaintiff and his family about his status as a student and offering information and additional opportunities for the plaintiff to complete his studies.

46. The District has always been ready, willing and able to work with Plaintiffs to restore V.S. to an educational program, provided that V.S. is willing to acknowledge his misconduct and the harm it has caused, particularly to Mrs. Dyer. As educators, we believe that it is imperative that V.S. admit

his wrongful conduct as part of any effort to restore him to a status in the School District. V.S. has refused to pursue any such negotiated opportunities we presented thus far.

47. In fact, on January 25, 2017, while the student discipline hearing was still pending, and before any final decision had been made with respect to the discipline to be imposed upon the plaintiff, the District's counsel offered to, Plaintiffs' then-attorney, Ronald Benjamin, a plan to provide V.S. tutoring and access to chemistry labs, with assistance, so that he could complete his chemistry course on time and graduate with his class.

48. I am reliably informed that Plaintiffs unequivocally and categorically rejected the proposal. In fact, his father stood up in the hearing and ripped up the Settlement Proposal in the presence of the Hearing officer. Attached as **Exhibit "A"** is a copy of the page from the hearing transcript describing how V.S.'s father ripped up the settlement proposal in the presence of the hearing officer. **Exhibit "B"** is the settlement proposal submitted by our attorney.

49. While it was not necessarily expected that Plaintiffs would have accepted the proposal without revision, we certainly expected that there might be some negotiation over the terms so that V.S. could resume his studies and continue to make progress toward his diploma. We were very surprised by Mr. Spero's reaction and the absence of any sincere response or an effort to negotiate a resolution of the dispute.

50. Mrs. Spero, in her Declaration at paragraph 25, also states that her attorney made inquiry of the District's counsel March 16, 2017 as to the status of V.S.'s educational program and the likelihood of him restored to a program which would allow him to graduate. Upon information and belief, these allegations are also false.

51. I am reliably informed that, Plaintiffs' counsel first contacted our counsel to inquire as to V.S.'s status on March 31, 2017, following a court scheduled conference on this matter. I am further informed that our counsel responded to that inquiry the same day. A copy of that e-mail is attached as **Exhibit "C"**.

52. Thereafter, I understand that our counsel and plaintiff's counsel exchanged a series of e-mails in which V.S.'s status was discussed and in which options for V.S. to continue to pursue his diploma were explored. It is simply false and inaccurate to claim that the District was not responsive to inquiries about V.S.'s status as a student or the options available to them.

53. Importantly, V.S. has options for pursuing his diploma presently available to him, regardless of his suspension. The District remains ready and willing to assist him in pursuing those options, but cannot willingly accept any option that returns V.S. to Vestal High School before his suspension has been served, or otherwise undermines the results of the full, fair hearing that established that V.S. engaged in serious misconduct.

## THE HARM THAT WOULD RESULT FROM RETURNING V.S. TO VESTAL HIGH SCHOOL

54. Finally, I wish to address the claim of Plaintiffs' counsel that returning V.S. to attendance at Vestal High School would cause no harm to the District. To the contrary, permitting V.S. to return to attendance at the high school, at this time, would, in my opinion, cause great disruption to high school operations.

55. My opinion reflects the seriousness of V.S.'s misconduct, and the decision he and his family made to publicly level baseless allegations of racism against his teacher and other District employees. As detailed above, those allegations and the nature of V.S.'s misconduct are quite well-known within the Vestal community.

56. Reinstating V.S would send a clear message that a student can be proven in a proper, fair disciplinary hearing of engaging in defamatory and improper conduct, and still be allowed to attend school without consequences.

57. It is imperative to the mission of the Vestal Central School District that students experience disciplinary consequences for improper conduct. Consequences that instruct both the misbehaving student and the other students that such behavior is not tolerated.

58. A decision to reinstate this student, before his suspension has been served would to be to overrule the results of the disciplinary hearing, my decision and that of the Board of Education, and the State Commissioner of Education's determination. This would have a significant negative impact upon good order and discipline within the school system.

59. In addition to the above, reinserting V.S. into his former schedule in the high school would also cause a significant disruption within each of his classes. For example, V.S. is enrolled in a Regents chemistry class that requires a minimum amount of laboratory hours before a student is permitted to sit for the course's final exam. Here, V.S. has not attended a lab class for the past four months. With roughly four weeks of instruction left in the school year, it is simply not possible for V.S. to

make up enough lab time in this class to qualify to sit for the final exam. Thus, his presence in the class would be superfluous and very likely disruptive to the students who are working toward completing the course requirements.

60. I can state with some certainty that the teacher would be required to slow down the rest of the educational process for the balance of the class while trying to bring V.S. current in terms of his knowledge and understanding. I simply cannot envision a way in which V.S. could be brought current without jeopardizing the other students in the class. Frankly, I don't see how he could be brought current in his level of instruction in the remaining time in the school year.

61. The same could be said for each of V.S.'s classes, with one exception - math class. Mrs. Dyer is currently the only high school teacher teaching the Foundations for College Math class in which V.S. is enrolled, has already stated that she is so upset by V.S.'s false allegations that she would not be able to conduct the class with V.S. present.

62. As mentioned previously, Mrs. Dyer was removed from teaching this class, at her request, during the time between January 5 and February 8, 2017, in order to deal with the multiple threats and harassment that had been made against her, as well as the stress involved with teaching after this incident.

63. Mrs. Dyer has already made it clear to me that she would request, again, to be relieved of her teaching duties if V.S. were returned to the class, rather than teach in an environment where these or similar allegations could be made. She has already indicated that she cannot continue under those conditions.

64. While I recognize that she could be directed to perform these duties in spite of V.S.'s presence, I do not believe that it would be educationally sound to do so. To force a teacher, under those circumstances, to be placed in such a confrontational environment, and with the knowledge that V.S. and his parents persist in leveling allegations that have been found baseless after a hearing and which Mrs. Dyer has denied twice under oath, would cause serious problems within the educational community and would cause serious problems for a teacher who has already endured enormous stress, humiliation and harassment.

65. I also note that Plaintiffs must obviously recognize that there is no case against Mrs. Dyer, because they have dropped Mrs. Dyer as a defendant in the Amended Complaint they recently filed. This

action speaks volumes about V.S.'s claims, and reinforces Mrs. Dyer's concerns about remaining in a classroom with V.S.

66. Also, removing Mrs. Dyer as the teacher of V.S.'s class would require bringing in a substitute teacher, which would significantly disadvantage the other students in the class, as they would lose their teacher just before finals. This too would cause an overwhelmingly negative impact upon District operations, for those students in particular. The absence of their teacher would be extremely disruptive and very unfair to those students.

67. V.S.'s reinstatement would not only affect Mrs. Dyer, but I am reliably informed that there would be a significant impact upon the morale of the entire faculty of the high school. V.S.'s high profile, baseless allegations were made public on television, radio, newspapers, and social media. His reinstatement would communicate to teachers, staff and administrators that there are no consequences for the conduct V.S. was proven to have engaged in, and he had succeeded in "beating the system."

68. As a further consideration, I have significant concern about V.S.'s potential to seek retribution against students who cooperated with the District's investigation of his disciplinary charges and support of Mrs. Dyer. My concern in this regard is founded upon my knowledge of V.S.'s long history of intimidating other students as reflected in his disciplinary record.

69. I also strongly take issue with the suggestion that V.S. is in a position to complete the necessary course work in order to qualify for a high school diploma. The delays and lack of interest by V.S. in pursuing his high school diploma earlier in the school year have effectively foreclosed the possibility that he could complete the necessary course work to qualify for a high school diploma in the current school year.

70. My opinion stems from the fact that V.S. would have to pass every class in which he is currently enrolled to achieve the minimum 22 credits required to graduate from high school. Should he fail any class, he would not graduate.

71. It must also be noted that V.S.'s prior grade reports, which are appended to Ms. Caddick's affidavit, show that in addition to his multiple disciplinary incidents, V.S. was in danger of failing several classes. I respectfully submit that V.S. has other options available to him to pursue, as detailed herein. He can pursue the options outlined above at little or no cost to him.

72. It would be an enormous burden specifically and in terms of personnel to try to get V.S. to complete his high school course work in four weeks, particularly when he is the cause of this situation and has utterly refused to cooperate with the District in many of the efforts we have undertaken to help him complete his education.

73. It is false for the Plaintiff to assert that no harm or prejudice will accrue to the District if Plaintiff is reinstated. As mentioned above, the harm is enormous while such a directive to reinstate will, at this late date, have little positive effect.

74. I urge the Court to consider the negative consequences to the District if V.S. is ordered reinstated, and request that Plaintiffs' request for injunctive relief be denied.

Dated: May 15, 2017
Vestal, NY

_____
JEFEREY AHEARN

Sworn to before me on this
15th day of May, 2017.

_____
Notary Public

[Notary Seal: Elizabeth J Engle, No. 01EN6334107, Exp. 12/07/20__, Broome County, State of New York]