UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**DEBRA SPERO, as Natural Mother of**
**V.S., an infant**

         Plaintiffs,

v.                 **AFFIDAVIT OF**
                    **DEBORAH CADDICK**
                    Civil Action No.: 3:17-cv-00007

**VESTAL CENTRAL SCHOOL DISTRICT**
**BOARD OF EDUCATION, VESTAL CENTRAL**
**SCHOOL DISTRICT, JEFFREY AHEARN,**
**Superintendent of Schools, ALBERT A. PENNA,**
**Interim Principal of Vestal High School,**
**DEBORAH CADDICK and CLIFFORD KASSON,**
**in their Individual and Official Capacities,**

         Defendants,
_____

STATE OF NEW YORK )
COUNTY OF BROOME ) ss.:

 I, **DEBORAH S. CADDICK,** being duly sworn, depose and say:

1. I a resident of Broome County, New York and I am an Assistant Principal of the Vestal Central High School. I am a career educator.

2. I am a duly certified teacher in New York State, certified in the field of English. I have 10 years of experience as a classroom teacher. I subsequently became an administrator in October of 2003. I also hold an Administrative Certificate as a school district administrator.

3. I have served in the capacity of Assistant Principal of the Vestal Central High School since 2003.

4. I am familiar with the facts and circumstances of the matters that led up to the suspension of Plaintiff V.S. from the Vestal Central School District. Additionally, I am familiar with V.S.'s academic record as a student at Vestal. I am also familiar with the policies and procedures of the Vestal High School.

## ACADEMIC STANDING OF V.S.

5. V.S. was in his high school senior year at the time of the incidents which give rise to this suit. My

review of the records and my personal familiarity with the academic standing of V.S. shows that he needs credit in each class he enrolled in for his senior year in order to graduate. There was no margin for error.

6. Attached hereto as **Exhibit "A"** is a graduation status form which was sent to V.S., dated August 22, 2016. This form shows what V.S. was required to complete in his senior year in order to graduate. The completion of the 5 ½ credits during his senior year would give him the minimum 22 credits required to graduate. All courses had to be successfully completed in order for him to graduate in June of 2017.

7. Attached hereto as **Exhibit "B"** is a copy of an interim grade report for V.S. dated October 6, 2016, which is during the first marking period of the school year. The report shows that V.S. was, at the time, failing physical education. The code numbers which follow his grade of 60 on the grade report are 039. That code indicates that the student failed to make up work when he was absent. The other code of 052 indicates that the student lost credit because he failed to bring in the appropriate materials/equipment for physical education class.

8. Attached hereto as **Exhibit "C"** is a copy of V.S.'s report card for the end of first marking period of the 2016-17 school year. It shows that V.S. was still not passing physical education. At that time, his grade had fallen to a 57. Again, the comments indicate he was failing to dress properly for gym class and had failed to make up necessary work.

9. Attached hereto as **Exhibit "D"** is a copy of a form letter sent to V.S. in November of 2016 regarding the credits needed for graduation. This is a standard form which is sent to high school seniors advising them of their academic standing and progress toward graduation requirements.

10. Attached hereto as **Exhibit "E"** is a copy of V.S.'s interim grade report from December 16, 2016. This report displays V.S.'s grades at the close of the marking period which ended approximately November 23, 2016, which reflected substantially incomplete work and significant deficiencies. These grades were compiled prior to the disciplinary episodes involved in this matter. This grade report shows that V.S. had incomplete course work in chemistry. He was also failing participation in government, as reflected by the presence of code 032 on the report, which stands for the proposition that the student did not complete anywhere from one to five assignments. The report also shows that in Foundations for College Math, the course being taught by Katherine Dyer, V.S.

had a 41 average. The report further shows that in Forensic Science, V.S. had a grade of 42, and in physical education he had a grade of 60 (passing is 65).

11. It should also be noted that, in the column to the extreme right on the form, the report states the days the student was absent from school. The report states that V.S. missed various classes repeatedly, including missing Chemistry, Participation in the Government, Math, English and Phys. Ed. on various days. The report's comments indicate that he often did not make up the work that he missed.

12. Attached hereto as **Exhibit "F"** is V.S.'s the second report card for the 2016-17 school year, covering the period from November 10, 2016, to January 27, 2017, the end of the first semester. This report card shows that V.S. had incomplete grades in Math. Although he had, at this time, just barely raised his grades to passing in his other subjects, he was behind in Math.

13. Attached hereto as **Exhibit "G"** is V.S.'s student transcript.

## CIRCUMSTANCES LEADING TO V.S.'S SUSPENSION

14. It is my understanding that Plaintiffs are alleging that V.S. was suspended because he voiced concerns about what he perceived to be racially discriminatory treatment. I was personally involved in investigating V.S.'s claims of racism, and know that the District's investigation of those allegations found them to be baseless and unfounded.

15. Initially, V.S. was sent to the office by Mrs. Dyer on November 22, 2016, for refusing to put his cell phone away. As he was leaving, he called Mrs. Dyer a fucking racist.

16. Mrs. Dyer subsequently submitted a discipline report regarding V.S.'s comment calling her a fucking racist. I reviewed that report with V.S. on December 1, 2016.

17. After meeting with V.S. and hearing his allegation of a racist comment by Mrs. Dyer, I placed him on probation for senior activities based upon his use of profanity and insubordination, and also initiated an investigation of V.S.'s charge that Mrs. Dyer had racially segregated students in her class by preparing a written report of possible harassment/discrimination. A copy of that form is attached as **Exhibit "H"**.

18. The initial report was referred to my fellow assistant principal Cliff Kasson (who is now the head principal of the high school). Mr. Kasson thoroughly investigated V.S.'s claim of racial discrimination through interviews with V.S., several other students and Mrs. Dyer. I am reliably

informed that Mr. Kasson concluded that V.S.'s claims were unfounded after interviewing Mrs. Dyer and numerous student witnesses.

## ACADEMIC SUPPORT AND OPPORTUNITIES FOR V.S.

19. I also am aware that V.S. was given considerable academic support even during his period of suspension. Beginning on December 2, 2016 (when the first suspension began) through December 23, 2016, make up work was provided to V.S. during those periods. The records in the District Guidance Office demonstrate that make up work was provided during this period of suspension. Attached as **Exhibit "I"** are the notes of the staff for the Principal, teachers and guidance counseling provided during his suspension.

20. Upon students' return from vacation on January 3, 2017, a tutoring program was established for V.S. as indicated for suspended students under state law and regulation.

21. Then, on January 5, 2017, V.S. was reinstated to a regular education program, and attended classes through the completion of his disciplinary hearing on February 8, 2017.

22. It is significant to note that after February 8, 2017, no one on behalf of V.S. had contact with me, or, upon information and belief, anyone at Vestal High School seeking information regarding alternative education options.

23. There were various options available to V.S. despite his out of school suspension. V.S. could have, for example, applied to pursue a TASC diploma (formerly called a GED). As of July 1, 2017, he would be eligible to participate in TASC diploma program at no cost to him. This is a program available to him through the local BOCES.

24. In addition to the TASC Program, the District also has a Homeschooling program available to V.S.. V.S. would need to do have his parent make a request to the Superintendent to be treated as a student to receive homeschooling. That request would then go to the BOCES office. BOCES provides a Homeschooling Program which the District participates in. BOCES would then send a packet of materials explaining how the Homeschooling Program works and what the requirements of the same are. Attached hereto as **Exhibit "J"** is a copy of the paperwork involved in applying for homeschool status.

25. There are numerous on-line services, many of which are free, available for students who desire to be home instructed.

26. All of these various options were and are available to V.S. and were available to V.S. all along. Upon information and belief, V.S has not pursued any of these options which would have permitted him to continue his education.

## V.S. ATTENDANCE RECORDS

27. Attached hereto as **Exhibit "K"** are V.S.'s school attendance records. It should be noted that V.S. had a considerable amount of excused and unexcused absences during the school year prior to his suspension.

28. After his reinstatement as a full-time student on January 5, 2017, V.S. missed several days of school even though he had been recently readmitted during the pendency of his suspension. For example, on January 17, he was dismissed for the day from the nurse's office. He then was absent for the entire school day on January 30 and 31, 2017 and February 3, 2017, had an unexcused absence for 8th period on February 6, 2017, and had unexcused absences for the entire day on February 7 and 8, 2017. Thereafter, his current suspension became effective.

29. I point this out to the Court because it is significant that V.S., while brought back into school, and recognizing the compelling need for him to be present in class in order to make up work and in order to succeed in his educational program, continued to miss school. While some of these absences may have been excused, these actions, in my opinion, are inconsistent with a sincere and purported desire and effort by V.S. to complete his educational program.

## V.S.'S STUDENT DISCIPLINE RECORD

30. Attached hereto as **Exhibit "L"** is a report of student discipline incidents involving V.S. since January of 2014, which covers the entire period of time while V.S. was a student at Vestal High School. This report shows a series of episodes involving reports of intimidation of other students to truancy, and a variety of types of misconduct. We attach the student discipline record of V.S. because the student discipline record is always relevant in any student discipline case. The discipline history of a student is considered by a hearing officer in determining the appropriateness and/or the severity of the penalty.

31. This evidence is also offered to counter the statements contained in the declaration of Deborah Spero. For example, in paragraph 11 of the Deborah Spero declaration, it is stated that V.S. never hurt anyone or threatened anyone. To the contrary, his discipline reports reflects several instances

and altercations with other students, reports of violence directed at other students as well as damaging property and allegations of theft. These are in addition to the numerous other instances described in the student discipline report. Thus, to the extent that the Plaintiffs allege that V.S. was a good or model student, the evidence firmly suggests the contrary.

### DISRUPTION CAUSED BY PUBLICITY OF UNFOUNDED ALLEGATIONS

32. I am also personally aware of the disruption to school operations that occurred following V.S.'s initial suspension from the high school. V.S. made public allegations of racism against the District through social and traditional media, claiming that he was suspended because he called a teacher a racist.

33. Upon information and belief, the allegations made by V.S. were utterly baseless. As detailed elsewhere in this affidavit, there has, to my knowledge, never been any evidence to substantiate any of V.S.'s claims that Mrs. Dyer, a well-respected member of our staff, made any racist remarks or otherwise engaged in any racially discriminatory conduct.

34. V.S., his parents and their attorney held several press conferences at which the local television, radio and newspaper media provided extensive and detailed coverage. The media coverage was extremely disruptive to the high school operations, because some students and members of the Vestal community initially believed the allegations made by V.S. that he was a victim of discrimination and had been wrongly singled out and wrongly disciplined.

35. In addition to the television, radio, newspaper, internet articles that appeared, there were also a large number of social media publications and/or messages and/or posts about V.S.'s allegations. These, too, caused great disruption in the high school because the students who initially appeared to believe the representations made by V.S. believe that he had been the victim of an outrageous act by the school administration and began to protest and cause disruption in the school setting. The district was forced to make several public announcements about this matter and a copy of the district's statements released to the media are attached hereto.

36. These episodes forced the district administration to deal with the upset and turmoil within the high school caused by this improper and baseless set of allegations issued by V.S., his parents and their attorney.

37. As the Assistant Principal at the high school, I dealt with several episodes in the high school in

which students acted out in one manner or another because they believed that the District was treating V.S. unfairly. While the matter eventually quietly died down, the disruption attendant to these concerns was tremendous and required near constant attention by District administration.

38. In my experience, I have been involved in numerous student discipline matters. In none of those cases has a student publicized or sought media attention in the manner pursued by Plaintiffs as described. To the contrary, student disciplinary hearings are done privately, without media coverage or fanfare. This case was certainly very different. However, it should be noted that there is not to my knowledge, been any proof that V.S. was the subject of any racial slur. The allegations have never been proven. Further, I am reliably informed that V.S. did not testify in his own hearing and offered no reliable or credible evidence to substantiate any of his claims.

**THE DISRUPTION THAT WOULD BE CAUSED BY V.S.'S RETURN TO SCHOOL**

39. If the Court were to order V.S. reinstated to attendance in Vestal High School, I believe that such an order would cause ongoing disruption in the high school. One area of particular concern is that V.S. is extremely far behind in his schooling at this point. Given that as of the day of this affidavit, V.S. will have only approximately four weeks of classes left to learn and become proficient in an entire school year or semester of work. This does not appear to be educationally sound or even possible.

40. As the Assistant Principal of the high school that deals primarily with student discipline matters, I can assure the Court that if this student were to be reinstated, that it would create a serious morale problem for the staff and also students in the high school that the district's efforts at disciplining a student are subject to being overruled or overturned by a Court, regardless of whether that discipline was appropriately administered or not.

40. Accordingly, I urge the Court to deny the application for a preliminary injunction in this case.

Date: May 15, 2017
Vestal, NY

DEBORAH CADDICK

Sworn to before me this 15th day of May, 2017

Notary Public

ELIZABETH J ENGLE
NOTARY PUBLIC
No. 01EN6334107
Exp. 12/07/20
BROOME COUNTY
STATE OF NEW YORK

7