**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DEBRA SPERO**, as Natural Mother of
**V.S.**, an infant,
                              Plaintiff,


        -against-                                **Civil Action No.**: 3:17:CV-7 (GTS-DEP)


**VESTAL CENTRAL SCHOOL DISTRICT**
**BOARD OF EDUATION, VESTAL CENTRAL SCHOOL**
**DISTRICT, JEFFREY AHEARN**, Superintendent of Schools,
**ALBERT A. PENNA**, Interim Principal Vestal
High School, **DEBORAH CADDICK and CLIFFORD**
**KASSON**, in their Individual and Official capacities.

                              Defendants.
_____

<u>**PLAINTIFF'S MEMORANDUM OF LAW OPPOSING DEFENDANTS' MOTION FOR**</u>
<u>**SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS**</u>


**Dated: December 1, 2017**

**Submitted By:**                      **Legal Services of Central New York, Inc.**
                                       Attorneys for Plaintiff
                                       Willa S. Payne, Esq. (Bar No: 517751)
                                       Susan M. Young, Esq. (Bar No: 102862)
                                       Joshua Cotter, Esq. (Bar No: 518217)
                                       189 Main Street, Suite 301
                                       Oneonta, NY 13820
                                       Telephone: 607-766-8118
                                       Facsimile: 607-386-4176
                                       wpayne@lscny.org

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT**…………………...………...…………………………… 1

**FACTS**……………………………………………………………………………..........8

**SUMMARY OF ARGUMENT**……………………………...………………………….. 7

**ARGUMENT**…………………………………………………………………… 8

**I.   THIS COURT SHOULD DENY SUMMARY JUDGMENT BECAUSE AMPLE EVIDENCE SUPPORTS THAT PLAINTIFF WAS IMPERMISSIBLY PENALIZED FOR SPEECH ON A MATTER OF PUBLIC CONCERN THAT HAD NO FORSEEABLE TENDENCY FOR DISRUPTION**

   **A.** *Standard*…………………………………………………………...… 8

   **B.** *Because There is Ample Evidence that Defendants Violated Plaintiff's First Amendment Rights, Summary Judgment Must Be Denied.* …………………… 9

      **i.** *Plaintiff's Speech on a Matter of Political/Social Importance As Well As Public Concern Warrants Increased Protection*…………………….…… 9

      **ii.** *Defendants Cannot Justify the Suspension of V.S Under Second Circuit Precedent*……………………………………………………………....11

         **a)** **Nature and Content of Speech**……………………………12

         **b)** **The Student's Disciplinary History and Past Conduct**………14

         **c)** **Type and Severity of Punishment**……………………………15

         **d)** **Size and Nature of Alleged Disruption**…………………………15

            **1)** **Prior to Decision to Suspend**……………………………...15

            **2)** **Actions and Alleged Disruption After Five Day Suspension**…………………………………………....…16

**II.  PLAINTIFF'S AMENDED COMPLAINT ALLEGES FACTS PLAUSIBLY SUGGESTING THAT DEFENDANTS VIOLATED PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHT AND THERE IS SUFFICIENT EVIDENCE IN THE RECORD TO DEFEAT A MOTION FOR SUMMARY JUDGMENT**

   **A. Standards**……………………………………………….…………18

   **B. Defendants are Entitled To Neither Summary Judgment Nor Judgment on The Pleadings on the Substantive Due Process Claim**…………………………19

**III. PLAINTIFF IS ENTITLED TO ADDITIONAL DISCOVERY BEFORE CONSIDERATION OF THE SUMMARY JUDGMENT MOTION**…………..….21

   **A. Facts Sought To Oppose the Motion and How They Are to be Obtained**….23

   **B. Evidence Adduced in Discovery Will Create Genuine Issues of Material Fact**……………………………………………………………………… 23

   **C. Efforts by Plaintiff to Obtain Discovery**…………………………………… 24

**IV. PLAINTIFF'S CLAIMS ARE NOT BARRED BY QUALIFIED IMMUNITY**……………………………………..……………………………..………**24**

**CONCLUSION**…………………………………………………………………………**25**

## TABLE OF AUTHORITIES

**CASES:**                                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
     477 U.S. 242 (1986)...................................................................................................8, 22

*Ashcroft v. al-Kidd,*
     563 U.S. 731 (2011)…………………………………………………………..24

*Barmore v Aidala,*
     419 F. Supp.2d 193 (N.D.N.Y. 2005)…………………………………………...20

*Bradford v. Norwich City Sch. Dist.,*
     54 F.Supp.3d 177  (N.D.N.Y. 2014)…………………………………….............11,14

*Burnette v. Carothers,*
     192 F.3d 52 (2d Cir. 1999)………………………………………………….......20

*Connick v. Myers,*
     461 U.S. 138 (1983)…………………………………………………….…......12

*Cuff v. Valley Cent. Sch. Dist.,*
     677 F.3d 109 (2d Cir. 2012)…………………………………...……………...*passim*

*DC v. Valley Cent. Sch. Dist.,*
     2013 U.S. Dist. LEXIS 74177 (S.D.N.Y. Mar. 20, 2013)………………….….……15

*DeFabio v. E. Hampton Union Free Sch. Dist.,*
     658 F. Supp. 2d 461  (E.D.N.Y. 2009)…………………………………….......20

*Doninger v. Niehoff,*
     527 F.3d 41 (2d Cir. 2008)…………………………………………11, 12, 16, 21

*Doninger v. Niehoff,*
     642 F.3d 334 (2d Cir. 2011)……………………………………………….…..…….. 14

*Hellstrom v. United States Dep't of Veterans Affairs,*
     201 F.3d 94  (2d Cir. 2000)……………………………………….….... 22

*Horton v. Bd. of Educ.,*
     2017 U.S. Dist. LEXIS 60719  (N.D.N.Y. Apr 21, 2017)……………………..….. 20

*J.C. v. Beverly Hills Unified School District,*

711 F.Supp.2d 1094 (C.D.Cal. 2010)……………………………………………………16

*Kowalski v. Berkeley Cty. Sch.*,

   652 F.3d 565 (4th Cir. 2011)………………………………………............ 14

*Malley v. Briggs*,

   475 U.S. 335  (1986)…………………………………………………………..25

*McKenna v. Wright*,

   386 F.3d 432 (2d Cir. 2004)………………………………………………19, 22

*Morse v. Frederick*,

   551 US 393,403 (2007)…………………………………………………...…11

*Pappas v. Giuliani,*

   290 F.3d 143 (2d. Cir. 2002)……………………………......................................12

*Patel v. Searles*,

   305 F.3d 130 (2d Cir. 2002)……………………………………..……19

*R.O. v. Ithaca City Sch. Dist.,*

   645 F.3d 533 (2d Cir. 2011)………………………………………………..... 12

*Scott v. Fischer*,

   616 F.3d 100 (2d Cir. 2010)……………………………………………….…24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,

   393 U.S. 503  (1969)………………………………………...…12, 13, 17, 19

*T.V. v. Smith-Green Cmty. Sch. Corp.,*

   807 F. Supp. 2d 767 (N.D. Ind. 2011)…………………………………….…... 16

*Vincent v. Yelich*,

   718 F.3d 157 (2d Cir. 2013)……………………………………………….…24

*Walczyk v. Rio*,

   496 F.3d 139 (2d Cir. 2007)…………………………………………….…25

*Wisniewski v. Bd. of Educ.*,

   494 F.3d 34 (2d Cir. 2007)……………………………………..… *passim*

*Wright v. N.Y. State Dep't of Corr Servs*.,

   831 F.3d 64 (2d Cir. 2016)………………………………………….…..8, 9

**STATUTES AND REGULATIONS**

20 U.S.C. § 1232(g)…………………………………………………………………………...…4

**OTHER**

2008 Op Comm Ed. No. 16439……………………………………………………………………21

## PRELIMINARY STATEMENT

This civil rights action challenges the suspension of a seventeen-year-old student of color at the Vestal Central School District ("District") as a violation of V.S.'s First Amendment Rights and his right to Substantive Due Process. In December 2016, V.S. spoke out on social media about the racism he experienced at his high school. In retaliation for V.S.'s exercise of his constitutionally protected rights, defendants first suspended him for five days and then again from February 8, 2017, through the end of the 2016-2017 school year and for the entire 2017-2018 school year.

By this motion, made before formal discovery has truly begun, the defendants have moved for summary judgment on plaintiff's First Amendment Claim and for summary judgment or Rule 12(c) dismissal of the Substantive Due process claim. They concede that the suspension(s) imposed were based upon V.S.'s speech, and rely solely upon their conclusion that his speech predicted substantial disruption warranting an 18-month suspension.  In seeking dismissal of V.S.'s substantive due process claim, Defendants argue that there is a rational relationship between the suspension imposed and V.S.'s alleged conduct.  Finally, they claim qualified immunity for the individual defendants and that there was no personal involvement of Kasson and Caddick.[1]

As we show below, not only are Defendants wrong on the merits but their motion should be denied because Plaintiff has had virtually no opportunity for discovery.  To find otherwise will have a seriously chilling effect on students' ability to speak out about their opinions and personal experiences with gravely important political and social issues like racism.

---

[1] Plaintiff does not contest Point IV of Defendants' argument regarding Caddick and Kasson's personal involvement.

## FACTS

Defendants twice suspended V.S., a senior at Vestal High School, following his social media accusations that Defendants both acted against him as the result of racism and failed to protect him and other students of color from the racist acts of fellow students and teachers.  V.S., the son of a Guyanese mother, identifies as a student of color. At the time these suspensions, he was four months from his June 2017 graduation and had been accepted to State University of New York Broome Community College. [2]

### V.S.'s Social Media Postings

Between December 2 and December 5, 2016, while home serving a suspension for protesting what he perceived as racism within the District, V.S. expressed his belief that the District and his teacher had subjected him and other students to racist actions in a series of tweets.[3]  Because of the political/social nature and public importance of the District's racist actions, V.S. directed two tweets to the local news media.[4] The remaining tweets were not directed at any one individual or entity.  V.S.'s tweets that were the basis of his first five-day suspension (On December 8, 2017) follow:

- "I love being discriminated and prejudiced in the vestal high school system."
- "Crazy how racism will never fade away, we are stuck."
- "How can you allow racism to brew within your staff and discipline the one trying to shine attention to the racism that is going on #truthwillprevail."
- "@WBNG12NEWS suspended from school for calling my teacher a racist after being separated with 4 other students because of our color"
- "@WBNG12NEWS then she reported me after a day for feeling threatened by me after I attempted to report her, and I was told I wasn't going to be acknowledged because I have no say. Vestal High School is corrupt and unfair to its colored students. And we need help."
- "End racism within our schools, how are you supposed to teach the young minds while (yours) is stuck in such an evil way #vestalhighschool"[5]

---

[2] Decl. of V.S. ("V.S. Decl.") ¶ 33 (May 3, 2017), attached to Decl. of Willa Payne ("Payne Decl") as Ex. A.
[3] *Id.* ¶ 19
[4] *Id.* ¶ 20
[5] *Id.* ¶20

On December 7, 2016, two days after his last tweet as outlined above, and a day on which V.S. posted nothing on Twitter, he posted twice on an entirely different social media platform, Snapchat.[6]  The first post was a 10-second video of his sister, a licensed firearm owner, demonstrating how to unload a firearm and safely store it, while the second showed  him with his girlfriend as she recovered from surgery.[7] These images, like all images on Snapchat, disappeared after a short period of time and were only accessible to V.S.'s followers.  Nothing on V.S.'s Snapchat account made reference to the allegations of racism, V.S.'s suspension, the District, or any student, teacher or administrator in the District.[8]

**School Investigation and Manufactured "Disruption"**

On December 8, 2017, at around 11 a.m., two students provided School Resource Officer ("SRO") Conor Talbut with copies of V.S's social media postings.[9] SRO Talbut emailed copies of V.S.'s tweets and snap chat video to all of the defendants at 12:21 p.m.[10] Around the same time, a school friend told V.S. that two girls were going to try to get out of school early by reporting his social media postings.[11]  V.S.'s father called the school at 12:44 to alert them of the students' activities.[12] By that time, defendants had already determined to suspend V.S. for his speech and notified Mr. Spero when he called.[13]

At 12:44, during this telephone conversation with Mr. Spero, defendant Penna notified the Speros that he would suspend V.S. for an additional five days because (1) by discussing his

---

[6] *Id.* ¶ 22
[7] *Id.*; the "snap" posted by V.S. annexed to Payne Decl. as Ex.B .
[8] *Id.*
[9] Incident Report attached to Payne Decl. as Ex F.
[10] Email from SRO Talbut (12/8/2016) and attached to Payne Decl. as Exhibit C.
[11] V.S. Decl. ¶ 23; Declaration of K.M., dated May 17, 2017 annexed to Payne Decl. as Ex. V. ¶5
[12] Caddick's notes from call between Penna and Mr. Spero and V.S.'s sister (Dec. 8, 2016), annexed to Payne Decl. as Exhibit D ("Caddick Phone Notes").
[13] *See* Payne Decl. Ex. D.

3

suspension, V.S. violated both the policy of Vestal High School that students are not to speak about their discipline and the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232(g); (2) V.S. disparaged and defamed the school by accusing it of racism on social media, and; (3) simply displaying the firearm showed that V.S. was violent.[14]

During their phone conversation at approximately 12:44 p.m., Mr. Spero and V.S.'s sister informed the District administrators that (1) the gun was in their home under lock and key; (2) the female in the video was V.S.'s sister; (3) the gun belonged to V.S.'s sister who had a concealed carry permit; (4) the reference was to V.S.'s adult sister and not a reference to the school; and (5) V.S. had no access to the weapon.[15] Before hanging up with Mr. Spero, Penna directed Mr. Spero to "Get the cell phone away from [VS]".[16]

Despite knowing the above information at 12:44 p.m., about twenty minutes after the defendants reviewed the social media postings, and having already suspended V.S. for the speech, the defendants continued to investigate V.S.[17] SRO Talbut went to the Spero home to inquire about the tweets and video, but not until 4 p.m. that day.[18] The Speros fully cooperated.[19] SRO Talbut confirmed that V.S.'s sister had a valid permit and that the firearm was securely locked in a finger print case.[20] According to him, there was nothing criminal about the video or V.S.'s sister's possession of her legally acquired licensed firearm, and no charges were pressed against either V.S. or his sister.[21] SRO Talbut reported his findings to the administration.[22]

---

[14] *See* Payne Decl. Ex. D.
[15] Payne Decl. Ex. D.
[16] *Id.*
[17] 3214 Hearing Transcript from January 25, 2017 in full annexed to Payne Decl. as Ex. E.
[18] Incident Report attached to Payne Decl. as Ex F.
[19] *See* Payne Decl. Ex. E, p 53:18-19
[20] *See* Payne Decl. Ex. F.; Payne Decl. E. p 54:15-17
[21] *See* Payne Decl Ex E, p. 54:5-6
[22] *See id.*

Very shortly after they had viewed the postings on December 8, 2016, the defendants and their counsel held a meeting---not to prepare for the "disruption" they allegedly feared V.S.'s social media postings might cause but rather to create a justification for his removal from school. Caddick took notes. They include: "No threats really?"; "[a] lot of complaining"; and "[V.S] does have some First Amendment rights."[23] Caddick also noted that their attorney needed to do some "thought and research."[24]

After being told of the additional five-day suspension, V.S. tweeted:

- "Me trying to spread awareness to the racism I had to face is nothing wrong. I would never hurt a soul, I just wanted to help. I love everyone."
- "We are all equal, because of the pigmentation of my skin means I'm a danger to the school? You are racist, face it you are a horrible being"
- "[Defamation] of character is a crime, because of my skin color you are gonna say I'm going to kill people that's outrageous, you are a racist.[25]

Vestal High School has approximately 1100 students.[26] In total, on December 8th there were the two complaints from the original girls, two phone calls about V.S's speech[27], discussion in the commons, and the same two girls who wanted to be escorted from their class to guidance after school.[28]

**Five-Day Suspension For V.S's Comment That His Suspension Was "Unfair", Alleged Violation of his own FERPA Rights and Social Media Posts**

V.S. was first notified that he would be suspended for his speech in the phone conversation outlined above that defendants' had with the Speros on December 8, 2017 at 12:44 p.m. Subsequent to that oral notification, the District sent a letter to V.S.'s parents dated

---

[23] 12/8/17 notes from conversation between Defendants annexed to Payne Decl. as Ex. G.
[24] *Id*.
[25] V.S. Decl. ¶ 26.
[26] Def. Ex. 1, p. 142:10.
[27] Payne Decl. Ex. E, p. 52:16-25.
[28] Def Ex 1, p 137:23-25, Payne Decl. Ex.V. ¶2-10.

December 9, 2016.[29] In that letter, the District stated, "due to the violent nature of V.S.'s

behavior, an immediate suspension is implemented, effective December 9, 2016."[30]

Based on their anger over the social media postings, defendants decided on December 8 -

-- shortly after they saw the postings --- that they wanted V.S.'s suspension to be longer, which

would require a Superintendent's hearing.[31] Penna had already outlined his case against V.S. on

December 8th and 9th, 2017.[32]

On December 14, 2016, V.S. was served with the Notice of Superintendent's Hearing.

The notice, based upon his social media postings (for which he had already been suspended once

for five days), and his private discussions with students that his suspension was "unfair", and his

alleged violation of his own FERPA rights, charged V.S. with being "insubordinate or disorderly

or engaged in conduct which endangered the safety, morals, health or welfare of others or some

or all of the above."[33] Specifically, Respondent's notice alleged that V.S. engaged in the

following conduct:

> a.      "On December 2, 2016, you were involved in an incident in Math class. At
> the time, you were instructed not to discuss the incident. Several students came to
> speak with administrators regarding the incident because you shared with those
> students that you were being suspended for 'no reason' and 'it was unfair.'"
> b.      "On December 8, 2016, you posted a number of posts on social media which
> were retaliatory in nature against the teacher and the administration."[34]

The December 14, 2016, notice further alleged that:

> (1) the New York State Police contacted the District with concerns about student safety, (2)
> the SRO and school administration received concerns from parents and students about
> student safety, and (3) as a result of V.S.'s social media activity a lockdown drill had to be
> cancelled on December 9, 2016.[35]

---

[29] Penna suspension letter dated 12/9/16, annexed to Payne Decl. as Ex. H.
[30] *Id.*
[31] *See* Payne Decl. Ex. G
[32] Penna notes dated 12/9/16 annexed to Payne Decl. as Ex. I.
[33] December 14, 2016 notice of Superintendent's Hrng' annexed to Payne Decl. as Ex. J.
[34] *Id*.
[35]*Id*.

**Superintendent's Hearing**

A Superintendent's Hearing was held from December 20, 2016, through January 31, 2017. At that hearing, despite being fully aware that V.S.'s social media activities were not a threat against the school district, and having already suspended him for five days based upon his speech, the School District sought an additional suspension of 18 months.[36]  During the hearing,V.S. attended school pursuant to a contract of conduct.[37] In a recommendation dated February 3, 2017, the hearing officer found V.S. guilty. The hearing officer adopted the punishment recommended by the school district that V.S. be suspended for 18 months.[38]

**Superintendent's Decision and Subsequent Appeals**

On February 7, 2017, Superintendent Ahearn issued a Decision affirming the hearing officer's findings and full suspension recommendation.[39] Plaintiff appealed V.S.'s suspension to the District's Board on February 23, 2017, but the Board upheld the suspension on March 18, 2017.[40]  Plaintiff appealed to the Commissioner of Education. The Commissioner denied V.S.'s request for a stay on April 21, 2017,[41]  and later dismissed V.S.'s appeal without prejudice.[42]

## SUMMARY OF ARGUMENT

Defendants' motion must be denied.  As we show in Point I, there is ample evidence in the record to demonstrate that V.S was impermissibly penalized for his speech in violation of the First Amendment.  In Point II, we demonstrate that neither summary judgment nor Rule 12(c) dismissal is appropriate on the Substantive Due Process Claim because the penalty imposed on

---

[36] 3214 Hearing 1/30/2017, p. 65:6-24 annexed to Payne Decl. as Ex K.
[37] Contract annexed to Payne Decl. as Ex. L.
[38] Hearing Officer Recommendations annexed to Payne Decl. as Ex. M.
[39] Supt's Dec. dtd. 2/7/17, annexed to Payne Decl. as Ex. N.
[40] Ltr. dtd 3/14/17 annexed to Payne Decl. as Ex. O.
[41] Comm. Ltr. dtd 4/21/17 annexed to Payne Decl. as Ex.  P.
[42] Commissioner's Decision annexed to Payne Decl. as Ex. Q.

V.S. was wildly disproportionate to his claimed misconduct and substantial evidence of the

defendants' impermissible motivation exists.  Point III then explains why, in any event, summary

judgment is procedurally inappropriate before plaintiff has had a full opportunity for discovery.

Finally, as set forth in Point IV, a grant of qualified immunity is impermissible where, as here,

rights are clearly established, and defendants should have been aware that their conduct violated

those rights[43].

## ARGUMENT

## I.  This Court Should Deny Summary Judgment because Ample Evidence Supports that Plaintiff was Impermissibly Penalized for Speech on a Matter of Public Concern That had no Foreseeable Tendency for Disruption

### A. Standard

This Court may grant defendants' summary judgment motion only if it determines that "there

is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. Proc. 56(a).  The moving party bears the initial burden of showing there is no

genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). If the

Court finds that the initial burden is met, then the burden shifts to the non-moving party to "set

forth specific facts showing that there is a genuine issue for trial," and present such evidence as

would allow a jury to find in its favor. *Id*. at 256.  In assessing whether there is a genuine issue

for trial the Court "must resolve all ambiguities and draw all permissible factual inferences in

favor of the non-moving party." *See Wright v. N.Y. State Dep't of Corr Servs*., 831 F.3d 64, 71-

72 (2d Cir. 2016) (internal quotation marks omitted).  As discussed in Point III, summary

judgment is almost never justified where discovery is incomplete.

### B. Because There is Ample Evidence that Defendants Violated Plaintiff's First Amendment Rights, Summary Judgment Must be Denied.

---

[43] Plaintiff's concede Defendants' argument on the personal involvement of Kasson and Caddick.

While the Supreme Court has not decided whether or not off campus student speech, like the speech in this case, ever justifies discipline, the Second Circuit has developed a standard for judging discipline of students' off campus speech.  A School District may discipline students for off campus speech if that speech "poses a reasonably foreseeable risk that [it will] come to the attention of school authorities and . . . materially and substantially disrupt the work and discipline of the school."  *Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 38 (2d Cir. 2007).

Defendants tacitly concede that V.S.'s social media postings are protected speech under the First Amendment. They also concede they suspended him because of the content of his speech and argue only that the administrators' perception of and response to V.S.'s speech was reasonable. However, viewing the record in the light most favorable to plaintiff, as this court must, *see Wright,* 831 F.3d at 71-72, shows ample evidence that school officials could not, either before their investigation or after it was concluded, have reasonably determined that V.S.'s social media postings would materially and substantially disrupt the work and the discipline of the school.  With the standard for summary judgment in mind, it is clear that plaintiff  sufficiently demonstrated a violation of his First Amendment rights because: (1) V.S.'s off campus speech concerned a matter of public importance, racism, and therefore warrants substantial protection; (2) the speech had no inherent tendency to materially and substantially disrupt the schoolwork or discipline of the high school and it was not objectively reasonable to predict that disruption would occur; and (3) the disruption that allegedly occurred was not substantial.

### (i)Plaintiff's Speech on a Matter of Political/Social Importance as well as Public Concern Warrants Increased Protection.

Importantly, the Second Circuit, in developing its standards for when student speech may be subject to school discipline, did not address student speech on a matter of political/social

concern or speech in the public interest. *See Cuff v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 111

(2d Cir. 2012) (student drew a cartoon of an astronaut threatening "to blow up the school with

the teachers in it"); *Doninger v. Niehoff,* 527 F.3d 41, 45 (2d Cir. 2008) (student posted a false

message on her publicly accessible blog that a scheduled activity had been canceled "due to

douchebags in central office"); *Wisniewski v. Bd. of Educ.,* 494 F.3d 34, 36 (2d Cir. 2007)

(student sent IM to his "buddy" group that showed "a small drawing of a pistol firing a bullet at a

person's head with the message "Kill Mr. VanderMolen," the student's English teacher); *see also*

*Bradford v. Norwich City Sch. Dist* 54 F.Supp.3d 177, 180-81 (N.D.N.Y. 2014) (students

exchanged a series of text messages detailing how they would kill another student). Defendants

cite no case --- and we have identified none --- in which the Second Circuit has applied the *Cuff-*

*Doninger-Wisniewski* standard to speech on a matter of political and social importance or public

concern.

    The speech in *Wisniewski, Cuff and Bradford* can all be reasonably understood as urging

violent conduct and did not address matters of political/social importance in the public interest.

While the speech in *Doninger* does not urge violent conduct it also does not involve speech on a

matter of political/social importance or public concern, and does urge students to disrupt school

operations. 527 F.3d at 48.   In contrast, V.S.'s speech did not urge disruptive or violent conduct.

Nor was the speech lewd, threatening, indecent or offensive.  Instead, much of it addressed

racism on the part of a school district, an appropriate matter of political/social importance and

public concern. The Second Circuit has not yet had the opportunity to address student off-

campus speech on a matter of public concern.  However, even in the on campus context, the

Supreme Court has expressed that deference should be given to speech, were it to involve a

matter of political or social importance. *See Morse v. Frederick*, 551 US 393,403 (2007) (where

the court drew a distinction between speech that was political in nature and speech that was promoting illegal drug use and stated that, "Political speech, of course, is "at the core of what the First Amendment is designed to protect."); *See Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 680 (1986) (where the court cited the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of [Fraser's] speech.") Additionally, in other contexts, the courts have clearly held that such speech is entitled to heightened protection.  *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("speech on public issues occupies the highest rung of the h[ie]rarchy of First Amendment values and is entitled to special protection") (internal quotes omitted); *Pappas v. Giuliani,* 290 F.3d 143, 146 (2d. Cir. 2002).

Thus, this Court should hold that off campus student speech on a matter of political/social importance and public concern, such as racism in a school is entitled to a heightened protection and that should inform the remainder of the analysis.

### ii.  *Defendants Cannot Justify the Suspension of V.S. Under Second Circuit Precedent*

As noted previously, school authorities may discipline a student for out-of-school speech or other expressive conduct only if the conduct "would foreseeably create a risk of substantial disruption within the school environment at least when it was similarly foreseeable that the off-campus expression might also reach campus," *Doninger* 527 F.3d at 48 (internal quotation marks omitted).  "[S]peech that is neither vulgar, lewd, indecent or plainly offensive . . . may not [be] regulate[d] . . . unless it would materially and substantially disrupt classwork and discipline in the school." *R.O. v. Ithaca City Sch. Dist.,* 645 F.3d 533, 540 (2d Cir. 2011).

 "The test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Cuff*, 677 F.3d at 113.  Although an actual disruption is not required, school officials must have more than an "undifferentiated fear

or apprehension of disturbance" to overcome students' First Amendment right to freedom of expression. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969). School officials must show that the regulation or prohibition of student speech was caused by something more than a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509.  Further, whenever school officials make a content-based prohibition of speech they must have "evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline. *Tinker*, 393 U.S. at 511.

There is no bright line test to determine how substantial an alleged disruption was or the reasonableness of a forecasted substantial disruption.  However, a review of the case law in this circuit and others indicates there are factors the Court should consider in determining the reasonableness of a district's response including the nature and content of the speech, the punishment imposed upon the student and the reason for punishment, the size and nature of any actual disruption, and the student's disciplinary record. A survey of the case law in this area shows no court in this Circuit or others have found a "substantial and material disruption" on a record similar to this one.

### a)  Nature and Content of Speech

The cases demonstrate that the content of the speech, nature of the speech, to whom it is directed, and past issues arising out of similar speech are all relevant factors for the Court to consider.  With respect to each of these factors, V.S.'s speech dramatically differs from the student speech for which discipline has been upheld.  As outlined above, V.S. was suspended for engaging in three forms of speech: (1) discussing his suspension, (2) tweeting about the perceived racism he encountered in the School District, and (3) snapchatting a video of his sister safely unloading and putting away a firearm.  V.S.'s tweets raise the important social and

political issue of racism in public schools. None of this speech contains anything that can be reasonably perceived to be a threat, vulgar remark, or call to action against the school district.  *cf Cuff.,* 677 F.3d  at 111 (student drew a cartoon of an astronaut threatening "to blow up the school with the teachers in it"); *Wisniewski* 494 F.3d at 36 (student made a drawing of a bullet going into a person's head captioned "Kill Mr. VandeMolen," the student's English teacher); *Doninger v. Niehoff,* 642 F.3d 334, 349 (2d Cir. 2011) (student in a blog post called school administrators "douche bags" and urged students to take action to "piss [them] off more"); *Bradford.*, 54 F.Supp.3d at 180-81 (students' exchanged a series of text messages detailing how they would kill another student).

Further, unlike the speech found to justify discipline, V.S.'s speech did not identify an educator, administrator or a student of Vestal High School by name or title, nor single out any particular person for any type of treatment, no less violent treatment. *cf Doninger* 642 F.3d at 349 (speech identified an administrator); *Wisniewski* 494 F.3d at 36 (speech identified a teacher); *Bradford.*, 54 F.Supp.3d at 184 (speech identified a student); *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 574 (4th Cir. 2011) (speech identified a student.)

The video is very clearly a gun safety demonstration-the individual in the video is showing how to unload and put away a gun.[44]  Despite this, the school has consistently mischaracterized the nature of the snapchat posting-when in fact it is clearly a person unloading and putting away a firearm. It is unreasonable that this gun safety demonstration in the hands of a third party with no connection to the school—is more dangerous or inherently disruptive, than the photos showing Caucasian Vestal High School students holding automatic rifles and wearing masks, all of which were viewed by the District before the 18 month suspension.[45] Only by

---

[44] Payne Decl. Ex. B.
[45] Payne Decl. Ex. R.

viewing plaintiff's statements of opinion through a lens that assumes students of color who speak out against racism are inherently dangerous could one conclude that disruption was to be feared.

Even if it was reasonable for the school to be concerned about these postings at first glance, once their investigation made clear there wasn't an issue-and they knew this within twenty minutes (and certainly before the imposition of the 18-month suspension) there was no reasonable basis at that point to determine that a substantial disruption of the school work or discipline was likely to occur. Further, if the District was seriously concerned that the snapchat video posed a threat, their SRO officer wouldn't have waited until 4:15 p.m. to visit the Spero residence when he received the postings at 11:11 a.m.[46]

### b.  The Student's Disciplinary History and Past Conduct

As alleged by defendants, a student's disciplinary history and past conduct can also inform the reasonableness of the District's response, but here, V.S.'s anecdotal record contained only minor infractions. V.S. has no criminal record, no history of threats against the school, and no history of prior out of school suspension.[47] Students at the school were not afraid of him or fearful that he may harm someone.[48] *Cf  Cuff.,* 677 F.3d  at 113-114 (upholding a suspension where, among other things, the student had a history of engaging in threatening speech and a long disciplinary history.); *DC v. Valley Cent. Sch. Dist.,* No. 7:09-cv-9036, 2013 U.S. Dist. LEXIS 74177, at *13-14 (S.D.N.Y. Mar. 20, 2013) (holding that because of past disruptions

---

[46] Payne Decl. Ex. F.
[47] While Defendants' claim V.S.'s anecdotal record is significant, in actuality, of the 21 entries from 1/16/14 through 11/21/2016, 14 of those were for either being late to class/school or for leaving a class early, 2 were for illegal parking, 1 was for throwing paper balls with another student, 2 were for incidents V.S. was accused of but not found guilty of, 4 only warranted verbal warnings and 0 of the incidents warranted an out of school suspension. In fact, one of the entries is where V.S. informed Caddick that other students were calling him the "N" word and other racist names on 10/13/2015.
[48] Payne Decl. Ex. V, ¶9-11.

stemming from a student's racist speech, the school district reasonably assumed the racist speech at issue would create a substantial disruption.)

### c.   Type and Severity of Punishment

The type and severity of the punishment also is relevant to the reasonableness of the District's response. *See Doninger*, 527 F 3d at 53 ("[W]e have no occasion to consider whether a different, more serious consequence than disqualification from the student office would raise constitutional concerns."); *Wisniewski*, 949 F. 3d at 40 (declining to decide whether a six month suspension would offend the First Amendment because plaintiff made no such challenge.) Here, along with an initial five-day suspension for his speech, V.S. was suspended for 18 months, a suspension that amounts to an expulsion of a student four months' shy of graduation. School Districts have routinely given far less severe punishments for speech that caused substantial disruptions or threatened the school or students., *see Cuff*, 677 F.3d at 112 (five-day out-of-school and one-day in-school suspension for expressing a desire to bomb his school with all the teachers in it); *Wisniewski,* 494 F.3d at 37 (one semester suspension with in-home instruction for sending a threatening message suggesting that a teacher be killed).

### d.   Size and Nature of the Alleged Disruption

#### (1) Prior to the Decision to Suspend

There were no substantial disruptions to school work or discipline as a result of V.S.'s speech prior to the district's first decision to suspend.[49]   There is no evidence in the record that in the twenty minutes from the school officials' viewing the speech to their suspension of V.S. they learned anything that would lead a reasonable school official to forecast a substantial disruption. In fact, the only complaint fielded was from the two students who initially brought the tweet to

---

[49] Payne Decl. Ex. V ¶3-7.

the District's attention.[50]   The complaints of two students do not suggest a reasonable possibility of substantial disruption.  *See T.V. v. Smith-Green Cmty. Sch. Corp.,* 807 F. Supp. 2d 767, 783-84 (N.D. Ind. 2011) (holding a school district had not shown a risk of substantial disruption where two parents complained and there was "petty sniping" among students.); *J.C. v. Beverly Hills Unified School District*, 711 F.Supp.2d 1094, 1117-1119 (C.D.Cal. 2010) (holding a school district had not shown a disruption where they received one phone call from a disgruntled parent, one student refused to go to class, and five students missed a portion of their classes.)

There were undoubtedly conversations in the commons about the issue, a phone call from a concerned father, and the two student complaints, but there were also students who expressed concern for V.S. because they believed the two students complaining were only trying to get out of school early.[51] Even considered collectively, these incidents do not forecast substantial disruption so as to justify under suspension from education under *Tinker*.

### (2) Actions and Alleged Disruption After Five Day Suspension

The administrators became aware of V.S's social media postings at 12:21 p.m. and made the decision to suspend him before 12:45 p.m.  Following their decision, there continued to be no substantial disruption.  No classes were cancelled, there was no barrage of calls or complaints, no students were unruly or unmanageable, and no additional safety measures were put in place.  The school received only two phone calls besides the call from Mr. Spero.[52] One of the phone calls was from a father of one of the two girls who complained, who happened to be a state trooper.[53] Two students were escorted to a counselor's office following the end of the school day because

---

[50] See Def. Ex. 1 p 137:23-25.
[51] V.S. Decl. ¶23; see Payne Decl. Ex. V. ¶5.
[52] See Payne Decl. Ex. E, p. 52:1-25.
[53] Def. Ex. 1, p 138:1-15.

they said they were scared.[54]  SRO Talbut visited V.S's home and confirmed there was no actual threat. The SRO's sole purpose for being at the school is to deal with student discipline issues so the time he spent investigating V.S.'s postings did not take away from or substantially disrupt his workday or job responsibilities.  Despite the minimal complaints and the determination that no actual threat was posed, the School District cancelled an unannounced lockdown drill.  Only administrators and law enforcement knew about the lockdown drill.  Classes and school activities went on as normal.[55] The drill was eventually rescheduled and completed.

As is evident from the administrators' contemporaneous notes of their meeting with their lawyer, they made no plans to manage a disruption or to ensure the safety of students and staff but instead tried to create a rationale for suspending V.S.  because they were extremely uncomfortable with the content of his speech. In Principal Penna's first phone call with Mr. Spero, he did not express concern about a threat to the school; rather he told Mr. Penna to "get the phone away from V.S.", presumably so V.S. would stop tweeting that the school district was racist.[56]  Evidence of the defendants' concern over their reputation as a result of V.S.'s accusations of racism, is peppered throughout their affidavits.[57] The principal's own notes from the day after the initial suspension in which he wrote that  V.S. "spewed defaming, slanderous, untrue and disparaging comments against VCSD and Vestal High School" pinpoints the real concerns of the District. Even on this slim record, it is clear that the District's disagreement with V.S's speech was the driving force behind their decision to suspend him.

The written basis for V. S's first suspension based upon his speech, demonstrates the cognitive gymnastics the District used to rationalize excluding him from the school.  The first

---

[54] Payne Decl. Ex. E., p. 26:14-23.
[55] Payne Decl. Ex. V ¶6-7.
[56] Payne Decl. Ex. D.
[57] Affidavits of Deborah Caddick and Jeffrey Ahearn.

articulated basis was V.S.'s telling his friend in a private conversation that his suspension was

"unfair and for no reason." [58]  V.S. was also suspended because he purportedly violated his own

FERPA rights,[59] a legal impossibility.  Any school administrator of reasonable competence

would know that neither of these rationales passed constitutional muster.

Although it is certainly understandable why the District would be uncomfortable when

confronted with racism allegations, their discomfort at being charged with racism is not evidence

of a reasonable belief of substantial disruption.  As the *Tinker* court so eloquently said:

> Any variation from the majority's opinion may inspire fear. Any word spoken, in
> class, in the lunchroom, or on the campus, that deviates from the views of another
> person may start an argument or cause a disturbance. But our Constitution says we
> must take this risk; and our history says that it is this sort of hazardous freedom --
> this kind of openness -- that is the basis of our national strength and of the
> independence and vigor of Americans who grow up and live in this relatively
> permissive, often disputatious, society.
> 393 U.S. at 508 (internal citation omitted).

This Court should honor the *Tinker* principle—and refuse to take a substantial step back

from the protection the Supreme Court and courts in this circuit have accorded to student

speech—by finding V.S.'s exclusion from public education to be unconstitutional.


**II.  Plaintiff's Amended Complaint Alleges Facts Plausibly Suggesting that Defendants
Violated Plaintiff's Substantive Due Process Right and there is Sufficient Evidence in the
Record to Defeat a Motion for Summary Judgment.**

**A.  Standards**

The standard for deciding a Rule 56 motion is set forth in Point I (A).  In deciding a Rule

12(c) motion, the Court applies "the same standard applicable to a motion under Rule 12(b)(6),

accepting the allegations contained in the complaint as true and drawing all reasonable

---

[58] Payne Decl. Ex. H.
[59] Payne Decl. Ex. H.

inferences in favor of the nonmoving party." *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.

1999). "A party endeavoring to defeat a lawsuit by a motion to dismiss for failure to state a claim

faces a 'higher burden' than a party proceeding on a motion for summary judgment." *McKenna v.

Wright*, 386 F.3d 432, 436 (2d Cir. 2004). "A complaint will only be dismissed under Rule 12(c)

if it appears beyond doubt that the (nonmoving party) can prove no set of facts in support of his

claim which would entitle him to relief." *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002)

(internal quotations omitted). Where the moving party has relied upon materials "outside of the

pleadings", the district court must convert the motion for judgment on the pleadings to one for

summary judgment if that material is not excluded by the court. *Barmore v Aidala*, 419 F.

Supp.2d 193, 196 (N.D.N.Y. 2005).

Here, defendants seek judgment on the pleadings or in the alternative summary judgment on

plaintiff's Substantive Due Process Claim. In their motion, defendants rely upon materials

outside of the pleadings.[60] Thus, this Court must either exclude that material in its consideration

of defendants' motion for judgment on the pleadings, or treat defendants' motion as one for

summary judgment. *Id*. In either case, the defendants' motion must fail.

**B. Defendants are Entitled to Neither Summary Judgment nor Judgment on the Pleadings
on the Substantive Due Process Claim.**

"Generally, to establish a substantive due process violation, a plaintiff must: (1) identify

the constitutional right at stake, and (2) demonstrate that the government's action [was]

conscience-shocking or arbitrary in the constitutional sense." *Horton v. Bd. of Educ*., 2017 U.S.

Dist. LEXIS 60719 * 13 (N.D.N.Y. Apr 21, 2017).  A school administrator's suspension of a

student violates substantive due process where there is "no rational relationship between the

punishment and the offense." *DeFabio v. E. Hampton Union Free Sch. Dist*., 658 F. Supp. 2d

---

[60] Def. Br. p. 9, 10.

461, 486 (E.D.N.Y. 2009) (collecting cases). As Defendants have conceded the constitutional right at stake, we will not discuss that here. The First Amendment right has been fully discussed above.

There is no rational relationship between the non-violent tweets and snapchat video and either the five-day suspension or the 18-month suspension imposed on V.S. by the school officials.  Such a suspension for a high school senior who was four months away from graduation was, in effect, a permanent suspension or expulsion. *See* 2008 Op. Comm. Ed. No 15,849[61]

An 18-month suspension for non-threatening speech is a grossly disproportionate punishment when compared to school discipline cases involving far more serious offenses. *see Cuff*, 677 F.3d at 111-12 (five-day out-of-school and one-day in-school suspension for expressing a desire to bomb his school with all the teachers in it); *Wisniewski,* 494 F.3d at 37 (one semester suspension for sending a threatening message suggesting that a teacher be killed). The District's actions against V.S. are precisely the type of egregious overreach the Second Circuit likely had in mind when it left open the issue of whether an extremely harsh suspension for speech made outside of school could violate the Constitution. *See Doninger*, 527 F.3d at 53.

Although defendants argue --- based on self-serving affidavits from Defendants Ahearn, Caddick and District Counsel Dewind--- that the suspension was rationally related to V.S.'s conduct,[62] in fact even the limited record that exists prior to full discovery is replete with evidence of arbitrariness, bad faith, and irrationality.

---

[61] Evidence of the District's arbitrariness and bad faith is found in the punishment the District gave to one of its students who participated in a "Kick-a-Jew" Day during which students kicked their Jewish peers. This same District meted out a mere three-day suspension for that racist and violent conduct.  *See Appeal of C.M, ex rel T.M., from the Acton of the Board of Education of the Vestal Central School District,* http://www.counsel.nysed.gov/Decisions/volume52/d16439  (Commissioner ordered suspension expunged on other grounds but no change made to the length of the suspension).

[62] Def. Br. p 9-10.

Most important is the very length of the suspension itself, which is absolutely disproportionate to the conduct alleged, even assuming that V.S.'s speech could justify any discipline.  Further, notes taken by District administrators on the day the decision was made to suspend V.S. for five days support the plaintiff's contention that the initial five-day suspension and the subsequent 18-month suspension of V.S. were made in bad faith out of anger at plaintiff's public accusations of racism. They paint a picture of a District attempting to manufacture a disturbance while acknowledging internally that the real issue was frustration with V.S.'s allegations of racism. [63]

In addition, the defendants incorrectly allege that the lengthy suspension was "originally" the recommendation of the independent hearing officer.[64] In fact, the recommendation initially came from the counsel for the District at the conclusion of the superintendent's hearing.[65]

Finally, the defendants attempt to bolster their "rational relationship" argument by referring to plaintiff's disciplinary history and stating that this history justifies its punishment.[66] This argument raises an issue of material fact, as the disciplinary history of V.S. consists of minor infractions, not one of which resulted in any out of school suspension, and included instances where V.S. was a victim of other students' racist name calling.[67]

Because defendants' Rule 56 motion on substantive due process fails, a fortiori, their Rule 12(c) motion does as well.  *See McKenna*, 386 F.3d at 436 (A Rule 12(c) motion imposes a greater burden on the movant than does a Rule 56 motion.)

### III.  Plaintiff is Entitled to Additional Discovery Before Consideration of the Summary Judgment Motion

---

[63] Payne Decl. G.
[64] Def. Brief p. 11.
[65] Payne Decl. Ex. K.
[66] Def. Brief  p. 11.
[67] *See* Defendants' Ex. L to Affidavit of Deborah Caddick.

"Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. United States Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000) Where a party seeks summary judgment before the non-moving party has had a reasonable opportunity to conduct discovery, denial of the motion is generally appropriate. *See* Rule 56(d); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 n. 5 (1986) (indicating that summary judgment must be denied if "the nonmoving party has not had the opportunity to discover information that is essential to his opposition."). While plaintiff primarily argues that the record contains more than enough evidence to require the denial of summary judgment, if this Court should find the record lacking, it must deny summary judgment because there has not been a sufficient opportunity to discover material information.

Pursuant to Rule 56(d), if a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declaration or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. Pro. 56(d). A party opposing summary judgment on 56(d) grounds must show "(1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir. 1999).

For purposes of this motion, the primary material fact on which plaintiffs will seek discovery is the objective reasonableness of the defendants' actions. Defendants' claim that the suspensions were reasonable is the gravamen of their defenses to both the First Amendment and the Substantive Due Process claims and are therefore inherently material. *See Cuff* 677 F.3d at

112-13 (affirming a grant of summary judgment because District's actions were reasonable only after completion of discovery).  Because (1) whether the defendants acted reasonably in suspending V.S. for his speech presents issues of material fact; (2) the plaintiff has had almost no opportunity for discovery; and (3) as shown below, plaintiffs have made a more than adequate showing on each of the *Gurary* factors, summary judgment is not appropriate.

### A.  Facts Sought to Oppose the Motion and How They are to be Obtained[68]

The defendants assert that based on the available record, which consists almost solely of their own declarations it was objectively reasonable for them to suspend him for his off campus speech.[69] Plaintiffs are entitled to the opportunity to test the accuracy of these claims by deposing the District's personnel involved with investigation and decision making.  As demonstrated above, there is already evidence in the incomplete record that shows defendants' actions were not objectively reasonable. Further discovery will buttress this showing by providing the essential context lacking from defendants self-serving declarations.  With respect to plaintiff's Due Process claim, plaintiff would again seek, through depositions of district personnel and document discovery, to illuminate the context behind the defendants' decision to suspend V.S. as well as the length of other suspensions the District has issued to other students.

### B. Evidence Adduced in Discovery will Create Genuine Issues of Material Fact

With respect to both the First Amendment claim and the Fourteenth Amendment claim, facts will be adduced during discovery concerning the allegations of racism, the investigation and decision to suspend V.S. This evidence will inform the question of whether the defendants' decision to suspend V.S. was objectively reasonable given the specific circumstances.

---

[68] A more detailed discussion of the 56(d) factors is found in the accompanying declaration of plaintiff's counsel Joshua Cotter.
[69] Def's Br. At 6.

### C. Efforts by Plaintiff to Obtain Discovery

Plaintiff served defendants with document demands, interrogatories and notices of deposition on September 20, 2017.  Those requests have not been answered and defendants have made a motion to stay discovery. The defendants do not explain why this case is one of the "rarest of cases" where summary judgment may be granted prior to discovery.  Therefore, defendant's motion should be denied as premature.

### IV.  Plaintiff's Claims are Not Barred by Qualified Immunity

The doctrine of qualified immunity protects officials unless (1) "the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Defendants bear the burden of establishing qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). "Even if [the Second Circuit] or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by [it] or other courts clearly foreshadow a particular ruling on the issue. .." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citation and internal quotation marks omitted).  Where a right is clearly established "[a]n officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) quoting *Malley v. Briggs*, 475 U.S. 335, 341, (1986).

As shown above, even on the limited record available to the Court, plaintiff has established the individual defendants violated his First and Fourteenth Amendment rights.  With respect to the second step in the qualified immunity analysis defendants tacitly concede the clear establishment of the Fourteenth and First Amendment rights plaintiff asserts but argue that their

24

actions were reasonable given the factual context.  As discussed in detail above, it was not

reasonable for the District to suspend V.S. for off campus speech on a matter of political/social

and public importance --- racism in public schools --- that posed no reasonably foreseeable threat

to school order.  It was also not reasonable for the District to suspend V.S. for telling his friend

that his suspension was unfair, or because he allegedly violated his own FERPA rights-a legal

impossibility. Further, no school official of reasonable competence could find that suspending a

child for five days, no less 18 months was rationally related to his alleged non-violent, non-

aggressive actions in this case.

## <u>CONCLUSION</u>

For the reasons set forth fully above, it is respectfully submitted that defendants' motion

for summary judgment and in the alternative for judgment on the pleadings should be denied in

its entirety.

**DATED**: December 1, 2017

Oneonta, NY                                             Respectfully Submitted,

                                                       __s/Willa S. Payne_____
                                                       **Legal Services of Central New York, Inc.**
                                                       Attorneys for Plaintiff
                                                       Willa S. Payne, Esq. (Bar No: 517751)
                                                       Susan M. Young, Esq. (Bar No: 102862)
                                                       Joshua Cotter, Esq. (Bar No: 518217)
                                                       189 Main Street, Suite 301
                                                       Oneonta, NY 13820
                                                       Telephone: 607-766-8118
                                                       wpayne@lscny.org



👤 Business Portal

# Decision No. 16,439

Commissioner's Decisions    Search Decisions

Appeal of C.M., on behalf of her daughter T.M., from action of the Board of Education of the Vestal Central School District regarding student discipline.

Decision No. 16,439

(December 24, 2012)

Aswad & Ingraham, attorneys for petitioner, Thomas A. Saitta, Esq., of counsel

Hogan, Sarzynski, Lynch, Surowka & DeWind, LLP, attorneys for respondent, Michael G. Surowka, Esq., of counsel

KING, JR., Commissioner.--Petitioner appeals the determination of the Board of Education of the Vestal Central School District ("respondent") upholding the suspension of her daughter, T.M. The appeal must be sustained.

T.M. is a student at respondent's Vestal Senior High School ("school"). The record indicates that on December 1, 2010, several students participated in "Kick a Jew Day" ("the incident") during which they kicked Jewish students. An investigation was conducted by the principal and assistant principals. During her investigation, the principal became aware that the school's small Jewish population was concerned about retaliation if they worked with the administration to identify the students who participated in the incident. In her affidavit, the principal explained that, during the investigation period, several student victims received telephone calls from families of the students who participated in the incident asking them not to implicate their children. The principal averred that a student who witnessed T.M.'s conduct agreed to speak with the principal only in confidence.

By letter dated January 20, 2011, petitioner was notified that the principal was considering suspending T.M. for a period of five days or less in relation to her conduct on December 1, 2010. The letter advised that petitioner and T.M. would have the opportunity for an informal conference with the principal on January 24, 2011, where they would be permitted to present T.M.'s version of the events and ask questions of the complaining witnesses. Following this informal conference, the principal suspended T.M. for three school days.

By letter to the superintendent dated January 31, 2011, petitioner appealed the suspension. In a second letter dated February 7, 2011, petitioner provided additional details about the circumstances surrounding T.M.'s suspension. On February 9, 2011, petitioner's counsel provided

a letter with supplemental supporting materials and details. The superintendent denied petitioner's appeal by letter dated February 8, 2011. On February 18, 2011, petitioner's counsel appealed the superintendent's determination and requested an opportunity for petitioner to speak before respondent. Respondent considered the appeal at its March 8, 2011 meeting and affirmed the superintendent's determination. This appeal ensued. Petitioner's request for interim relief was denied on March 23, 2011.

Petitioner contends that the notice failed to sufficiently inform her of the conduct for which T.M. was being suspended. Petitioner also claims that she did not receive an opportunity to question complaining witnesses.

Respondent asserts that the district fully complied with the requirements of Education Law §3214(3) and that petitioner had the opportunity to confront the principal as the complaining witness.

In the case of a suspension of five days or less, the suspending authority must provide the pupil with notice of the charged misconduct. Written notice must be provided to the pupil and the person in parental relation to the pupil to advise them of the reason for the proposed suspension and their right to request an immediate informal conference with the principal at which the pupil or person in parental relation may present the pupil's version of events and question complaining witnesses (Education Law §3214[3][b][1], 8 NYCRR §100.2[l][4]; Appeal of F.W., 48 Ed Dept Rep 399, Decision No. 15,897; Appeal of F.M., 48 id. 244, Decision No. 15,849; Appeal of a Student with a Disability, 48 id. 154, Decision No. 15,823).

The notice and opportunity for an informal conference must take place prior to the suspension of the pupil, unless the pupil's presence in the school poses a continuing danger to persons or property or an ongoing threat of disruption to the academic process, in which case the notice and opportunity for an informal conference must take place as soon after the suspension as is reasonably practicable (Education Law §3214[3][b][1], 8 NYCRR §100.2[l][4]).

The purpose of the written notice requirement is to ensure that parents of, or persons in parental relation to, a student suspended for five days or less are made aware of the statutory right provided in Education Law §3214(3)(b)(1) to question the complaining witnesses in the presence of the principal who imposed the suspension in the first instance, and who has authority to terminate or reduce the suspension. This procedure affords the principal the opportunity to decide whether his or her original decision to suspend was correct or should be modified (Appeal of F.W., 48 Ed Dept Rep 399, Decision No. 15,897; Appeal of F.M., 48 id. 244, Decision No. 15,849; Appeal of a Student with a Disability, 48 id. 79, Decision No. 15,798).

In an appeal to the Commissioner, a petitioner has the burden of demonstrating a clear legal right to the relief requested and the burden of establishing the facts upon which petitioner seeks relief (8 NYCRR §275.10; Appeal of Aversa, 48 Ed Dept Rep 523, Decision No. 15,936; Appeal of Hansen, 48 id. 354, Decision No. 15,884; Appeal of P.M., 48 id. 348, Decision No. 15,882).

Petitioner's claim that the January 20, 2011 notice failed to inform her of the conduct upon which the proposed suspension was based is without merit. The notice specifically states, "It is alleged that [T.M.] endangered the safety, morals, health or welfare of herself or others, in that on or about December 1, 2010, [T.M.] kicked at least one student during an incident of bullying." The letter cited the provisions of respondent's Code of Conduct which T.M. was charged with violating.

Further, the record contains a statement written by T.M. two days prior to the informal conference which addresses the event indicated in the notice. Accordingly, petitioner has failed to carry her burden with respect to this claim.

The record indicates that petitioner met with the principal and two assistant principals on January 24, 2011, before the suspension was imposed. Although the principal investigated the incident and interviewed witnesses, she did not personally observe T.M.'s participation in the incident. Accordingly, under these circumstances, she was not the complaining witness (Appeal of R.N.T. and M.T., 47 Ed Dept Rep 298, Decision No. 15,702; Appeal of J.Z., 47 id. 243, Decision No. 15,681). Although there have been circumstances where the principal was the complaining witness (cf.Appeal of E.S., 50 id., Decision No. 16,105 [where principal viewed videotape of student's conduct]; Appeal of C.C. and R.C., 47 id. 295, Decision No. 15,701 [where principal observed student's intoxicated state at school prom]; Appeal of L.O. and D.O., 47 id. 194, Decision No. 15,666 [where principal conducted search of student's vehicle and marijuana was found]), such is not the case before me. Petitioner's meeting with the principal and other school officials, therefore, did not constitute the required informal conference, since petitioner did not have an opportunity to question the complaining witnesses.

While I understand the principal's concerns about honoring student witnesses' requests for confidentiality under circumstances such as those presented here, I note that it is insufficient to provide merely an opportunity to speak with the principal without the complaining witnesses present, or an opportunity to speak with complaining witnesses without the principal present (Appeal of P.D., 46 Ed Dept Rep 50, Decision No. 15,438; Appeal of B.C. and A.C., 42 id. 395, Decision No. 14,891; Appeal of a Student Suspected of Having a Disability, 40 id. 542, Decision No. 14,552).

In light of this disposition, I need not address the parties' remaining contentions. However, nothing herein should be construed as minimizing the gravity of the allegations presented in this appeal or the serious safety, social and emotional issues raised by harassment, bullying and discrimination in public schools. The behavior of T.M. and the other students involved in the incident is totally unacceptable and cannot be tolerated. Respondent was justified in suspending T.M. and indeed would have been justified in imposing a more serious penalty. Discipline aside, respondent needs to take steps to intervene and protect its students from being subjected to harassment, bullying and discrimination.[1] It is apparent from this record that respondent needs to establish a more positive school culture based on tolerance, so that no student is subjected to a hostile school environment. I exhort respondent, through instruction in civility, discipline or other interventions, to address the intolerance and discrimination that led to the incident involved in this appeal.

THE APPEAL IS SUSTAINED.

IT IS ORDERED THAT the three-day suspension of petitioner's daughter from March 21, 2011 to March 23, 2011 be expunged from her record.

END OF FILE.

[1] I note that, effective July 1, 2012, boards of education must comply with the provisions of Article 2 of the Education Law (Dignity for All Students Act) and, effective July 1, 2013, the amendments thereto (Chapter 102 of the Laws of 2012).



**New York State Education Building**
89 Washington Avenue
Albany, NY 12234

© 2015 - 2017 New York State Education
Department

CONTACT US 📞

NYSED General Information: (518) 474-3852
ACCES-VR: 1-800-222-JOBS (5627)
TASC (formerly GED): (518) 474-5906
New York State Archives: (518) 474-6926
New York State Library: (518) 474-5355
New York State Museum: (518) 474-5877
Office of Higher Education: (518) 486-3633
Office of the Professions: (518) 474-3817
P-12 Education: (518) 474-3862

11/30/2017, 3:08 PM