UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

**DEBRA SPERO, as Natural Mother of**
**V.S., an infant,**

                         Plaintiffs,

         v.

**VESTAL CENTRAL SCHOOL DISTRICT**
**BOARD OF EDUCATION, VESTAL CENTRAL**
**SCHOOL DISTRICT, JEFFREY AHEARN,**
**Superintendent of Schools, ALBERT A. PENNA,**
**Interim Principal of Vestal High School,**
**DEBORAH CADDICK and CLIFFORD KASSON,**
**in their Individual and Official Capacities,**

                         Defendants,

| |
|---|
| **DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS NO GENUINE DISPUTE** |
| Civil Action No.: 3:17-cv-00007 (GTS/DEP) |

Defendants Vestal Central School District Board of Education ("Board"), Vestal Central School District ("District"), Jeffrey Ahearn, and Albert A. Penna (collectively "Defendants"),[1] pursuant to Local Rule 7.1(a)(3) of the Court, provide the following Statement of Material Facts as to Which There is No Genuine Dispute.

1.     The District is a central school district organized and existing under the laws of the State of New York, located in Broome County, New York.  (Ahearn Aff. ¶ 2.)

2.     The Board is a board of education for a central school district organized and existing under the laws of the State of New York.  (Ahearn Aff. ¶ 3.)

3.     The Vestal Central School District has a high school attended by students in the District from ninth through twelfth grades.  Its average enrollment across all four grades as of the

---

[1] Former Defendants Deborah Caddick and Clifford Kasson have been dismissed from the litigation.

2016-2017 school year was approximately 1100 students.  (Ahearn Aff. ¶ 4; Penna Dep. [Motion Exhibit 11] p. 97.)

4.      Defendant Jeffrey Ahearn was the interim superintendent of schools for the District from January through May, 2016.  He became the permanent superintendent of schools on June 1, 2016 and continues to serve in that position today.  (Ahearn Dep. [Motion Exhibit 12] p. 22.)

5.      As superintendent of schools, Defendant Ahearn is the sole District employee with power to continue a disciplinary out-of-school suspension of a student beyond an initial five-day suspension.  To do so, pursuant to New York Education Law § 3214 he must convene a hearing (hereinafter referred to as a "superintendent's hearing") presided over by himself or by a hearing officer appointed to do so.  At the hearing, the student and his family are afforded full hearing rights, including the opportunities to present argument, witnesses, and evidence; to cross-examine the District's witnesses; to be represented by counsel of their choice; and, to be provided with the record of the proceedings, including the transcript of the hearing itself.  It is the practice of the District and Defendant Ahearn to appoint a hearing officer to preside over a superintendent's hearing, after which the hearing officer submits a recommendation as to whether the student is guilty of the misconduct charged, and, if so, as to what disciplinary penalty is appropriate.  Upon receipt of the recommendation of the hearing officer, Defendant Ahearn conducts his own independent review of the full record and evidence admitted at the hearing, and determines whether to accept or modify the hearing officer's recommendations as to guilt and penalty.  (Ahearn Aff. ¶ 5; Ahearn Dep. [Motion Exhibit 12] pp. 27-28, 33-34, 64-65.)

6.      Defendant Albert Penna was the interim high school principal for the District from March 21, 2015 to April 13, 2017.  (Penna Dep. [Motion Exhibit 11] pp. 21-22, 43.)

7.     As interim high school principal, Defendant Penna was the sole administrator at the high school with power to impose an initial out-of-school suspension of a student of one to five days in length.  (Penna Dep. [Motion Exhibit 11] pp. 42-43.)

8.     Clifford Kasson was an assistant high school principal for the District for 2011 to April, 2017.  He had primary responsibility for students in grades ten and eleven, although he collaborated with the other assistant principal, Deborah Caddick, and would fill in for her to address matters involving students in grades ten and eleven when she was not available.  (Kasson Dep. [Motion Exhibit 10] pp. 13-15, 23.)

9.     Deborah Caddick was an assistant high school principal for the District from approximately 2005 to March, 2019.  Her responsibilities mirrored Mr. Kasson's, except that she had primary responsibility for grades nine and twelve.  (Caddick Dep. [Motion Exhibit 9] pp. 10-14, 19.)

10.    As assistant high school principals, Mr. Kasson and Ms. Caddick had authority to impose discipline up to and including in-school suspension.  They also were the primary investigators in matters involving potential discipline of high school students for misconduct.  (Caddick Dep. [Motion Exhibit 9] pp. 14-15; Penna Dep. [Motion Exhibit 11] pp. 38-39.)

11.    Plaintiff Vincent Spero was born in 1999.  At the time of most of the relevant events in this litigation – those occurring in late 2016 and early 2017 – he was seventeen years old and over the age of compulsory education.  (Vincent Spero Dep. [Motion Exhibit 3] p. 9; New York Education Law § 3205(1)(a).)

12.    Prior to attending school at the District, Plaintiff attended school at Binghamton City School District through the eighth grade.  (Debra Spero Dep. [Motion Exhibit 4] p. 11.)

13.     At Binghamton City School District, Plaintiff received multiple instances of discipline for misconduct.  He reached the highest level of discipline there, as he was the subject of a superintendent's hearing with respect to his possession of a weapon (a Swiss army knife) at school, and received more than two weeks' out-of-school suspension.  (CCS Aff. ¶¶ 17-18 and Motion Exhibit 13.)

14.     Plaintiff transferred to the District and attended school there beginning with the ninth grade in the 2014-2015 school year.  (Kasson Aff. ¶ 2.)

15.     Plaintiff was registered by his father as Caucasian.  (Debra Spero Dep. [Motion Exhibit 4] pp. 50-51; Motion Exhibit 14.)

16.     In the approximately two and a half years Plaintiff attended school at the District, he was the subject of disciplinary referrals approximately thirty times.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 131, 150-151; Motion Exhibits 15 and 16.)

17.     Plaintiff's disciplinary history shows he was guilty of insubordination and lying on at least seven occasions (November 10, 2014; December 9, 2014; February 27, 2015; November 19, 2015; December 3, 2015; January 6, 2016; January 22, 2016).   (See Motion Exhibit 16.)

18.     Although with respect to some of the associated referrals there was insufficient evidence to discipline Plaintiff for the primary allegation against him, the notes to his disciplinary history showed he lied in the course of the investigations (e.g., on December 9, 2014 and November 19, 2015).  (See Motion Exhibit 16.)

19.     These referrals continue to appear in Plaintiff's disciplinary history record because referrals are not deleted when they are determined not to be sufficiently corroborated.  Among other things, preserving these referrals as items in the disciplinary history is necessary to maintain a record that the incident was investigated and the allegation was not found to be sufficiently

corroborated, and that no disciplinary penalty was imposed.  (Penna Dep. [Motion Exhibit 11] p. 117.)

20.     During more than one investigation of alleged incidents involving Plaintiff, students reported to Mr. Kasson or Ms. Caddick that they were afraid of Plaintiff, that he was intimidating and aggressive, that he was prone to outbursts in class, and that he had said he had gang affiliations from his time attending Binghamton City School District.  (Caddick Dep. [Motion Exhibit 9] pp. 60-66, 90-91; Kasson Dep. [Motion Exhibit 10] pp. 55-56; see Motion Exhibit 16 p. 4.)

21.     In 2016, administrators at the District, including Defendant Kasson, became aware of a videorecording that showed Plaintiff confronting a younger and smaller student, G.S., at a gas station.  The video depicted Plaintiff confronting G.S. in a hostile and intimidating manner. Although G.S. could readily be seen and heard in the video indicating he did not wish to engage in any physical confrontation, Plaintiff continued to confront him, even advancing on G.S. as G.S. tried to leave.  (Kasson Aff. ¶ 3; see Caddick Dep. [Motion Exhibit 9] p. 67; Vincent Spero Dep. [Motion Exhibit 3] p. 161; Motion Exhibit 17, file "Spero-student verbal confrontation.")  (The videorecording would be presented in evidence at the superintendent's hearing concerning Plaintiff in January, 2017.  See Ahearn Dep. [Motion Exhibit 12] pp. 210-211.)

22.     Consistent with his behavior as depicted in the gas station video, Plaintiff had a reputation among the staff at the high school for behaving in an intimidating and aggressive manner.  He was known to stare angrily at adult staff members in a way that made them uncomfortable or even fearful.  (Caddick Dep. [Motion Exhibit 9] pp. 60-65; Kasson Dep. [Motion Exhibit 10] pp. 55-56.)

23.     Plaintiff's academic performance was poor such that he had to pass every one of his classes in the 2016-2017 school year to have enough credits to graduate in June, 2017. (Caddick Dep. [Motion Exhibit 9] p. 39.)

24.     Plaintiff's attendance was also poor, as evidenced by the District's attendance records.  (Ahearn Aff. ¶ 6 and Motion Exhibit 18.)

25.     In September, 2016, Plaintiff was a student in a fourth period mathematics class taught by Katharine Dyer.  (Vincent Spero Dep. [Motion Exhibit 3] p. 20; Dyer Dep. [Motion Exhibit 6] p. 9.)

26.     Ms. Dyer had just started teaching for the District, but previously had taught at Johnson City Schools for eleven years.  (Dyer Dep. [Motion Exhibit 6] pp. 7-8.)

27.     Ms. Dyer had begun the semester with a seating arrangement for the class organized alphabetically, but it was her custom and practice to rearrange seating arrangements periodically during the school year to seat students by together who worked well with each other and/or who were in a position to help each other understand and work on the class material.  (Dyer Dep. [Motion Exhibit 6] pp. 10-11, 24-25.)

28.     In or about the third week of September, 2016, Ms. Dyer established a new seating arrangement placing students together according to her custom and practice.  Out of a class of approximately twenty-nine students, one African-American student (I.D.) was seated in the middle of the front row of seats; one African-American student (S.I.) was seated near the end of the second row; one slightly non-Caucasian student was seated near the other end of the second row; one slightly non-Caucasian student (A.C.) was seated in the back row; one biracial student (J.B.) was seated in the back row; one Latina student (B.H.) was seated in the back row; Plaintiff was seated

at the end of the second row; and the remainder of the students in the class were Caucasian.  (Dyer

Dep. [Motion Exhibit 6] pp. 9, 12-16, 19-20; Motion Exhibit 19 p. 1.)

29.    On the first day of the new seating arrangement, when I.D. was taking his seat in

the front row, Plaintiff said, "Hey, [I.D.], you belong back here with us."  Another student said,

"Yeah, back of the bus," or words to that effect.  Both Plaintiff and the other student who made a

comment were laughing.  (Dyer Dep. [Motion Exhibit 6] pp. 13, 16, 22.)

30.    After the class period ended, Ms. Dyer spoke with Plaintiff to say she hoped he did

not think she would take race into consideration when making the seating arrangement.  (Dyer

Dep. [Motion Exhibit 6] p. 14.)

31.    Plaintiff said he had just been giving Ms. Dyer a hard time because she was "new."

When Ms. Dyer said she was not new to teaching, Plaintiff said, "But you're new here."  (Dyer

Dep. [Motion Exhibit 6] p. 17.)

32.    There is no record that Plaintiff ever made any complaint to any administrator about

the seating arrangement issue until Plaintiff was confronted with the possibility of disciplinary

consequences for his later conduct.  (See, e.g., Kasson Dep. [Motion Exhibit 10] pp. 43-44.)

33.    When he finally did mention the seating arrangement issue to an administrator, Ms.

Caddick, he claimed only that some of the students of color had been seated in the back of the

room, not all of them.  (Caddick Dep. [Motion Exhibit 9] pp. 155-156.)

34.    Not long after Plaintiff made his comment, a student seated in the front row next to

I.D. transferred out of the District.  Ms. Dyer moved J.B. to the vacated seat so I.D. would have a

partner for group learning activities.  (Dyer Dep. [Motion Exhibit 6] pp. 17-19.)

35.    Some weeks later Ms. Dyer again changed the seating arrangement according to

her usual practice.  (Dyer Dep. [Motion Exhibit 6] pp. 24-25; Motion Exhibit 19 p. 2.)

36.     On November 22, 2016, during the fourth period mathematics class, Ms. Dyer observed a puff of smoke or vapor from I.D.'s mouth.  She asked to speak with I.D. in the hall. I.D. admitted he was "vaping" (i.e., using an electronic cigarette) and claimed it was not a problem. Ms. Dyer advised him it was not permitted and sent him to the assistant principals' office for disciplinary consequences.  As there was no other adult present in the hallway at that time, she sent I.D. to the assistant principals' office unescorted.  (Dyer Dep. [Motion Exhibit 6] pp. 29, 41.)

37.     Ten to fifteen minutes later, Plaintiff was playing music on his cell phone.  (Dyer Dep. [Motion Exhibit 6] pp. 31-32, 37; Debra Spero Dep. [Motion Exhibit 4] pp. 19-20, 33.)

38.     Ms. Dyer heard the music and told Plaintiff he would have to turn his phone off. (Dyer Dep. [Motion Exhibit 6] p. 34.)

39.     Plaintiff said "No."  (Id.)

40.     Ms. Dyer asked Plaintiff to put his phone away again, and again, Plaintiff said "No."  (Id.)

41.     Ms. Dyer said "Then I'm going to have to ask you to leave."  (Id.)

42.     Plaintiff repeated Ms. Dyer's statement, saying, "Then I'm going to have to ask you to leave," in a mocking tone.  (Id.)

43.     Plaintiff then got up and started gathering his things to leave.  As he did, Plaintiff said "Fucking racist" to Ms. Dyer, before the other students in the class.  (Dyer Dep. [Motion Exhibit 6] p. 35.)

44.     Ms. Dyer directed Plaintiff to go to the assistant principals' office.  As a paraprofessional was now present in the hallway not far from her room, Ms. Dyer asked her to accompany Plaintiff to the assistant principals' office.  (Dyer Dep. [Motion Exhibit 6] p. 35.)

45.     When Plaintiff and the paraprofessional reached the assistant principals' office, I.D. was already there.  Neither Mr. Kasson nor Ms. Caddick was present, however.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 42-43.)

46.     Plaintiff and I.D. were directed to sit apart and wait for the assistant principals.  (Id.)

47.     However, when the class period ended, Plaintiff and I.D. took it upon themselves to leave for their lunch period, rather than wait for one of the assistant principals to return.  (Id.)

48.     Prior to the end of the school day, Ms. Dyer notified Ms. Caddick that Plaintiff had called Ms. Dyer a "fucking racist" during class.  Ms. Caddick directed Ms. Dyer to contact Plaintiff's parents.  (Dyer Dep. [Motion Exhibit 6] pp. 49, 52.)

49.     Ms. Dyer spoke with Plaintiff's mother by telephone after school hours on November 22, 2016.  (Dyer Dep. [Motion Exhibit 6] p. 42.)

50.     During the telephone conversation Mrs. Spero claimed that Plaintiff had told her that Ms. Dyer, upon returning from the hallway conversation with I.D., had used the "n word." (Dyer Dep. [Motion Exhibit 6] pp. 42-43.)

51.     Ms. Dyer said she would never say anything like that.  (Dyer Dep. [Motion Exhibit 6] p. 42.)

52.     Plaintiff did not make any direct claim to Ms. Dyer that she had used the "n word" or any other racial slur.  (Dyer Aff. ¶ 3.)

53.     Ms. Dyer did not report Mrs. Spero's purported secondhand claim to anyone in the District's administration at that time.  (Dyer Dep. [Motion Exhibit 6] pp. 52-53; Kasson Dep. [Motion Exhibit 10] pp. 62-64; Penna Dep. [Motion Exhibit 11] pp. 99-100.)

54.     November 22, 2016 was the last day of school before the Thanksgiving break. School resumed on Monday, November 28, 2016.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 44-45.)

55.     During first period on the morning of December 1, 2016, Ms. Caddick met with Plaintiff and informed him that he was being placed on "senior probation" for calling Ms. Dyer a "fucking racist" during class on November 22.  Senior probation is a conditional disciplinary penalty whereby, if the student commits a further disciplinary infraction, he or she will be prohibited from participating in "senior activities" such as the prom.  (Caddick Dep. [Motion Exhibit 9] p. 54; Kasson Dep. [Motion Exhibit 10] pp. 46-47; Caddick Aff. ¶ 2.)

56.     During the December 1 meeting, Plaintiff admitted he called Ms. Dyer a "fucking racist."  (Caddick Aff. ¶ 3; Vincent Spero Dep. [Motion Exhibit 3] p. 39.)

57.     During the December 1 meeting, Plaintiff did not claim Ms. Dyer had used the "n word."  He did claim that Ms. Dyer had seated some of the students of color in the back of the room in September.  (Caddick Aff. ¶ 4.)

58.     Plaintiff had a social studies class for third period that day.  The teacher was Mr. Donlon.  (Caddick Dep. [Motion Exhibit 9] p. 50; Vincent Spero Dep. [Motion Exhibit 3] pp. 52-53.)

59.     Mr. Donlon informed Ms. Caddick that during the third period social studies class on December 1, Plaintiff was disrupting the class by ranting aloud against Ms. Dyer and calling her racist.  (Caddick Dep. [Motion Exhibit 9] p. 50.)

60.     During his fourth period math class with Ms. Dyer on December 1, Plaintiff spoke aloud the words "Drexel" and "Maxwell Lawrence."  (Dyer Dep. [Motion Exhibit 6] pp. 64-65; see also Caddick Dep. [Motion Exhibit 9] pp. 116-117.)

61.     Additionally, either Plaintiff or a student he was speaking with said "4205."  (Dyer Dep. [Motion Exhibit 6] p. 65.)

62.     Drexel was the name of the street on which Ms. Dyer lived.  4205 was her address number.  Maxwell Lawrence was her husband's first and middle names.  (Dyer Dep. [Motion Exhibit 6] pp. 64-65.)

63.     When Plaintiff said "Drexel" and "Maxwell Lawrence," he was glaring at Ms. Dyer.  (Dyer Aff. ¶ 4.)

64.     Ms. Dyer was concerned that Plaintiff was evidently attempting to intimidate her. She was fearful for herself and her two young children.  (Dyer Dep. [Motion Exhibit 6] pp. 69-70; Penna Dep. [Motion Exhibit 11] p. 109; Dyer Aff. ¶ 4.)

65.     Ms. Dyer notified Ms. Caddick of the incident on December 1.  (Dyer Dep. [Motion Exhibit 6] pp. 67-68.)

66.     When Ms. Dyer spoke to Ms. Caddick, she appeared fearful and teary-eyed, and made reference to the fact that she had two young children.  (Caddick Dep. [Motion Exhibit 9] p. 134.)

67.     Ms. Caddick asked the District's School Resource Officer, Conor Talbut, a police officer with the Vestal Police Department, to speak with Ms. Dyer about her concerns.  (Caddick Dep. [Motion Exhibit 9] p. 49.)

68.     Officer Talbut spoke with Ms. Dyer on the evening of December 1 to discuss what had happened.  He advised her that she could contact the police if anything happened at her home. (Dyer Dep. [Motion Exhibit 6] p. 70; Talbut Dep. [Motion Exhibit 8] pp. 28-29.)

69.     On December 1, 2016, Ms. Caddick asked Ms. Dyer to provide a written summary of the intimidating comments by Plaintiff and the surrounding circumstances.  (Dyer Dep. [Motion Exhibit 6] p. 71.)

70.     By e-mail sent in the evening on December 1, 2016, Ms. Dyer summarized what had occurred in the classroom on December 1, and also mentioned Plaintiff's "fucking racist" comment from November 22.  (Dyer Dep. [Motion Exhibit 6] pp. 70-71; Motion Exhibit 20.)

71.     On December 2, 2016, Ms. Caddick met with Plaintiff again.  She informed him that he was going to be suspended for five days for intimidating Ms. Dyer.  (Vincent Spero Dep. [Motion Exhibit 3] p. 45; Caddick Dep. [Motion Exhibit 9] p. 51.)

72.     Plaintiff admitted saying "Drexel" during the class with Ms. Dyer.  (Caddick Dep. [Motion Exhibit 9] p. 51.)

73.     Plaintiff called his mother, who instructed him to wait in the office until she and his father arrived.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 60-62.)

74.     When Plaintiff's parents, and his sister Brittany, arrived, a meeting ensued between Mr. and Mrs. Spero, Brittany, Plaintiff, Defendant Penna, Mr. Kasson, and Ms. Caddick, in which the Speros were informed that Plaintiff was being suspended for intimidating Ms. Dyer by saying her street name and her husband's first and middle names.  (Vincent Spero Dep. [Motion Exhibit 3] p. 66; Caddick Dep. [Motion Exhibit 9] p. 52; First Amended Complaint ¶¶ 33-35.)

75.     During that December 2 meeting, Plaintiff admitted he had been talking about where Ms. Dyer lived.  (Brittany Spero Dep. [Motion Exhibit 5] pp. 12-13; Kasson Dep. [Motion Exhibit 10] pp. 47-48.)

76.     During the meeting, when Plaintiff claimed he had experienced racism, his sister Brittany Spero told him he was a "millennial" and did not know what racism was.  She asked him

if anyone had called him a bad name, and he said no.  She responded that he should have stayed out of it.  (Brittany Spero Dep. [Motion Exhibit 5] pp. 13-16.)

77.     Nevertheless, Defendant Penna handed Mr. or Mrs. Spero a pamphlet on the Dignity for All Students Act.  (Penna Dep. [Motion Exhibit 11] pp. 134, 142.)

78.     No DASA complaint was ever submitted by Plaintiff or his family.  (Penna Aff. ¶ 2.)

79.     Either during the December 2 meeting or following it, Plaintiff's parents were provided a "pre-suspension letter."  (Caddick Dep. [Motion Exhibit 9] pp. 16-17; Motion Exhibit 21; Penna Dep. [Motion Exhibit 11] pp. 133-135.)

80.     Mr. Spero asked the administrators to apologize to Ms. Dyer on the family's behalf. (Caddick Dep. [Motion Exhibit 9] p. 52.)

81.     Defendant Penna instructed Plaintiff not to discuss the matter or his suspension with others.  (Caddick Dep. [Motion Exhibit 9] pp. 52-53.)

82.     Plaintiff's parents took him home with them from the December 2 meeting. (Vincent Spero Dep. [Motion Exhibit 3] p. 67.)

83.     During or after the December 2 meeting, a "suspension letter" was mailed that day to Plaintiff's parents.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 65-66; Motion Exhibit 22.)

84.     Plaintiff was suspended for five school days.  Although the District's intent had been to commence his suspension on December 3, 2016, because his parents took him home on December 2 the decision was made to count that as the first day of his suspension, allowing him to return to school a day earlier.  Thus, the suspension was ultimately scheduled to run from December 2, 2016 to December 8, 2016.  (Penna Dep. [Motion Exhibit 11] p. 138.)

85.     Defendant Penna made the decision to suspend Plaintiff.  (Penna Dep. [Motion Exhibit 11] p. 112; Penna Aff. ¶ 3; see Motion Exhibit 22.)

86.     Although the suspension letter indicated the District was considering whether to conduct a superintendent's hearing, no decision was made to conduct a superintendent's hearing based on Plaintiff's December 1 intimidation efforts.  (Penna Aff. ¶ 4.)

87.     The District, through Mr. Kasson and Ms. Caddick, began investigating Plaintiff's claims regarding the seating arrangement Ms. Dyer had established in September.   They interviewed five students in the classroom who were seated near enough to Plaintiff to have heard his "fucking racist" comment.  (Kasson Dep. [Motion Exhibit 10] p. 68.)

88.     Four of the students were summoned to be interviewed.  A fifth, B.H., came to be interviewed on her own initiative.  (Id.)

89.     Although at that time Mr. Kasson and Ms. Caddick did not know of any claim that Ms. Dyer had used the "n word," they asked the students open-ended questions about whether there was anything that had happened in the class that they should know about.  (Kasson Dep. [Motion Exhibit 10] pp. 62-64, 85-87, 89-90; Motion Exhibit 23.)

90.     None of the five students, including B.H., reported any racial slur had been used by Ms. Dyer.  (Kasson Aff. ¶ 4.)

91.     Some students confirmed that some of the students of color in the class had been seated toward the back of the room.  However, none actually stated they believed the seating arrangement was racially motivated.  Those who did speak to Ms. Dyer's motivation at all indicated they did not believe she had any racial motivation, except for B.H., whose comment was limited to saying that when Plaintiff accused Ms. Dyer of racism, it was "not unfair of him." (Kasson Aff. ¶¶ 5-7.)

92.     Between December 2 and December 5, 2016, Plaintiff posted a number of messages (or "tweets") to Twitter, a social media platform, making various accusations of racism against the District and its personnel.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 68-72; Motion Exhibit 24 pp. 2-4.)

93.     Plaintiff's Twitter user identification, which appeared with each of his posts, was "$avage Spero."  (Motion Exhibit 24.)

94.     The Twitter posts from December 2 through December 5, 2016, evinced Plaintiff's anger at the District and its personnel, claiming he was "discriminated and prejudiced [against] in the vestal high school system," accusing the District of "allow[ing] racism to brew within your staff," calling the high school "corrupt and unfair to it's [sic] colored students," claiming his teacher "separated [him] with 4 other students because of our color" and subsequently "reported me after a day . . . after I attempted to report her," and accusing the District and/or its personnel of having minds "stuck in . . . an evil way."  (Motion Exhibit 24 pp. 2-4.)

95.     Plaintiff was aware that other students in the high school could view, and in the past had viewed, his Twitter posts.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 69-71.)

96.     On December 7, 2016, Plaintiff posted a video to Snapchat, a different social media platform, showing an unidentified woman handling a gun and ammunition.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 73-75; Motion Exhibit 17, file "spero video copy.")

97.     The video was titled by Plaintiff as "Guidette with a Strap."  (Vincent Spero Dep. [Motion Exhibit 3] p. 74.)

98.     On the morning of December 8, 2016, Plaintiff posted a short video as part of his Snapchat "story," such that it would play immediately after a viewer saw the gun video.  The new

video depicted a girl in a hospital bed who was not identified in the video.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 76-79.)

99.     Plaintiff was aware that other students in the high school could view, and in the past had viewed, his Snapchat posts.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 71-72.)

100.    On December 8, 2016, students in the District's high school viewed Plaintiff's Twitter posts and his Snapchat "story" including the gun video.  (Dauber Dep. [Motion Exhibit 7] pp. 11-15, 19-22; Talbut Dep. [Motion Exhibit 8] pp. 30-32.)

101.    According to one student, M.D., "a lot of people were talking about" the gun video, including the members of a "group chat" she participated in with eight other students over social media, and people in her classes and in the hallways.  There were "a lot of rumors going around about what actually happened," and M.D. heard that Plaintiff "was tweeting things like about how much he disliked Vestal and the people there, and then he had afterward gone on to post a Snapchat story . . . [with] a lot of guns and whatever."  There was also a rumor that the gun video was captioned "I'm coming for you Vestal or something like that."  However, M.D. did not believe that caption was actually on the video, but "this is all what [she and her friends] were talking about."  She summarized the situation as "hearing that someone is posting pictures of guns and possibly threatening your school" and noted that it occurred in "the period of time where a lot of school shootings started happening and people were particularly on high alert about that kind of thing."  (Dauber Dep. [Motion Exhibit 7] pp. 11-18.)

102.    M.D. testified she found the gun video, in the context of the tweets Plaintiff had posted attacking the school district, to be "scary," noting that in past school shootings there had been signs before the attacks that something might happen.  (Dauber Dep. [Motion Exhibit 7] p. 31.)

103.   A fellow student and participant in the group chat, J.P., told M.D. that with "everything that's been going on within the schools lately, like school shootings," she was worried about not reporting the matter in case something did happen, and she thought Plaintiff might be planning something.  (Dauber Dep. [Motion Exhibit 7] pp. 26-27.)

104.   Other people than J.P. also speculated that Plaintiff was going to do something and were scared.  (Dauber Dep. [Motion Exhibit 7] pp. 30-31.)

105.   M.D. herself was "freaking out" and felt something had to be done.  (Dauber Dep. [Motion Exhibit 7] p. 18.)

106.   M.D. encouraged J.P. to report the matter.  (Dauber Dep. [Motion Exhibit 7] pp. 28-29.)

107.   J.P. approached two members of student government, S.C. and C.G., and the three girls then went to School Resource Officer Conor Talbut to report the gun video and the tweets. (Dauber Dep. [Motion Exhibit 7] pp. 28-30; Talbut Dep. [Motion Exhibit 8] pp. 30-31.)

108.   Officer Talbut, a police officer with ten years of experience employed by the Vestal Police Department, interpreted the tweets to indicate Plaintiff was upset with the school.  (Talbut Dep. [Motion Exhibit 8] pp. 9-10, 32.)

109.   Officer Talbut recorded the gun video and the tweets from a student's phone. (Talbut Dep. [Motion Exhibit 8] p. 33.)

110.   Officer Talbut then went to the assistant principals' office to report the matter. However, when he learned they were in a meeting at the District's main office, a separate building from the high school, he called Ms. Caddick.  (Talbut Dep. [Motion Exhibit 8] p. 35.)

111.   Defendant Ahearn, Defendant Penna, Mr. Kasson, and Ms. Caddick were at that time in a leadership team meeting (or "administrators' meeting") at the District office that was not

yet finished.  Upon receiving Officer Talbut's call and learning there was a problem with a video featuring a gun, they left the meeting before it was finished.  Defendant Ahearn went to his office. Defendant Penna, Mr. Kasson, and Ms. Caddick returned to the high school.  The meeting continued in their absence.  (Talbut Dep. [Motion Exhibit 8] pp. 35-36; Ahearn Dep. [Motion Exhibit 12] pp. 117-118; Caddick Dep. [Motion Exhibit 9] p. 56; Penna Dep. [Motion Exhibit 11] p. 170; Kasson Dep. [Motion Exhibit 10] p. 102.)

112.    At the high school, Officer Talbut showed Ms. Caddick, Mr. Kasson, and Defendant Penna the tweets and the Snapchat story (including the gun video and the picture or video of the girl in the hospital) on his phone.  He advised them that several students had approached him, expressed concern that Plaintiff might be planning an attack on the school, and reported that the posts were being widely discussed among concerned students.  He further advised them that other students had seen the social media posts and were concerned.  He forwarded the tweets and the video to Ms. Caddick by e-mail.  (Talbut Dep. [Motion Exhibit 8] pp. 35-37; Caddick Dep. [Motion Exhibit 9] pp. 55-59.)

113.    Meanwhile, M.D., who was "freaked out," sent a text message to her father, Erick Dauber, that a student had posted a video of a gun and might be planning to shoot up the school. (Dauber Dep. [Motion Exhibit 7] pp. 18, 35-36.)

114.    Mr. Dauber, a state police captain, called Officer Talbut and confirmed that Officer Talbut was aware of the gun video and the issue in the school.  (Talbut Dep. [Motion Exhibit 8] pp. 38-39.)

115.    J.P.'s mother similarly called Officer Talbut and expressed concern over the gun video.  (Talbut Dep. [Motion Exhibit 8] p. 41.)

116.    Another student, A.H., spoke with Ms. Caddick and told her that a "lot of students" were saying Plaintiff was aggressive and violent, and were making assumptions about him. (Caddick Dep. [Motion Exhibit 9] pp. 86-87.)

117.    The parents of other students called the District about the gun video on December 8, speaking to personnel (including the secretaries) in the high school office, guidance counselors, and the District office.  (Kasson Dep. [Motion Exhibit 10] p. 111; Penna Dep. [Motion Exhibit 11] pp. 189-190, 200-201; Ahearn Dep. [Motion Exhibit 12] pp. 145, 275-276.)

118.    Approximately eight to ten additional students spoke to Officer Talbut about the tweets and the gun video, expressing concern that Plaintiff might be planning to attack the school, between the time he first learned of the issue from J.P. and the time he left to visit Plaintiff's house. (Talbut Dep. [Motion Exhibit 8] pp. 41-42.)

119.    Students reported concerns about Plaintiff's social media posts and intentions to the secretaries in the assistant principals' office for the rest of the day.  (Kasson Dep. [Motion Exhibit 10] pp. 106-107.)

120.    Mr. Kasson spoke to between five and ten students about the issue himself.  (Kasson Dep. [Motion Exhibit 10] pp. 112, 152-153.)

121.    Teachers and other staff members came to the high school office to report the tweets and gun video, and to describe the disruption the tweets and gun video were causing in their classes.  Mr. Kasson spoke to a handful of staff members and some of the guidance counselors. (Kasson Dep. [Motion Exhibit 10] pp. 110-115; Penna Dep. [Motion Exhibit 11] pp. 189-190.)

122.    The flood of calls and reports was so constant that the administrators and their staff did not even have time to record what calls and reports came in.  They had all they could handle just responding to tell each individual that the issue had come to their attention and they were

addressing it.  (Kasson Aff. ¶ 8; Penna Dep. [Motion Exhibit 11] p. 189; Ahearn Dep. [Motion Exhibit 12] pp. 124-125, 286; Talbut Dep. [Motion Exhibit 8] p. 50.)

123.    Some parents asked if they should not have their children come to school.  (Kasson Dep. [Motion Exhibit 10] p. 142.)

124.    Defendant Penna spoke with Mr. Spero, Plaintiff's father, by telephone, notifying him of the problem with the gun video and that Plaintiff was going to have an additional suspension.  (Penna Dep. [Motion Exhibit 11] pp. 184-185.)

125.    During the telephone call Mr. Spero expressed surprise and upset that his son would have posted a video featuring a gun.  (Kasson Dep. [Motion Exhibit 10] pp. 104-105.)

126.    Meanwhile, M.D. attended her English class, which was entirely taken up with students discussed Plaintiff's posts and the gun video.  (Dauber Dep. [Motion Exhibit 7] pp. 22-23.)

127.    M.D. described the fear of violence engendered by Plaintiff's posts and video as lasting the entire school day.  (Dauber Dep. [Motion Exhibit 7] pp. 34-35.)

128.    More than one person suggested Plaintiff might be planning to "shoot up the school."  (Dauber Dep. [Motion Exhibit 7] p. 34.)

129.    Officer Talbut went to Plaintiff's family home, where he was joined by two other police officers investigating the incident.  (Talbut Dep. [Motion Exhibit 8] p. 44.)

130.    Mr. Spero, Plaintiff, and Brittany Spero met Officer Talbut and the other two police officers at the house.  (Id.)

131.    Officer Talbut advised Plaintiff that students had viewed his tweets and the gun video, and they had caused significant concern at the school.  (Talbut Dep. [Motion Exhibit 8] p. 45; Vincent Spero Dep. [Motion Exhibit 3] p. 107.)

132.    Plaintiff confessed to Officer Talbut that he had posted the gun video and that he had been "stupid" to do it.  (Talbut Dep. [Motion Exhibit 8] p. 45; Kasson Dep. [Motion Exhibit 10] pp. 116-117; Vincent Spero Dep. [Motion Exhibit 3] pp. 103-104.)

133.    Officer Talbut and the other two police officers interviewed the Speros and visited the bedroom where the gun in the video was stored.  They learned there was a permit for the gun and it was stored in a weapon safe.  (Talbut Dep. [Motion Exhibit 8] p. 45.)

134.    Brittany Spero, who was the unidentified woman in the gun video, did not know Plaintiff was videorecording her handling the gun and was upset that he posted the video on social media.  (Brittany Spero Dep. [Motion Exhibit 5] pp. 18-20.)

135.    Officer Talbut and the other two police officers left the house, and outside discussed that everything seemed to be okay with the gun that was depicted in the video.  (Talbut Dep. [Motion Exhibit 8] pp. 46, 68.)

136.    Officer Talbut returned to the high school.  (Talbut Dep. [Motion Exhibit 8] pp. 48-49.)

137.    Plaintiff, who had just been told by police officers that his tweets and the gun video had caused significant concern at the school, immediately posted additional tweets on Twitter.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 110-112; Motion Exhibit 24 p. 1.)

138.    The December 8, 2017 tweets included the statements, "You are racist, face it you are a horrible being!" and "Deformation [sic] of character is a crime, because of my skin color you are gonna say I'm going to kill people that's outrageous, you are a racist."  (Motion Exhibit 24 p. 1.)

139.    The December 8, 2017 tweets seemed angry to M.D.  (Dauber Dep. [Motion Exhibit 7] pp. 101-102.)

21

140.    Officer Talbut reported to the high school administrators that the gun in the video was in a safe and registered.  (Talbut Dep. [Motion Exhibit 8] pp. 48-49.)

141.    However, the District administrators were unable to conclude there was no remaining threat, as they did not know Plaintiff's intentions and, in particular, whether he had access to any other firearms. (Ahearn Dep. [Motion Exhibit 12] pp. 279-280.)

142.    Officer Talbut received at least three or four more student inquiries expressing concern about Plaintiff's posts and intentions that day.  (Talbut Dep. [Motion Exhibit 8] pp. 48-49.)

143.    Officer Talbut "didn't stop moving" after his report to the administrators and "didn't stop talking to people" about Plaintiff and the gun video, and it was "a chaotic day," in his words.  (Talbut Dep. [Motion Exhibit 8] pp. 50-51.)

144.    Students also reported to the guidance office at the high school expressing concern about Plaintiff's posts and whether he might attack the school; some expressed concern about staying in school that day.  (Caddick Dep. [Motion Exhibit 9] pp. 89-90; Kasson Dep. [Motion Exhibit 10] p. 110; Penna Dep. [Motion Exhibit 11] pp. 243-244.)

145.    The guidance office also received calls about the situation.  (Penna Dep. [Motion Exhibit 11] pp. 189-190.)

146.    People placed calls and made visits to the high school office, with such frequency that the administrators were "sequestered" there.  (Penna Dep. [Motion Exhibit 11] p. 189.)

147.    Guidance counselor Merryl Wallach recommended that a state-mandated lockdown drill, scheduled to be conducted the next morning, be rescheduled in light of the concern in the District over Plaintiff's posts.  (Penna Dep. [Motion Exhibit 11] pp. 244-245.)

148.    The other District administrators agreed and the lockdown drill scheduled for the morning of December 9, 2016 was cancelled.  (Kasson Dep. [Motion Exhibit 10] pp. 115-116; Caddick Dep. [Motion Exhibit 9] pp. 89-90.)

149.    Multiple students, including S.C. and C.G., among others, requested to be escorted from class to the guidance counselors' office by Officer Talbut and/or Ms. Wallach out of concern over Plaintiff's posts and intentions.  (Caddick Dep. [Motion Exhibit 9] pp. 89-91; Kasson Dep. [Motion Exhibit 10] p. 110; Talbut Dep. [Motion Exhibit 8] pp. 46-47.)

150.    Officer Talbut had to reassure S.C. and C.G. that the situation had been looked into and things were okay, which calmed them down.  (Talbut Dep. [Motion Exhibit 8] pp. 47-48.)

151.    J.P., who had been the first to report the posts to Officer Talbut, faced harassment by Plaintiff's friends that day, and she requested an escort to class as well.  (Dauber Dep. [Motion Exhibit 7] pp. 37-42.)

152.    Even after leaving school that day, M.D. was so frightened by Plaintiff's Twitter and Snapchat posts that she called her father, Captain Dauber, to say a lot of people thought Plaintiff might "shoot up the school."  (Vincent Spero Dep. [Motion Exhibit 3] p. 37.)

153.    The fallout from Plaintiff's posts, including handling calls, reports, and inquiries from students, staff, and parents; various meetings regarding the issue; and other related matters, occupied Defendants Ahearn and Penna, and Ms. Caddick and Mr. Kasson, as well as Officer Talbut and others, from when the issue was first reported by J.P. to the end of the day.  (Kasson Aff. ¶ 9; Penna Dep. [Motion Exhibit 11] p. 189; Ahearn Dep. [Motion Exhibit 12] pp. 124-125, 286; Talbut Dep. [Motion Exhibit 8] p. 50; Caddick Dep. [Motion Exhibit 9] pp. 130-131.)

154. The next day, December 9, 2016, a new suspension letter was sent to Plaintiff's parents regarding Plaintiff's second five-day suspension. (Vincent Spero Dep. [Motion Exhibit 3] p. 113; Motion Exhibit 25.)

155. Defendant Penna made the decision to suspend Plaintiff a second time for five days. (Motion Exhibit 26.)

156. Although the December 9 suspension letter referenced Plaintiff's insubordination in disregarding Defendant Penna's instruction not to discuss his suspension with others, that was not used as part of the basis for the suspension. (Penna Dep. [Motion Exhibit 11] pp. 180-182.)

157. Plaintiff was suspended for an additional five days, starting December 9, 2016. (Motion Exhibit 25; Penna Dep. [Motion Exhibit 11] pp. 152-153.)

158. The suspension letter further advised that the District was considering holding a superintendent's hearing regarding the matter. (Motion Exhibit 25.)

159. Discussion among the students concerning Plaintiff and the gun video continued for another one to two weeks. (Dauber Dep. [Motion Exhibit 7] pp. 24-25.)

160. The disruption resulting from Plaintiff's postings was "continuous" after December 8, 2017, including telephone calls and comments from parents and teachers. (Kasson Dep. [Motion Exhibit 10] p. 129.)

161. Plaintiff's conduct caused substantial disruption among students and staff who were concerned and fearful about what could happen. (Kasson Dep. [Motion Exhibit 10] p. 151; Penna Dep. [Motion Exhibit 11] pp. 188-189.)

162. Plaintiff's friends, including B.H., stated that Plaintiff was mad at the school. (Kasson Dep. [Motion Exhibit 10] p. 151.)

163.    Officer Talbut similarly was dealing with the fallout from Plaintiff's posting of the gun video in the weeks that followed.  (Talbut Dep. [Motion Exhibit 8] pp. 57-58.)

164.    Ms. Caddick spoke to at least two parents between December 8 and December 15, 2017, regarding concerns over Plaintiff and the gun video, one of whom expressed concern over the disruption in the fourth period math class.  (Caddick Dep. [Motion Exhibit 9] pp. 131-132.)

165.    Defendant Ahearn requested that Mr. Kasson and Ms. Caddick interview the remaining students in Ms. Dyer's fourth period mathematics class regarding Plaintiff's claims of a racist seating arrangement.  (Caddick Dep. [Motion Exhibit 9] pp. 93-94; Ahearn Dep. [Motion Exhibit 12] pp. 105-106, 283.)

166.    Mr. Kasson and Ms. Caddick interviewed the rest of the students in the class.  The interviews took place on December 9 and 12, 2016.  (Caddick Dep. [Motion Exhibit 9] pp. 93-94, 97; Kasson Dep. [Motion Exhibit 10] pp. 85-86.)

167.    Out of the approximately twenty-nine students from Ms. Dyer's class who had been interviewed, eight indicated they were aware of Plaintiff's postings on Twitter accusing the District or its personnel of racism, and/or of the gun video on Snapchat.  (Caddick Dep. [Motion Exhibit 9] pp. 110-121.)

168.    If students in the general high school population were aware of Plaintiff's social media postings in the same proportion as those in Ms. Dyer's class, then roughly three hundred of the 1100 high school students would have been aware of them.  (The Court is asked to take judicial notice that 8/29 of 1100 is roughly three hundred.)

169.    With regard to Plaintiff's accusations about the seating chart issue, the students from the class revealed in their interviews that they were aware seating changed frequently

throughout the semester, and most of them had something positive to say about Ms. Dyer. (Caddick Dep. [Motion Exhibit 9] pp. 124-125.)

170. In the twenty-four additional interviews, none of the students reported ever hearing Ms. Dyer use a racial slur. (Kasson Aff. ¶ 5.)

171. In fact, to this day, the only student in Ms. Dyer's fourth period math class other than Plaintiff who has ever claimed to have heard Ms. Dyer use the "n word" on November 22, 2016 was B.H. (Kasson Aff. ¶ 6.)

172. B.H. did not make this claim during her interview by Mr. Kasson on December 2, 2016. (Kasson Aff. ¶¶ 4, 6.)

173. B.H. was not actually present in Ms. Dyer's class on November 22, 2016. The District's attendance records show she was marked absent from the class that day. (Transcript of January 31, 2017 superintendent's hearing [Motion Exhibit 2] pp. 16, 28-29; Motion Exhibit 27.)

174. In fact, it appears B.H. was not in school at all on November 22, 2016, as she was marked absent for every class she had that day except for physical education (where attendance recording was not consistent). (Id.)

175. Thus, B.H. could not have heard anything Ms. Dyer said on November 22, 2016 during the fourth period math class; she was not present. (Id.)

176. B.H. had a documented disciplinary history of absenteeism, insubordination, and lying (forgery). (Transcript of January 31, 2017 superintendent's hearing [Motion Exhibit 2], pp. 30-32; Motion Exhibit 28.)

177. However, on December 14, 2016, Plaintiff's girlfriend, E.M., reported to Mr. Kasson that Plaintiff was claiming Ms. Dyer had used the "n word." (Kasson Dep. [Motion Exhibit 10] pp. 62-63.)

178.     This was the first time Plaintiff's claim had been brought to the attention of any administrator.  (See, e.g., Kasson Dep. [Motion Exhibit 10] p. 62.)

179.     On December 14, 2016, Defendant Ahearn issued a notice to Plaintiff's parents that Plaintiff would be the subject of a superintendent's hearing to determine whether he should face an out-of-school suspension beyond the five-day suspension spanning December 9 to 15, 2016. (Vincent Spero Dep. [Motion Exhibit 3] pp. 114-115; Motion Exhibit 29.)

180.     The superintendent's hearing notice recited the significant events of late November and December, 2016, including that Plaintiff had failed to heed Defendant Penna's warning not to talk about his suspension.  (Motion Exhibit 29.)

181.     However, the decision to hold a superintendent's hearing was based solely on the disruption created by Plaintiff's gun video and Snapchat story in the context of his expressions of anger at the District and its administrators in his "tweets" on Twitter.  (Ahearn Aff. ¶ 8; see Ahearn Dep. [Motion Exhibit 12] pp. 285-286.)

182.     Defendant Ahearn made the decision to hold a superintendent's hearing.  (Ahearn Aff. ¶ 7.)

183.     A superintendent's hearing was convened before a hearing officer, Michael Sherwood, and began December 20, 2016.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 128-129; First Amended Complaint ¶ 81.)

184.     Mr. Sherwood was a local attorney and a town judge.  (Ahearn Dep. [Motion Exhibit 12] pp. 237-238.)

185.     Plaintiff was represented by counsel, Attorney Ronald Benjamin, during the first few sessions of the superintendent's hearing.  (Ahearn Dep. [Motion Exhibit 12] pp. 226-228.)

186.    Mr. Benjamin's tactics, including multiple frivolous motions, deliberate delay, and soliciting public protests, protracted the superintendent's hearing, such that it continued over five separate hearing dates (December 20, 2016; January 17, January 25, January 30, and January 31, 2017).  (Id.)

187.    During the hearing Plaintiff was afforded the right to present evidence and witnesses on his own behalf, to representation by counsel of his choice, and to cross-examine the District's witnesses.  (Ahearn Aff. ¶ 5.)

188.    However, Mr. Benjamin withdrew from representing Plaintiff and/or refused to continue representing Plaintiff on or about January 24, 2017.  (Transcript of January 25, 2017 superintendent's hearing [Motion Exhibit 1], p. 3.)

189.    Because Mr. Benjamin's tactics had already unduly protracted the hearing, the District opposed Plaintiff's request to adjourn the hearing to give him time to obtain new counsel. (Ahearn Dep. [Motion Exhibit 12] pp. 226-228.)

190.    Because of the time that had already passed by that point, the hearing officer rejected Plaintiff's request.  (Transcript of January 25, 2017 superintendent's hearing [Motion Exhibit 1], p. 5.)

191.    Plaintiff continued to serve his out-of-school suspension for a period up to January 5, 2017.  During that period, schoolwork was made available to Plaintiff so he could continue his education.  It was kept at the high school guidance office for Plaintiff's parents to pick up. However, Plaintiff's parents failed to do so on a regular basis.  (Transcript of hearing on preliminary injunction [Motion Exhibit 30], pp. 118-122; Motion Exhibit 31.)

192.     From January 5 to February 7, 2017, Plaintiff was allowed to attend school pending the decision of the superintendent from the superintendent's hearing.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 166-167.)

193.     During the superintendent's hearing, the attorney representing the District recommended that Plaintiff be suspended for the remainder of the 2016-2017 school year and all of the 2017-2018 school year.  (Ahearn Dep. [Motion Exhibit 12] pp. 209-210.)

194.     Defendant Ahearn had kept himself out of the hearing process and did not discuss the potential length of a suspension with the District's attorney or anyone else.  (Ahearn Dep. [Motion Exhibit 12] pp. 64, 182-183, 210.)

195.     On February 3, 2017, the hearing officer rendered his recommendation that Plaintiff be found guilty of misconduct and suspended for the rest of the 2016-2017 school year and all of the 2017-2018 school year.  (Vincent Spero Dep. [Motion Exhibit 3] pp. 129-130; Motion Exhibit 32.)

196.     Defendant Ahearn reviewed the hearing record and all evidence submitted during the hearing, and decided to accept the recommendation.  (Ahearn Dep. [Motion Exhibit 12] pp. 27-28, 206-208, 210-211, 217.)

197.     Defendant Ahearn accepted the recommended penalty because of Plaintiff's actions in the classroom including disrespect for Ms. Dyer, his defamation of Ms. Dyer's position and career, the disruption to the class and his classmates, the disruption his conduct created in the high school generally, Plaintiff's angry and intimidating demeanor toward Ms. Dyer, his inappropriate comments and swearing, the rapidity with which Plaintiff's conduct had escalated and the way in which its effect had broadened from the classroom to social media and thus to the general public in a very short time frame, the cancellation of the lockdown, Plaintiff's disciplinary record

including incidents of insubordination, his record of lying, Plaintiff's lack of remorse for the effects of his postings, his poor grades, and his character as revealed in the gas station video involving G.S.  (Ahearn Dep. [Motion Exhibit 12] pp. 206-208, 219-221.)

198.    During the disciplinary process, and up to the point that Plaintiff was given an extended suspension on February 7, 2017, no administrator focused on the fact that the tweets included accusations of racism.   Instead, the tweets were deemed significant because they showcased Plaintiff's anger against the District and its personnel, which created the context in which the gun video was so alarming.  (Kasson Dep. [Motion Exhibit 10] p. 17; Talbut Dep. [Motion Exhibit 8] pp. 40-41, 66; Caddick Dep. [Motion Exhibit 9] pp. 58-59; Penna Dep. [Motion Exhibit 11] pp. 159, 172-173, 187, 198-199, 235-236, 239-240, 304-307.)

199.    By letter dated February 7, 2017, Defendant Ahearn notified Plaintiff and his family that Plaintiff was found guilty of misconduct and would continue to be suspended for the remainder of the 2016-2017 school year and all of the 2017-2018 school year.  (Ahearn Dep. [Motion Exhibit 12] pp. 203-204, 206-208; Motion Exhibit 33.)

200.    The District has imposed other suspensions of equal length.  (Kasson Dep. [Motion Exhibit 10] p. 130.)

201.    For example, a student found to have repeatedly sold marijuana in school during the 2015-2016 school year was essentially permanently suspended.  (Penna Dep. [Motion Exhibit 11] pp. 270-271.)

202.    Another student also found to have sold marijuana in school (prior to 2016), who had no prior disciplinary history, was suspended from the middle to the end of the school year, and all of the following school year.  (Kasson Dep. [Motion Exhibit 10] pp. 178-181.)

203.    Plaintiff attempted to re-enroll at Binghamton City School District during his suspension from Vestal Central School District.  (Debra Spero Dep. [Motion Exhibit 4] pp. 68-69.)

204.    The Binghamton City School District suspended Plaintiff for five days and scheduled a superintendent's hearing based on Plaintiff's posting of the racism tweets and the gun video.  (CCS Aff. ¶ 38; Motion Exhibits 34 and 35.)

205.    Before the superintendent's hearing could be held, the Binghamton City School District disenrolled Plaintiff because he did not reside in that school district.  (CCS Aff. ¶ 39; Motion Exhibit 36.)

206.    After Plaintiff was suspended for the second time on December 9, 2016, but before the superintendent's hearing resulted in extending the suspension through the 2017-2018 school year, Plaintiff continued to make statements to news media concerning his allegations against the District and its personnel.  (CCS Aff. ¶ 40; Motion Exhibit 37.)


Dated: May 31, 2019
       East Syracuse, New York                     Respectfully submitted,

                                                    The Law Firm of Frank W. Miller

                                                    **s/Charles C. Spagnoli, Esq.**
                                                    **Bar Roll No.:  507694**
                                                    *Attorneys for Defendants*
                                                    Office and Post Office Address:
                                                    6575 Kirkville Road
                                                    East Syracuse, New York  13057
                                                    Telephone:  315-234-9900
                                                    Facsimile:  315-234-9908
                                                    cspagnoli@fwmillerlawfirm.com