**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DEBRA SPERO**, as Natural Mother of V.S.,
an infant,

          PLAINTIFFS                    **Civil Action No.**: 3:17:CV-7 (GTS-DEP)

-VS-

**VESTAL CENTRAL SCHOOL DISTRICT**
**BOARD OF EDUCATION, VESTAL CENTRAL**
**SCHOOL DISTRICT, JEFFREY AHEARN**, Superintendent
of Schools**,** and **ALBERT A. PENNA**, Interim Principal
of Vestal High School, in their Individual and Official
Capacities,

          DEFENDANTS
_____

_____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGEMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**
_____

**LEGAL SERVICES OF CENTRAL NEW YORK, INC.**
Willa S. Payne, Esq. (Bar No: 517751)
Susan M. Young, Esq. (Bar No: 102862)
Joshua Cotter, Esq. (Bar No: 518217)
Attorneys for the Plaintiff
221 South Warren Street, Suite 300
Syracuse, NY 13202
(607)-766-8118
wpayne@lscny.org

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT……………………………………...…………..1

STATEMENT OF FACTS………………………………………………………...1

PROCEDURAL HISTORY………………………………………………………7

STANDARD OF REVIEW………………………………………………………7

ARGUMENT……………………………………………………………………8

I.    DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS

    A.  It was not Reasonably Foreseeable that V.S.'s Speech Would Create Substantial Disruption ………………………………………………..8

      i.    Nature of Speech……………………………………...…………....9

      ii.   The Context of V.S.'s Speech…………………………………..11

      iii.  Words and Actions of Administrators……………...………..12

      iv.  Defendants Can't Prove Foreseeable Substantial Disruption by Claiming V.S.'s Speech Was Angry………..…………………..…13

      v.   V.S.'s Speech Caused No Actual Disruption ……………………14

          a.  Prior to First Suspension………………………………..14

          b.  Post-Suspension Claims of Disruption……………..……17

          1. The District's Speculation, Conjecture, and Hearsay do not Fill the Holes in the Record……………………………………19

    B.  The Extraordinarily Severe Punishment Also Supports the Conclusion that Defendants Violated the First Amendment…………….…………. 20

    C.  Defendants Remaining Arguments Lack Merit……................................ 23

II.   DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO SUBSTANTIVE DUE PROCESS …………………………………………………..…………….. 23

III.  THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY……………………………………………………………….. 24

IV.  PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION………….. 25

CONCLUSION……………………………………………………….…..…. 25

# TABLE OF AUTHORITIES

**Case Name**                                           **Page Found**

*Ashcroft v. al-Kidd*

563 U.S. 731 (2011)……………………………………………………………………..24

*Bery v. City of New York*

97 F.3d 689(2d Cir. 1996)…...................................................................................25

*Bessuink v. Woodland R-IV Sch. Dist.*

30 F. Supp.2d 1175 (E.D. Mo. 1998)……………………………………………13

*Bethel School Dist. No. 403 v. Fraser*

478 U.S. 675 (1986)...............................................................................................11

*Bradford v. Norwich City Sch. Dist*

54 F.Supp.3d 177 (N.D.N.Y. 2014)…....................................................................10,11

*Burge v. Colton Sch. Dist. 53*

100 F. Supp. 3d 1057 (D. Or. 2015)......................................................................18,19

*Byrnie v. Town of Cromwell Bd. of Educ.*

243 F.3d 93, 101 (2d Cir. 2001)…........................................................................8

*Cuff v. Valley Cent. Sch. Dist.*

677 F.3d 109 (2d Cir. 2012)…..............................................................................passim

*DC v. Valley Cent. Sch. Dist*.

No. 7:09-cv-9036, 2013 U.S. Dist. LEXIS 74177 (S.D.N.Y. Mar. 20, 2013)…..........................12

*DeFabio v. E. Hampton Union Free Sch. Dist.*

658 F. Supp. 2d 461 (E.D.N.Y. 2009)…................................................................23

*Doninger v. Niehoff*

 527 F.3d 41 (2d Cir. 2008)…...............................................................................passim

*Flaherty v. Keystone Oaks Sch. Dist.*

247 F. Supp. 2d 698 (W.D. Pa. 2003)……………………………………….……19

*Gill v. Pidlypchak*

389 F.3d 379 (2d Cir. 2004)……………………………………………………22

*Horton v. Bd. of Educ.*

2017 U.S. Dist. LEXIS 60719 (N.D.N.Y. Apr 21, 2017) ..........................................23

*J.C. v. Beverly Hills Unified School District*

711 F.Supp.2d 1094 (C.D.Cal. 2010)…................................................................16, 17

*J.C. v. Laverne Pub. Sch. Dist.*

2018 U.S. Dist. LEXIS 57904 (W.D. Okla. 2018)…....................................................23

*J.S. v. Blue Mt. Sch. Dist.*

650 F.3d 915 (3dCir. 2011)………………………………………...……14, 19

*Lavine v. Blaine Sch. Dist.*

257 F.3d 981 (9th Cir. 2001) …...........................................................................12, 22

*Mardis v. Hannibal Pub. Sch. Dist. # 60*

2009 U.S. Dist. LEXIS 36016 (E.D. Mo. 2009) …....................................................20

*Morse v. Frederick*

551 US 393 (2007)…..............................................................................................10

*NYCLU v. New York City Transit Auth.*

684 F.3d 286 (2d Cir. 2011)….............................................................................8, 25

*Porter v. Quarantillo*

722 F.3d 94 (2d Cir. 2013) ...................................................................................8

*R.O. v. Ithaca City Sch. Dist.*

645 F.3d 533 (2d Cir. 2011) …..............................................................................8

*Rosa R. v. Connelly*

889 F.2d 435 (2d Cir. 1989)……………………………………………25

*Schoenecker v. Koopman*

349 F. Supp. 3d 745 (E.D. Wis. 2018)…................................................................19

*Snyder v. Phelps*

562 U.S. 443 (2011)……………………………………………………10

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*

393 U.S. 503 (1969)…...................................................................................passim

*T.V. v. Smith-Green Cmty. Sch. Corp.*

807 F. Supp. 2d 767 (N.D. Ind. 2011)…................................................................16

*Vincent v. Yelich*

718 F.3d 157 (2d Cir. 2013)……………………………………………………………………24

*Walczyk v. Rio*

496 F.3d 139 (2d Cir. 2007)……………………………………………………………………24

*Wisniewski v. Bd. of Educ.*

494 F.3d 34 (2d Cir. 2007)…...............................................................................passim

## PRELIMINARY STATEMENT

This civil rights action challenges the Vestal Central School District's ("District's") suspension of V.S., a seventeen-year-old student of color at Vestal High School ("High School") as a violation of his First Amendment and Substantive Due Process rights. In December 2016, V.S. spoke out on Twitter about the racism he experienced at his high school.  Unconnected to the tweets, V.S. also posted a video on Snapchat of his sister making sure her permitted gun is unloaded and safely stowing it in it's safe.  Because of V.S.'s speech, defendants suspended him for eighteen months, effectively ending his high school career

Plaintiff is entitled to summary judgment holding that defendants' suspension violated the First Amendment because it was not reasonably foreseeable that V.S.'s speech would cause substantial disruption.  His tweets, which contained no threats or implied threats, and the video showing the safe storage of a gun were not violent or threatening and there were no other facts surrounding the speech that suggested disruption.  The District's response to V.S.'s speech, including the punishment, was unreasonable.   All factors in the First Amendment analysis applicable to student off-campus speech weigh in favor of finding a First Amendment violation.

Plaintiff can also demonstrate that his right to Substantive Due Process was violated by the lengthy and irrational suspension imposed by the defendants.  The suspension was not rationally related to his conduct, was shocking in its length, and was motivated by bad faith.

## STATEMENT OF FACTS

Defendants suspended V.S., a Vestal High School senior only four months from graduation, for eighteen months.  (St[1]. ¶¶ 1, 24-25, 42-46, 210.) V.S.'s suspension occurred shortly after he charged the District with racist actions against him and failure to protect him and

---

[1] 'St' refers to Plaintiff's Statement of Material Facts

other students of color from the racist acts of fellow students and teachers. (St. ¶¶ 55-59.) V.S.,

the son of a Guyanese mother, identifies as a student of color. (St. ¶ 2.)

### V.S.'s Social Media Postings

On December 2 and December 5, 2016, outside of school, V.S. issued a series of tweets

expressing his opinion that the District and his teacher had subjected him and other students to

racist actions.  (St. ¶¶ 55-59.) Because of the political/social nature and public importance of the

District's racist actions, V.S. directed one tweet string to the local news media. (St. ¶ 56.)  The

remaining tweets were not directed at any one individual or entity. (St. ¶¶ 45, 58-59.) On

December 2, 2016, V.S. tweeted:

- "I love being discriminated and prejudiced in the vestal high school system. Crazy how racism will never fade away, we are stuck"
- "@WBNG12NEWS suspended from school for calling my teacher a racist after being separated with 4 other students because of our color"
- "@WBNG12NEWS then she reported me after a day for feeling threatened by me after I attempted to report her, and I was told I wasn't going" and "@WBNG12NEWS to be acknowledged because I have no say. Vestal High School is corrupt and unfair to its colored students. And we need help."
- "How can you allow racism to brew within your staff and discipline the one trying to shine attention to the racism that is going on #truthwillprevail." (St. ¶¶ 55-56, 58.)

Three days later on December 5, 2016 V.S. tweeted:

- "End racism within our schools, how are you supposed to teach the young minds while (yours) is stuck in such an evil way #vestalhighschool" (St. ¶ 59.)

On December 7, 2016, two days after V.S.'s last tweet, he posted on a different social

media platform, Snapchat. (St.  ¶ 70.)  The post was a 10-second video of his sister, a licensed

firearm owner, demonstrating to her mother how to make sure a gun is unloaded and then safely

store it. (St. ¶¶ 69-70.)  V.S. is not in the video and does not say anything during the video. (St. ¶

74.) The video, like all images on Snapchat, was accessible only to V.S.'s followers and

disappeared from the platform after a short time. (St. ¶ 67.)  Nothing on V.S.'s Snapchat account

made reference to allegations of racism, V.S.'s suspension, the District, or any student, teacher or administrator in the District. (St. ¶ 73.)  There is no threat, implied or explicit, to use the weapon in the Snapchat video. (St. ¶ 71.)

### V.S.'s Five-Day Suspension Based on Conjecture and Rumors

On December 8, 2017, at around 11 a.m., J.P. a senior student discussed V.S.' tweets and Snapchat video in the "commons", a large cafeteria-type space used by upperclassmen.  (St. ¶¶ 76-77.) J.P. told other students V.S. had posted "pictures of guns" and was saying "threatening things on twitter."  (St. ¶ 84.) These false rumors led students like M.D. to believe the Snapchat video was captioned something like "watch out Vestal" or "I'm coming for you Vestal." (St. ¶ 79.) Around the same time, a school friend contacted V.S., who was visiting his girlfriend in the hospital, to let him know that two girls were spreading rumors about his social media posts. (St. ¶ 86.)

At 11:11 a.m. on December 8, 2016, two students, C.G. and S.C., escorted J.P. to the office of School Resource Office Talbut.  (St. ¶ 88.) Using his phone, SRO Talbut took pictures of the tweets and recorded the Snapchat off of J.P.'s phone. (St. ¶ 89.) At the time SRO Talbut took pictures of the tweets, they had been up for several days and had a total of eight "likes." (St. ¶ 90.) At approximately 11:20 a.m., SRO Talbut called Assistant Principal Caddick who was at the District Office with Principal Penna and Assistant Principal Kasson. (St. ¶¶ 94-95.)

Principal Penna and Assistant Principals Caddick and Kasson (collectively "the administrators") then returned to the High School and went directly to Ms. Caddick's office to meet with SRO Talbut. (St. ¶¶ 96-97.)  They first saw V.S.'s social media posts during that meeting. (St. ¶ 98.) Principal Penna was upset by V.S.'s tweets, which he viewed as slanderous, defaming, alarming, concerning, disparaging, untrue, and damaging to the school district. (St. ¶¶ 107-109.) At approximately 12:25, SRO Talbut received a call from the father of M.D. because

- 3 -

M.D. had told her father about the rumors circulating in the commons.  (St. ¶¶ 101-102.) After speaking with Mr. Dauber, Officer Talbut received a call from J.P's mother. (St. ¶ 103.)

V.S.'s father called the school at 12:27 p.m. to alert Principal Penna to the false rumors. (St. ¶ 87.) At approximately 12:44 p.m., Principal Penna called Mr. Spero and told him that V.S. would be suspended an additional five days. (St. ¶ 111.) During their phone conversation, Mr. Spero informed the administrators that (1) the gun was in his home under lock and key; (2) the female in the video was V.S.'s sister; (3) the gun belonged to V.S.'s sister who had a concealed carry permit; and (4) V.S. had no access to the weapon. (St. ¶ 110.)  Before hanging up with Mr. Spero, Penna directed him to "Get the cell phone away from [VS]." (St. ¶ 112.)  The information from Mr. Spero had no impact on Principal Penna, who already had decided to suspend V.S. This decision was made without (1) any discussion with students who had seen the tweets or video; (2) knowing when the tweets and Snapchat were posted; (3) speaking with V.S. or viewing his disciplinary history; or (4) speaking with staff other than SRO Talbut. (St. ¶¶ 114-121.)

Approximately one hour after Mr. Spero's phone call, SRO Talbut went to the Spero home. (St. ¶ 123.) Prior to the visit, SRO Talbut estimates eight to ten students talked to him about V.S.'s social media posts. (St. ¶ 122.)  He had brief conversations with each, letting them know the school was dealing with the situation. (*Id.*) The Speros fully cooperated with SRO Talbut. (St. ¶ 124.)  He confirmed that V.S.'s sister had a valid permit and that her gun was securely locked in a fingerprint protected case. (*Id.*) There was nothing criminal about the video or V.S.'s sister's possession of her legally acquired licensed firearm, and no charges were pressed against either V.S. or his sister. (St. ¶ 125.)  SRO Talbut returned to school and reported his findings to the administration. (St. ¶ 126.)

Three or four students approached SRO Talbut about V.S. when the officer returned to school. (St. ¶ 127.)   He informed those students the situation was being dealt with. (*Id.*).   At least two students spoke with him out of concern for V.S. (St. ¶ 128.)   At the very end of the day he spoke with the two girls who initially reported the social media posts to him. (St. ¶ 129.)   Both girls had been given a hard time by other students for reporting V.S. (*Id.*) Ms. Caddick spoke to only one student that afternoon and that student was supportive of V.S.  (St. ¶¶ 133-135.)   Mr. Kasson spoke to approximately five to ten students but only very briefly when they entered the assistant principals' office. (St. ¶ 132.)

 No classes were cancelled, no after school activities were cancelled, and no teachers left school. (St. ¶¶ 143-145.)  Despite knowing that neither the tweets nor the Snapchat video threatened harm to the school or its students or staff and that the gun in the video was permitted and in a gun safe, the District did not use any of its available methods --- e.g., its text message system or website --- to refute the false rumors that had circulated about the contents of the video and thus prevent the "substantial disruption" it claims to have feared. (St. ¶¶ 148-153.) The District received no emails concerning V.S.'s social media posts from December 2nd-17th (St. ¶ 184.) The majority of students who were in Ms. Dyer's class with V.S. did not see the social media posts.  (St. ¶ 171.) Only three of the students in Ms. Dyer's class saw the Snapchat video. (St. ¶ 171.) None of the students said they were fearful or intimidated by V.S. (St. ¶¶ 168-169.)

The administrators also decided to cancel an unannounced lockdown drill that was scheduled for December 9, 2016. (St. ¶ 117.)   Although the purpose of the drill is to make students think there is an active shooter in the school, the District claims it cancelled the drill out of concern that students would think that there was an active shooter. (St. ¶¶ 138-140.)  The drill

was rescheduled for three school days later and the District suffered no consequences from the New York State Education Department because of the cancellation. (St. ¶¶ 141-142.)

After being told of the five-day suspension for his social media posts and talking about his previous suspension, V.S. tweeted three more times expressing his frustration with his suspension, including: "Me trying to spread awareness to the racism I had to face is nothing wrong. I would never hurt a soul, I just wanted to help. I love everyone." (V.S. December 8th Tweets, Payne Decl. Ex. DD,)

The following day, on December 9, 2016, Principal Penna sent pre-suspension and suspension letters to V.S. (St. ¶ 175.)  The letters set forth as a rationale for suspending V.S.: that V.S. said his previous suspension was "unfair," even though he was directed not to; V.S.' tweets from December 2nd to December 5th; and his social media postings on December 7th (St. ¶¶  181-183). On December 14, 2016, V.S. was served with the Notice of Superintendent's Hearing, mirroring the charges set forth in the December 9, 2016 letters. (St. ¶ 193.)

Except for the calls from Mr. Dauber, Ms. Padavona and Mr. Spero, the District has no independent recollection or records indicating the identities of parents or community members who called regarding V.S. from December 8, 2016 to December 18, 2016. (St. ¶ 190.) There is also no record of email complaints about V.S.'s social media postings during that time period. (St. ¶ 184.) On December 18, V.S.'s former attorney issued a press statement that was covered by the media. (St. ¶ 185.)  The District has records of phone calls and emails about V.S. after the media coverage started on December 18, 2016. (St. ¶¶ 186-190.) The emails the District received all supported V.S. and objected to the District's decision to suspend V.S., and not his social media posts. (St. ¶¶188-189.)

### Superintendent's Hearing

At V.S.'s superintendent hearing, the District sought an additional suspension of 18 months. (St. ¶ 204.)  The reason for such a long suspension recommendation was stated by the District's attorney at the close of the hearing: "[V.S.] really up[ped] the ante by going out into social media and . . . harassing and defaming the teacher and school district with intent to harm..." (St. ¶ 205.) During the hearing, V.S. attended school pursuant to a contract of conduct and several of his teachers commended the effort he was putting forward. (St. ¶ 199.) On February 3, 2017, the hearing officer found V.S. guilty of being insubordinate, engaging in conduct that is disruptive, threatening to use a weapon, and engaging in defamation, harassment and intimidation. (St. ¶¶ 25-27, 183.) The hearing officer adopted the punishment recommended by the school district's attorney. (St. ¶ 206.)

On February 7, 2017, Superintendent Ahearn issued a Decision affirming the hearing officer's findings and full suspension recommendation. (St. ¶ 209.) He affirmed based on (1) conduct V.S. had already been punished for, (2) his disciplinary history, (3) the "low level" classes he was taking, (3) V.S's claim that the District acted in a racist manner, (4) his alleged "defaming of a teacher," and (5) the alleged disruption to the district. (St. ¶¶ 221-227.) Plaintiff appealed V.S.'s suspension to the District's Board on February 23, 2017, which upheld the suspension on March 18, 2017. (St. ¶ 234.)

### **PROCEDURAL POSTURE**

After the completion of discovery, defendants moved for summary judgment.  Plaintiff now cross moves for summary judgment with a request for a permanent injunction requiring the District to expunge all references to his suspension from his record.

## STANDARD OF REVIEW

Defendants' memorandum sets forth the standard for summary judgment, which we adopt as supplemented here. The non-movant cannot escape summary judgment, by relying on conclusory allegations and unsubstantiated speculation. *See Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir. 2001). Hearsay testimony that does not fit into one of the exceptions cannot be considered on a motion for summary judgment. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

To obtain a permanent injunction, the moving party must show actual success on the merits and irreparable harm. *See NYCLU v. New York City Transit Auth.,* 684 F.3d 286, 294 (2d Cir. 2011).

## ARGUMENT

### I.   DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS

A school district may not penalize a student for off- campus speech unless the speech foreseeably created a risk of substantial disruption, and it was foreseeable that the speech would reach the school. *Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008). The focus in determining whether a First Amendment violation has occurred must always be on the reasonableness of the District's response. *Cuff v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 113 (2d Cir. 2012)

#### A.  It was not Reasonably Foreseeable that V.S.'s Speech Would Create Substantial Disruption

"[S]peech that is neither vulgar, lewd, indecent or plainly offensive . . . may not [be] regulate[d] . . . unless it would materially and substantially disrupt classwork and discipline in the school." *R.O. v. Ithaca City Sch. Dist*., 645 F.3d 533, 540 (2d Cir. 2011).   V.S.'s speech was not vulgar, lewd, indecent, or offensive, so defendants were permitted to discipline him only if the speech "would foreseeably create a risk of substantial disruption within the school environment." *Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008). "The [reasonable

foreseeability] test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Cuff,* 677 F.3d at 113.  Although an actual disruption is not required, school officials must have more than an "undifferentiated fear or apprehension of disturbance" to overcome students' First Amendment right to freedom of expression. *Tinker*, 393 U.S. at 508. School officials must show that the regulation or prohibition of student speech was caused by something more than a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint*." Id*. at 509.

While there is no bright line test to determine how substantial a disruption must be or for identifying the facts necessary to reasonably forecast substantial disruption, a comparison of the facts in this case with Second Circuit and other precedent demonstrates that substantial disruption could not reasonably be forecast from V.S.' speech. The District's unreasonable response, including the unwarranted length of the suspension, further demonstrates that it violated the First Amendment.  *See Cuff*, 677 F.3d at 113.

### i. Nature of the Speech

As the pre-suspension letter, suspension letter, hearing officer's findings, attorney for the district's recommendation at the close of V.S.'s Supt. Hearing, and Supt. Ahearn's decision all clearly state, V.S. was suspended for engaging in three forms of speech: (1) discussing his suspension, (2) tweeting about the perceived racism in the School District, and (3) Snapchatting a video of his sister safely putting away a firearm. Both alone and in combination, none of this speech approaches the threshold for permissible discipline.

The Second Circuit cases allowing school discipline for non-lewd or vulgar student speech all involve either a threat of violence or a message that by its terms urges disruption of school activities. *See Cuff,* 677 F.3d at 111 (student drew a cartoon of an astronaut adding his

desire "to blow up the school with the teachers in it"); *Doninger,* 527 F.3d at 45 (student posted a message on her publicly accessible blog falsely asserting that a scheduled activity had been canceled "due to douchebags in central office" and urged students to complain to administrators about the fake cancellation); *Wisniewski v. Bd. of Educ.,* 494 F.3d 34, 36 (2d Cir. 2007) (student sent IM to his "buddy" group that showed "a small drawing of a pistol firing a bullet at a person's head" with the message "Kill Mr. VanderMolen," the student's English teacher); *see also Bradford v. Norwich City Sch. Dist,* 54 F.Supp.3d 177, 180-81 (N.D.N.Y. 2014) (students exchanged a series of text messages detailing how they would kill another student).

In contrast, there is no explicit or implicit threat in V.S.'s tweets, discussions with other students, or the Snapchat video. The Snapchat video is clearly a gun safety demonstration. V.S.'s sister shows how she checks her gun to make sure it is unloaded and then safely stores it. The tweets and complaints to other students are pure statements of opinion, some related to V.S's discipline and some to more general issues of racism in the District. Only by viewing plaintiff's statements of opinion through a lens that assumes students of color who speak out against racism are inherently dangerous could one conclude that disruption was to be feared.

Instead, V.S.'s speech was on a matter of public concern --- racism in the District. Speech is a matter of public concern "when it can be fairly considered as relating to any matter of political, social or other concern to the community or when it is a subject of legitimate news interest . . . " *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal citations and quotation marks omitted). The majority of V.S.'s speech, i.e. all the tweets, concerned perceived racism at the District's high school. Thus, V.S.'s speech is entitled to the highest degree of protection.

Although the Second Circuit has not addressed the issue, Supreme Court precedent strongly suggests that school speech on a matter of public concern is entitled to greater

protection than other speech.  *See Morse v. Frederick*, 551 US 393, 403 (2007) (holding that speech in question was not political and could be penalized because it reasonably could be read as promoting illegal drug use but stating that [p]olitical speech, of course, is "at the core of what the First Amendment is designed to protect") (internal quotation marks and citations omitted); *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 680 (1986) (noting the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of [Fraser's] speech"). Following Supreme Court precedent, this court should weigh the political nature of V.S.'s speech in his favor as it applies the Second Circuit's test for foreseeable disruption.

### ii. The Context of V.S.'s Speech

Second Circuit caselaw instructs that speech aimed at a particular administrator or teacher better supports a conclusion that substantial disruption is predictable than does more generalized speech.  *See Doninger v. Niehoff*, 642 F.3d 332, 341 (2d Cir. 2011) ("*Doninger II*) (speech identified an administrator); *Wisniewski* 494 F.3d at 36 (speech identified a teacher); *Bradford*, 54 F.Supp.3d at 180 (speech identified a student). V.S.'s tweets did not identify an educator, administrator or a student of Vestal High School by name or title.  The video did not have anything to do with the District.  Thus, not only was V.S.'s speech not threatening, but it was also not aimed at a particular individual. This too, refutes the argument that the tweets could be reasonably predicted to cause a substantial disruption.

Moreover, V.S.'s disciplinary record provides no reason to interpret his speech as threatening or violent. His anecdotal record contained only minor infractions and he had no criminal record, no history of emotional disturbance, no history of threats against the school, and no history of out-of-school suspensions prior to December 2016. (St. ¶¶ 154-163.) Students at the school were not afraid of him or fearful that he might harm someone. *See* Dauber Dep.95:3-5("I

- 11 -

know [V.S.] used to always preach like love and acceptance. . .") *See* Penna Dep. 240:24-241:1 ("…he was quite popular in school. Lots of people knew [V.S.]. He was a very popular social young man."); c*f Cuff.,* 677 F.3d at 113-114 (upholding a suspension where, among other things, the student had a history of engaging in threatening speech and a long disciplinary history.); *Lavine v. Blaine Sch. Dist.* 257 F. 3d 981, 984, 989-90 (9th Cir. 2001) (upholding a suspension for a poem explicitly describing a mass shooting and his own suicide where the student had a history of suicidal ideations and had recent troubles in his family life); *DC v. Valley Cent. Sch. Dist*., 2013 U.S. Dist. LEXIS 74177, at *13-14 (S.D.N.Y. Mar. 20, 2013) (holding that because of past disruptions stemming from a student's racist speech, the school district reasonably assumed that the racist speech at issue would create a substantial disruption.); No such historical context exists for V.S.'s speech.

The hearing record contains nine examples of pictures posted by Caucasian students holding guns and in one memorable instance wearing masks as they did so. Superintendent Ahearn viewed all these photos before issuing the 18-month suspension. (St. ¶ 214.) No reasonable administrator could view V.S.'s Snapchat video of his sister lawfully and safely storing her gun as likely to be disruptive in the face of an evident widespread gun culture in which photos of Caucasian students holding guns while wearing masks passed as being "innocuous" and "innocent". (St. ¶216.)

### iii.  Words and Actions of Administrators

Finally, the actions and statements of administrators, their representatives and the hearing officer may be the best evidence that the District foresaw no substantial disruption from V.S.'s speech but was instead concerned about its reputation and controversy that accusations of racism might cause. Principal Penna was upset by the content of V.S.'s tweets, which he viewed as not

only damaging to the district but an attack on himself personally. (St. ¶¶ 106-108.)   He

described the tweets as slanderous, defaming, alarming, disparaging and untrue. (*Id*.)   Principal

Penna's emotional reaction to the viewing of the tweets and hasty decision to suspend V.S. is

very similar to that of the principal in *Bessuink v. Woodland R-IV Sch. Dist*., 30 F. Supp.2d 1175,

1178-1180 (E.D. Mo. 1998) (finding the principal's quick decision to discipline the student,

without speaking to any other students, was based upon his emotional reaction to the speech

rather than any actual fear of disruption).   He did not speak to any students prior to suspending

V.S. (St. ¶118.)   In his first phone call with Mr. Spero wherein he suspended V.S., he did not

express concern about a threat to the school; rather he told Mr. Penna to "get the phone away

from V.S.," so V.S. would stop tweeting that the school district was racist. (St. ¶¶ 94-95.)

Evidence of the defendants' concern over their reputation as a result of V.S.'s accusations

of racism is found throughout their affidavits and testimony (St. ¶¶ 88-90, 180, 192; Sherwood

Decision, [Payne Ex. L]; Aff. Of Sup't. Ahearn ¶¶ 14, 15, 17, 55, 65, 67 Payne Decl. Ex. XX;

Aff. of Deborah Caddick, ¶¶ 32-38, attached to Payne Decl. as Ex. KKK.) When it came time to

suggest discipline for V.S., the District's attorney stated on the record it was seeking an 18

month suspension because V.S.'s postings on "social media" "up[ped ]the ante" by "harassing

and defaming" the teacher and the District. Defamation and harassment could only flow from the

content of V.S.'s tweets.   Clearly, the attorney was concerned about V.S.'s perceived assault on

the reputation of the District rather than any combination of circumstances that might reasonably

have been perceived as a threat of violence.   Finally, the District entered into a contract allowing

V.S. to return to school during the pendency of the hearing, demonstrating that they did not fear

substantial disruption.   Indeed, no such disruption occurred.

### iv. Defendants Cannot Prove Foreseeable Substantial Disruption by Claiming V.S's Speech was Angry.

In an attempt to avoid the conclusion that no substantial disruption could have been forecast from V.S.'s speech, defendants claim that V.S.'s tweets were angry, which made the prediction of disruption reasonable.  The gravamen of this argument appears to be that because the tweets were angry, students would have assumed posting the gun video was a threat.   This is pure sophistry. A statement that an entity is racist is an opinion, no matter the degree of anger.  It is not a threat. Students can and should express anger at perceived injustices. Nor does a Snapchat video of a young woman safely storing a gun posted two days later magically convert the opinion into a threat.

**v. *V.S.'s Speech Caused no Actual Disruption.***

Defendants also contend that showing actual disruption conclusively proved that it was foreseeable substantial disruption would occur.  The district's logical fallacy fails for two reasons.  First, only minimal and non-cognizable disruption occurred. Second, any disruption that did occur was the result not of V.S.'s speech but of untrue rumors concerning that speech and the inept reaction of the District after it learned that the rumors were untrue.  Actual disruption is relevant to the substantial disruption question only if there is an actual nexus between V.S.'s speech and the claimed actual disruption.  *See J.S. v. Blue Mt. Sch. Dist.,* 650 F.3d 915, 929 n. 6 (3d Cir. 2011) (*en banc*) (stating that disruptions unrelated to the speech at issue are not relevant to the inquiry into the level of disruption the speech at issue caused.); *see also Latour v. Riverside Beaver Sch. Dist*., 2005 U.S. Dist. LEXIS 35919, at *6 (W.D. Pa. 2005).

**a. *Prior to First Suspension***

There were no substantial disruptions to schoolwork or discipline attributable to V.S.'s speech prior to the District's first decision to suspend.  The competent evidence shows only that: (1) Penna, Caddick, and Kasson left their leadership council meeting twenty minutes after the

time it was scheduled to end; (2) three girls brought the social media postings to the attention of SRO Talbut; (3) Eric Dauber, MD's father, and possibly J.P.'s mother called SRO Talbut, and discussions occurred in common areas of the school.[2] (St. ¶¶ 76, 88, 94-95, 101-103.)

To the extent that the discussions and reports involved false rumors of threats, the responsibility belonged not to V.S. but rather to the students who spread the rumors, sometimes without even having viewed the video. It is abundantly clear from the record that the few students who expressed concern, outside of J.P., were motivated by false rumors rather than the posts themselves. (St. ¶ 78.) While Defendants claim that students were frightened by V.S's speech and rely extensively on the testimony of M.D. for that proposition, they fail to note that M.D. had never actually seen any of V.S.'s postings. (St. ¶¶ 79-80.)   Her belief that V.S.'s postings were "scary" and her "freaking out" were based solely on false rumors her friend J.P. spread. (*Id.*). In fact, upon viewing the tweets for the first time during her deposition, M.D. became visibly upset, began to cry, and needed to take a break because she realized the evident double standard that was at play for students of color. (St. ¶¶ 81-83.) Because the hallway gossip and parental phone calls had their genesis in false rumors, the requisite nexus to V.S.'s speech is lacking.

Defendants' suggestion that it is irrelevant that false rumors, rather than V.S' speech, caused the disruption misconstrues V.S.'s position and distorts the precedent.  The contention is based on cases holding that the intent behind student speech is irrelevant.  V.S. does not argue that the intent of his speech is relevant or even ask that this Court discern intent. *Cuff* and

---

[2] Other purported instances contained in Defendants' statement of facts are not supported by competent record evidence, are based on speculation, hearsay and conjecture and thus are not admissible on a motion for summary judgment. For example, "The flood of phone calls so constant . . . staff did not even have time to record the calls and reports came in." and "Some parents asked if they should not have their children come to school." (Defs' SOMF ¶¶122,123.)

*Wisniewski* do not, as defendants urge, stand for the proposition that it does not matter that the actual speech was innocuous. In those cases, the response generated from the speech at issue was directly related to the content of the speech. *See Cuff*, 677 F.3d at 114-15 (finding disruption foreseeable from student's sharing of his violent drawing); *Wisniewski*, 494 F.3d at 38-39 (finding that student's actual drawing created a foreseeable risk of substantial disruption). Although intent was irrelevant in the court's analysis in both cases, *see Cuff,* 677 F.3d at 114; *Wisniewski*, 494 F.3d at 40, the actual content of the speech was dispositive.  In both cases, there was a nexus between the content of the speech and the alleged disruption.  That nexus is lacking here, so no substantial disruption can be attributed to V.S.'s speech.  To hold otherwise would put students at risk of suspension any time other students spread untrue rumors about something they post online.

In addition to the disruption attributable to the Vestal High School students who spread the false rumors, the Vestal administrators also share part of the responsibility for the resulting disruption.  *See Cuff*, 677 F.3d at 113 (requiring a focus on the reasonableness of the school's response).  Once defendants viewed V.S.'s social media postings prior to the decision to suspend, they knew that both were innocuous. Shortly after the meeting in which the administrators decided to suspend V.S., they learned from SRO Talbut that V.S.'s sister's gun posed no threat.  At this point, the responsibility for any further disruption rested squarely with the administrators who failed to use easily available facts to quell the false rumors.  To find otherwise validates an unprecedented eighteen-month suspension, based on nothing more than rumor and speculation which the District knew to be false.

Further, even considered collectively, these pre-suspension incidents do not forecast substantial disruption. *See T.V. v. Smith-Green Cmty. Sch. Corp.,* 807 F. Supp. 2d 767, 783-84

(N.D. Ind. 2011) (holding a school district had not shown a risk of substantial disruption where two parents complained and there was "petty sniping" among students.); *J.C. v. Beverly Hills Unified School District*, 711 F.Supp.2d 1094, 1117-1119 (C.D. Cal. 2010) (holding a school district had not shown a disruption where there was one upset parent, one student refused to go to class, and five students missed a portion of their classes.)

### b. *Post-Suspension Claims of Disruption*

Defendants' claim of disruption after the suspension letters also fails. First, these claims fail because if disruption occurred, it was the result of the administrators' failure to act to quell the false rumors. Second, there was no substantial disruption. No classes were cancelled or interrupted to the extent that teaching could not continue. There is also no evidence of a substantial uptick in discipline or even a concern of further discipline for students. Further, there was no barrage of calls or complaints, no emails, no students were taken out of class, no increased truancy, no decline in test scores, no students were unruly or unmanageable, no notification was sent out to the District community and no additional safety measures were put in place. (St. ¶¶ 143-153, 184, 190.) Perhaps most telling is that none of the first-hand testimony or records from students establish there was any concern about V.S's social media posts. (St. ¶¶ 79-80; 168-173; Holloway Decl. ¶¶4-7 attached to Payne Decl. as Ex. S; Kerstin McCoy Decl.¶¶4-11 attached to Payne Decl. as Ex. HHH.)

The competent testimony offered by the District to show disruption is grossly insufficient. SRO Talbut, who is not a District employee, estimates that he spoke about the posts to approximately 17 students of the eleven hundred who attended the high school.[3] (St. ¶¶ 88, 91 122, 127.) All the conversations with students were short and happened in his office or the

---

[3] This is assuming each of these students had actually seen V.S.'s social media posts and were not reporting rumors they heard about the posts, which based on the evidence in the record seems very unlikely.

hallways. (*Id*.) He also had two short phone conversations with parents on December 8th. (St. ¶¶ 101-103.)  He later went to the Spero house to make sure the gun was safe. (St. ¶ 123.)  At the end of the school day, he spoke with two of the students who initially reported the posts because other students were giving them a hard time for reporting them. (St. ¶ 129.) None of the actions SRO Talbut took are inconsistent with his duties as a School Resource Officer. (St. ¶ 130.); s*ee Burge v. Colton Sch. Dist. 53*, 100 F. Supp. 3d 1057, 1072 (D. Or. 2015) (holding that having a teacher's assistant shadow a student for an entire day did not support the District's contention of a substantial disruption because it was part of her ordinary duties), *see also J.C.* 711 F. Supp. 2d at 1118 (holding that the District did not show that the actions they took to resolve the situation were outside the realm of ordinary school activities.)

The administrators' actions on December 8th also do not support the District's substantial disruption claims. They left a meeting twenty minutes after it was scheduled to end. (St. ¶¶ 94-95.) Ms. Caddick did not speak to a single student who was concerned about V.S.'s social media posts. (St. ¶ 135.) Mr. Kasson spoke very briefly to at most five to ten students who came into the assistant principal's office. (St. ¶ 132.) The administrators also had meetings about V.S. throughout the day.  These are consistent with the duties of school administrators at Vestal, all of whom testified they regularly worked well past the end of the school day. (St. ¶¶ 9-14.) At the end of the day, the administrators decided to cancel a lockdown drill that no students and very few staff knew about. (St. ¶¶ 137-142.) The drill was completed only three school days later with no penalty to the District. (*Id*.)  After their final meeting of the day about V.S.'s social media posts at 3 p.m. Ms. Caddick and Mr. Kasson had time to work on an investigation unrelated to V.S.'s social media activities. (St. ¶ 166.)

While there was undoubtedly some discussion in the hallways or commons about V.S.'s speech and/or the subsequent discipline, these discussions, the rescheduling of an unannounced drill, and the administrators' performance of duties within the scope of their normal employment do not form a sufficient basis for finding foreseeable and substantial disruption. *See J.S.* 650 F.3d at 922 (holding there was no foreseeable substantial disruption where a counselor had to reschedule appointments, students complained to a teacher, and students disrupted a class by discussing the speech for five or six minutes.); *see also Burge*, 100 F. Supp. 3d at 1072 (holding there was no showing of a foreseeable substantial disruption where School District administrators and staff engaged in conduct consistent with their regular duties).

Finally, students and members of the community protested V.S.'s suspension.  In response to the media coverage, which began on December 18, 2016, the District received multiple calls and e-mails, most of which were supportive of V.S. (St. ¶¶ 184-190.) The protests of the District's decision by students, parents, and the public, and the media coverage of the suspension are not relevant to any substantial disruption inquiry because they were made in response to the District's decision to suspend V.S. and not his speech. *J.S.,* 650 F.3d at 929 n. 6; *Schoenecker v. Koopman,* 349 F. Supp. 3d 745, 753 (E.D. Wis. 2018) (holding news coverage in response to a school's decision to censor speech cannot be used to demonstrate "substantial disruption"); *Flaherty v. Keystone Oaks Sch. Dist.,* 247 F. Supp. 2d 698, 704 (W.D. Pa. 2003) (holding disrespect, negative publicity, and negative attention on the school are not sufficient evidence of a "substantial disruption" under *Tinker*.)

1. *The District's Speculation, Conjecture, and Hearsay do not Fill the Holes in the Record*

The District attempts to buttress the insignificant record evidence of disruption with hearsay, speculation, and conclusory allegations. (Defs' SOMF ¶¶ 20, 22, 59, 80, 90, 100, 103,

104, 117, 119, 122-123,125,141,144-145,147,151,160-161,168, 206.)  They allege "rumors were going around," "students were discussing a rumor," and "people other than J.P. and M.D. were also scared Plaintiff was going to do something." (Defs' SOMF ¶¶ 101,104.) Now --- more than three years after the incident occurred ---- Defendants contend there was a "flood of reports and phone calls," claiming that the volume was so high they did not have time to record the names of the callers. (Defs' SOMF ¶ 122.) These speculative and conclusory allegations are insufficient to show substantial disruption.  *See Schoenecker,* 349 F. Supp.3d at 753 (holding that vague assertions of disruptions in class are insufficient to forecast a "substantial disruption."); *Mardis v. Hannibal Pub. Sch. Dist. # 60,* 2009 U.S. Dist. LEXIS 36016, at *12 (E.D. Mo. 2009) (unsupported statements that the School received numerous phone calls from parents, students and the media are not sufficient.)

Defendants' speculative and tardy assertions are not only insufficient as a matter of law; they are also contradicted by the record and common sense.  Remarkably they did not make their way into the superintendent's hearing record.  Deborah Caddick, Clifford Kasson and SRO Talbut did not testify to a "flood" of reports or calls. (St. ¶204.) The contemporaneous notes taken by administrators that day and the next do not indicate any calls from individuals, other than Mr. Dauber, interested in V.S.'s situation. (St.¶90, Administrator Notes from December 8th and 9th attached to Payne Decl. as Ex. D, G, EEE, FFF.) It strains reason and credulity to find that the secretaries would record Mr. Spero's phone message in a "while you were out" note, (St.¶87) but record none of the other "flood" of calls.  Moreover, the District did not receive a single email from a parent, or anyone else about the V.S. matter from December 8th-17[th]. (St.¶174.)  Most telling in demonstrating a lack of disruption and concern is that the District did not ever use its notification system to send a text or an email or a letter to advise parents, who

were allegedly "flooding" the office with calls, that there was nothing to be concerned about. (St. ¶153.)

**B. The Extraordinarily Severe Punishment Also Supports the Conclusion that Defendants Violated the First Amendment**.

While the Second Circuit has not squarely addressed the issue, its case law suggests that an unjustifiably severe punishment is an unreasonable response under *Cuff,* and presents further evidence of a First Amendment violation. *See Doninger*, 527 F 3d at 53 ("[W]e have no occasion to consider whether a different, more serious consequence than disqualification from the student office would raise constitutional concerns."); *Wisniewski*, 494 F.3d at 40 (declining to decide whether a six month suspension would offend the First Amendment because plaintiff made no such challenge).

As a preliminary matter, Defendants' contention that once the court finds foreseeability, it cannot review the nature of the discipline, defs.' mem. at 15, lacks merit in two respects. First, there is no reasonable basis on which this Court could find either violent speech or foreseeability. Second, as the dicta in *Doninger* and *Wisniewski* suggest, an unreasonably long suspension could violate the First Amendment even where it was reasonably foreseeable that disruption would result from the speech.

The discipline in this case was both out of proportion to the offense defendants found had occurred and more severe than the discipline the District imposed in cases of heinous misconduct.  Here, V.S. was suspended for 18 months, a suspension tantamount to a permanent suspension for a student mere months away from graduation.  Both a student with a long history of cyber-bullying and referrals to law enforcement who posted online that she would blow up the school, and another who threatened to bring a shotgun to school and kill multiple people, received shorter suspensions than V.S. (St. ¶¶ 205-206, 208-209.)

Sadly, overtly racist and anti-Semitic speech and acts by students have been punished far less severely than V.S.'s voicing his opinion that the District is racist.  Assaulting Jewish students because they are Jewish, using anti-Semitic language, and calling a student of color a "nigger" have been deemed to warrant a lesser suspension than V.S.'s conduct.  (St. ¶¶ 20-22, 235.)  And when the media uncovered racist messages between white students on the Vestal football team, necessitating extra security and triggering calls from other superintendents as well as discussion in the school and community, no students were suspended. (St. ¶ 238.)

Further, the suspensions upheld by the Second Circuit have been substantially shorter than V.S.'s suspension.  School Districts have routinely given far less severe punishments for speech that caused substantial disruptions and were explicitly threatening. *See Cuff*, 677 F.3d at 112; *Wisniewski,* 494 F.3d at 37.

The conclusion that the disproportionate penalty meted out to V.S. violated the First Amendment is strengthened by the District's imposition of an eighteen-month suspension after it knew that none of his communications posed a threat to the District.  The untrue rumors stopped being discussed in school only one day after they started. (St. ¶ 147.)  During the pendency of his hearing V.S. returned to the school, his teachers noted a marked improvement in his performance, and he was on track to graduate. (St. ¶¶ 24-27, 197.) *See Lavine*, 257 F.3d at 992, (holding that although the student's emergency short term suspension did not violate the First Amendment, the school's continued placement of negative documentation in the student's file after the threat had ended did.)

**C.  Defendants' Remaining First Amendment Arguments Lack Merit.**

Defendants argue that V.S.'s First Amendment claim requires his speech to have been "chilled." That argument fails because V.S. suffered concrete harm in the form of his eighteen-

month suspension and inability to graduate with his class.  *See Gill v. Pidlypchak*, 389 F.3d 379,

383 (2d Cir. 2004) (holding that a plaintiff who alleges a harm independent of chilling can

pursue a First Amendment claim without showing that his speech was chilled).

Defendants next argue that V.S. failed to show "but for" causation.  As we understand

their argument, they contend that they disciplined V.S. solely for his social media posts.  The

argument fails for two reasons.  First, the record is replete with admissions by defendants'

representatives that V.S.'s complaints to his classmates partially motivated the suspensions. (*See*

Payne Exs. H, I, J, UU.) Second—and more important—the argument assumes that the social

media posts were a permissible basis for discipline.  As shown throughout this memorandum,

discipline based on the posts violated the First Amendment.

## II. DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO SUBSTANTIVE DUE PROCESS

"Generally, to establish a substantive due process violation, a plaintiff must: (1) identify

the constitutional right at stake, and (2) demonstrate that the government's action [was]

conscience-shocking or arbitrary in the constitutional sense."  *Horton v. Bd. of Educ*., 2017 U.S.

Dist. LEXIS 60719 at * 13 (N.D.N.Y. 2017). A school administrator's suspension of a student

violates substantive due process where there is "no rational relationship between the punishment

and the offense." *DeFabio v. E. Hampton Union Free Sch. Dist*., 658 F. Supp. 2d 461, 486

(E.D.N.Y. 2009) (collecting cases). Suspending a student for violating a school policy without

any evidence the student violated that policy violates that student's Substantive Due Process

rights.  *J.C. v. Laverne Pub. Sch. Dist*., 2018 U.S. Dist. LEXIS 57904, at *8 (W.D. Okla. 2018).

On the merits, V.S. has established that his right to substantive due process was violated

because there is no rational relationship between his speech and the draconian suspension and

because as the administrators' statements show, *see supra* at 13-14, they acted in bad faith to

retaliate against a perceived wrong to their reputations or egos rather than because of substantial disruption.  V.S's suspension is so grossly disproportionate to his actions and to the discipline given to students who engaged in overtly anti-Semitic conduct or made racist statements as to shock the conscience.  Therefore, the Court should grant summary judgment to plaintiff on this claim.

### III.  THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity protects officials unless (1) "the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Defendants bear the burden of establishing qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). Where a right is clearly established "an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)

Plaintiff has established that the individual defendants violated his First and Fourteenth Amendment rights.  Further, it is clearly established in the Second Circuit that a school official cannot suspend a student for out-of-school speech unless it was reasonably foreseeable the speech would cause a material and substantial disruption to classwork or discipline at the school. *Cuff,* 677 F.3d at 112; *Doninger* 527 F.3d at 48; *Wisniewski* 494 F.3d at 38.  Defendants tacitly concede the clear establishment of the First Amendment rights plaintiff asserts but argue that their actions were reasonable given the factual context.  As discussed in detail above, it was not reasonable for the District to suspend V.S. for off campus speech that posed no reasonably foreseeable threat to class work or discipline at the school. It was not reasonable for the District to suspend V.S. for rumors and conjecture that had no actual connection to his speech, or for

telling his friends that his suspension was unfair. The record establishes the underlying reason for seeking the suspensions was administrators' anger and disagreement with V.S.'s tweets.  (*supra* pp. 12-13.) And, suspending a student simply because administrators are uncomfortable with his or her speech is clearly not reasonable. *See Tinker*, 393 U.S. at 509.

It is also clearly established that an irrational and arbitrary suspension decision such as the one at issue violates a students' right to Substantive Due Process. *See Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989) (holding a school administrator's decision violates a student's right to Substantive Due Process if it is "arbitrary or irrational or motivated by bad faith.") As discussed in detail above, no school official of reasonable competence could find that suspending a child for five days, much less eighteen months was rationally related to plaintiff's non-violent, non-aggressive actions in this case.

### IV. PLAINTIFF IS ENTITLED TO ENTRY OF A PERMANENT INJUNCTION

V.S. seeks an injunction requiring the District to expunge all mention of his suspension from the permanent record.  Plaintiff has established that he is entitled to a judgment in his favor and irreparable harm is present based on the constitutional violation. *Bery v. City of New York*, 93 F.3d 689, 694 (2d Cir. 1996). Therefore, an injunction should issue. *See NYCLU v. New York City Transit Auth.,* 684 F.3d 286, 294 (2d Cir. 2011) (requiring a showing of actual success and irreparable harm for a permanent injunction.)

### <u>CONCLUSION</u>

Plaintiffs respectfully request this Court grant their motion for summary judgment, deny defendants' motion, issue a permanent injunction expunging all references to V.S.'s suspension from his school record, and set the matter for trial to determine appropriate damages, along with such further relief as is just.

Dated: June 17, 2019                    Respectfully submitted,
Oneonta, New York

S/Willa S. Payne
Willa S. Payne, Esq. (Bar No: 517751)
Susan M. Young, Esq. (Bar No: 102862)
Joshua Cotter, Esq.  (Bar No:518217)
LEGAL SERVICES OF CENTRAL NEW YORK
221 S. Warren Street, Suite 300
Syracuse, NY 13202
wpayne@lscny.org