**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**DEBRA SPERO**, as Natural Mother of V.S.,
an infant,

                     PLAINTIFFS,

-vs-

**VESTAL CENTRAL SCHOOL DISTRICT**
**BOARD OF EDUCATION, VESTAL CENTRAL**
**SCHOOL DISTRICT, JEFFREY AHEARN**, Superintendent
of Schools**, ALBERT A. PENNA**, Interim Principal
of Vestal High School, **DEBORAH CADDICK** and
**CLIFFORD KASSON** in their Individual and Official
Capacities,

                     DEFENDANTS,

---

## STATEMENT OF MATERIAL FACTS

                                            **LEGAL SERVICES OF**
                                            **CENTRAL NEW YORK, INC.**
                                            Willa S. Payne, Esq.
                                            Joshua Cotter, Esq.
                                            Susan Young, Esq.
                                            Attorneys for the Plaintiff
                                            221 South Warren Street, Suite 300
                                            Syracuse, NY 13202
                                            (607)-766-8118

Pursuant to Local Rule 7.1(a)(1), Plaintiff Debra Spero as natural mother of V.S., an infant, by and through her counsel, Legal Services of Central New York, Inc., submits the following Statement of Material Facts:

**Parties and Background**

1.  At all times relevant to the issues in this lawsuit V.S. was a senior at Vestal High School, a school within the Vestal Central School District ("District"). (Amended Complaint ¶13.)

2.  V.S. identifies as a student of color.  His mother is Guyanese. (First Declaration of V.S. ("V.S. Decl.") ¶¶ 2-3 (May 3, 2017) attached to the Declaration of Willa Payne ("Payne Decl.") as Ex A.)

3.  V.S. began attending Vestal High School when his family moved into the District in 2012. (V.S. Decl. ¶ 3.)

4.  The District is a public-school district organized and existing under the laws of the State of New York and a recipient of federal aid.  (Amended Complaint ¶ 8; Answer to Amended Complaint ¶ 4.)

5.  Defendant Jeffrey Ahearn is the District Superintendent of Schools. (Amended Complaint ¶ 9; Answer to Amended Complaint ¶ 4.)

6.  As Superintendent, Mr. Ahearn directs both business and instruction.  He is also responsible for disciplining students through the Superintendent's hearing process. (Deposition of Superintendent Jeffrey Ahearn 23:12-16; 27:22-28:5. ("Ahearn Dep.") attached to Payne Decl. as Ex. U.)

7.   Superintendent Ahearn's work day starts at around 7:30 a.m. to 8:00 a.m., and he stays in the office until anywhere from 5:30 p.m. to 11:30 p.m.  It is not unusual for him to also work while he is home. (Ahearn Dep. 7:13-8:6.)

8.   Defendant Albert Penna was, at all times relevant to the issues in this lawsuit, the principal at Vestal High School. (Amended Complaint ¶ 10; Answer to Amended Complaint ¶ 4.)

9.   As principal at Vestal High School Principal Penna had the authority to suspend students for up to five days.  According to Principal Penna, he made the decision for an out-of-school suspension collaboratively with his assistant principals. (Deposition of Albert Penna 42:13-43:11. ("Penna Dep.") attached to Payne Decl. as Ex. V.)

10.   It was normal for Principal Penna to work twelve-hour days as principal of Vestal High School. He was on the move constantly, being shifty, multi-tasking, phone calls were a big part of his day as he received calls from parents, the community other agencies and sometimes the State Ed department, he also met with people as a regular part of his day.  (Penna Dep. 37:9-23, 38:4-15.)

11.   Clifford Kasson was, at all times relevant to the issues in this lawsuit, an assistant principal at Vestal High School.  His job responsibilities included investigating reports of misconduct and discipline of students.  (Deposition of Clifford Kasson 15:10-19:6. ("Kasson Dep.") attached to Payne Decl. as Ex. X.)

12.   As an Assistant Principal at Vestal High School Mr. Kasson usually arrived at work at around 7:00 a.m. and stayed until 6:00 p.m. or 7:00 p.m. (Kasson Dep. 21:1-6.)

13.   Deborah Caddick was, at all times relevant to the issues in this lawsuit, an assistant principal at Vestal High School. Her job responsibilities included investigating reports of

misconduct and discipline of students. Deposition of Deborah Caddick 11:17-23; 13:5-16:13, ("Caddick Dep.") attached to Payne Decl. as Ex. W.)

14.   Ms. Caddick worked from approximately 7 a.m. until as late as 6:30 p.m or even later, depending on afterschool activities. (Caddick Dep. 12:25-13:4.)

**2016-2017 Vestal High School**

15.   During the 2016-2017 school year, Vestal High School had approximately 1,100 students. (Caddick Dep. 122:21-123:4; Penna Dep. 97:8-12.)

16.   The school day for Vestal High School during the 2016-2017 school year started at 8:00 a.m. and ended at 2:40 p.m. (Kasson Dep. 20:19-25.)

17.   Most of the students attending Vestal High School are white/Caucasian, and there are no persons of color on their teaching staff.  (Ahearn Dep. 169:7-16; 170:24-171:5.)

18.   On numerous occasions at Vestal High School, V.S. felt that he was treated differently or singled out because of his race.  (V.S. Decl. ¶¶ 3-6.)

19.   On at least one documented occasion V.S. reported feeling this way to Ms. Caddick on October 13, 2015. (V.S. Full Disciplinary Report, (Incident No. 27008), attached to Payne Decl. as Ex. DDD.)

20.   Vestal High School made national news when approximately forty of its students participated in "Kick a Jew" day where Vestal High School students assaulted other students of the Jewish faith during school.  This event happened on December 1, 2010. (Ahearn Dep. 172:18-175:14; Office of Civil Rights Letter and Resolution Agreement attached to Payne Decl. as Ex. CCC.)

21. As a result, the U.S. Department of Education began an investigation of the District.  The investigators found that over the course of school years 2007-2011 there were several anti-Semitic incidents of alleged harassment based on Jewish ancestry/ethnicity, including name calling like "cheapie" and chanting "Heil Hitler" and "Nazi."  Jewish students were bullied and intimidated. The investigation resulted in a Resolution Agreement between VHS and the New York Office for Civil Rights. (*Id.*)

22. Another highly publicized incident of racism occurred in the fall of 2017. Multiple students at the Vestal High School engaged in a group text message chat. The students texted one another extremely racist and offensive imagery and text about African Americans. These text messages were then widely shared on social media by other students. The local news published stories about the incident and students in other schools and community members were discussing the matter. The students sending racist and offensive messages would have been students at the high school when V.S. was a student there. (Deposition of M.D. 48:17-50:22 ("Dauber Dep.") attached to Payne Decl. as Ex Z; Ahearn Dep. 186:11-196:14.)

23.   Other students, both those of color and Caucasian students in the school were aware of the District's reputation for racism and felt the same way as V.S.  (Dauber Dep. 48:15-51:12; 61-62:7; Declaration of Aja Holloway ("Holloway Decl.") attached to Payne Decl. as Ex. S.)

24.   V.S. only had only to pass each of his classes during the 2016-2017 school year to receive a Regents Diploma.  (Caddick Dep. 38:25-39:6; 2016-2017 Grade Report of V.S. ("V.S. Report Card") attached to Payne Decl. as Ex. AA)

25.   At the mid-way point of his senior year, he was on track to graduate with his classmates in June 2017. (Caddick Dep. 41:10-12; V.S. Report Card, [Payne Ex. AA])

26.   Even after missing a month of school due to suspension, on January 28, 2017 V.S. was on track to pass his English, Regents Chemistry, Forensics, Participation in Government and Physical Education classes, according to his teachers. (Summary of V.S.'s Academic Status as of January 18, 2017 attached to Payne Decl. As Ex. TT.)

27. In a summary written after V.S. was suspended for five days, but before he was suspended again for eighteen months, his Physical Education teacher noted that "he has seen a positive change in this student as far as attendance and participating since the incident." His Participation in Government teacher noted, "he has seen two different [V.S.'s] from before incident and now." His English 12 teacher noted that, "he participates in class and seems to be putting forth extra effort to be a model student."  (Summary of V.S.'s Academic Status, [Payne Ex TT].)

**Events leading up to V.S.'s Suspension for his Social Media Postings**

28.   During the 2016-2017 school year, V.S. was enrolled in Katherine Dyer's math class. (Amended Complaint ¶ 19; Answer to Amended Complaint ¶ 4; V.S. Report Card, [Payne Ex. AA].)

29.   Early in the semester, V.S. alleged that Ms. Dyer created a seating arrangement that placed him and the other students of color in the back of the classroom. (Deposition of V.S. 20:19-22. (V.S. Dep.), attached to Payne Decl. as Ex. GG.)

30.   When interviewed by Ms. Caddick and Mr. Kasson, seven of the students in Ms. Dyer's math class indicated in their answers that they noticed the students of color were seated together in the classroom, despite not being directly asked that in the questions provided. (Investigation Questionnaire ("Questionnaire") attached to Payne Decl. as Ex. O; Students' Answers to the Questionnaire ("Investigation Results") are attached to Payne Decl. as Ex. P.)

31.   On November 22, 2016, Ms. Dyer sent one of the students of color in her class to the

assistant principal's office, allegedly because he was vaping. (Deposition of Katherine Dyer

29:10-30:8 ("Dyer Dep.") attached to Payne Decl. as Ex. BB.)

32.   As Ms. Dyer turned back to the class, V.S. heard her say under her breath "I am tired of

dealing with you fucking niggers." (V.S. Decl. ¶ 9; V.S. Dep. 38:5-13.)

33.   After hearing Ms. Dyer say "fucking niggers", V.S. said to her "you are fucking racist." He

was then asked to leave the classroom by Ms. Dyer. (V.S. Dep. 39:2-12.)

34. Upon arriving at the Assistant Principals office, V.S. signed in and noted the time he arrived.

(Sign-In Sheet for Assistant Principal's Office ("Sign-In Sheet") attached to Payne Decl. as Ex.

Q.)

35. His signature indicates that he arrived approximately two minutes after I.D. arrived. (Sign-In

Sheet, [Payne Ex. Q].)

36. Ms. Dyer's written account claimed that there was 10-15 minutes between when she sent I.D.

out and when V.S. was sent out of her classroom. (Ms. Dyer's official account of incident on

November 22, 2016 ("Dyer Account") is attached to Payne Decl. as Ex. R.)

37. V.S. later informed his mother about Ms. Dyer using the "N" word and Ms. Spero and Ms.

Dyer discussed his accusation on November 22, 2016. (Dyer Dep. 42:12-24.)

38. Ms. Dyer reported V.S.'s allegations to Ms. Caddick after having the conversation with Ms.

Spero. (Dyer Dep. 49-51:24.)

39. On November 28, 2016, Ms. Caddick took notes of a discussion with Ms. Dyer. In that

conversation, Ms. Dyer informed Ms. Caddick that Ms. Spero called her a racist when they

spoke on the phone on November 22, 2016. (Caddick Dep. 46:4-48:18; Notes taken by Ms.

Caddick during her November 28, 2016 conversation with Ms. Dyer are attached to Payne Decl. as Ex. LLL.)

40. No Dignity for All Students Act (DASA) form was filled out by any administrator related to Ms. Spero telling Ms. Dyer that V.S. alleged she used the "N" word or when Ms. Dyer told Ms. Caddick that Ms. Spero called her a racist. (Caddick Dep. 48:1-15.)

41.   Ms. Dyer alleges that on December 1, 2016, while she was passing out papers, she heard V.S. say "Drexel" and later heard someone say "Maxwell" and "Lawrence." (Dyer Dep. 64:14-65:13.)

42.   There were two students named Maxwell in Ms. Dyer's class.  (Dyer Dep. 65:4-7.)

43.   Ms. Dyer also alleges that towards the end of her December 1, 2016, math class, she heard someone say the numbers "Four" "Two" "Zero" "Five". (Dyer Dep. 65:15-19.)

44. V.S. denies ever making comments in Ms. Dyer's class about her address or husband. (V.S. Dep. 51:7-24.)

45.   Ms. Dyer never asked V.S. about the comments allegedly referencing her husband and address. (Dyer Dep. 65:20-66:3.)

46. Ms. Dyer testified at V.S.'s Supt. Hearing and was deposed in this matter. She did not testify she was "intimidated" by V.S. nor did she testify that V.S. "glared" at her when testifying about the alleged "intimidation" incident on December 1, 2016. (Relevant portions of the Transcript of V.S.'s Superintendent Hearing ("Hearing Transcript") attached to Payne Decl. as Ex. E, at Bates No. V.S. 71-72; Dyer Dep. 64:8-69:3.)

47. Ms. Dyer also submitted an incident report relating what allegedly happened in her class on December 1, 2016. In this incident report she never mentions feeling "intimidated" nor does she claim V.S. "glared" at her. (Dyer Account, [Payne Decl. Ex. R].)

48.   After Ms. Dyer reported what she allegedly heard to the school administration, V.S. was brought to Ms. Caddick's office and informed that he would be suspended for five days for allegedly "intimidating" Ms. Dyer. (V.S. Dep. 55:16-57:17.)

49. Principal Penna, Assistant Principal Kasson, and Assistant Principal Caddick (collectively, "the administrators") met with V.S. and his family and informed him that he was suspended from school effective December 2, 2016 through December 8, 2016 for allegedly intimidating a teacher. (Caddick Dep. 52:10-24.)

50.   At the conclusion of the meeting, Principal Penna told V.S. not to discuss the suspension. (Penna Dep. 142:17-145:15; V.S. Dep 64:20-23; Caddick Dep. 52:18-20; Kasson Dep. 60:6-8; *see* Hearing Transcript at Bates No. 210-211, [Payne Decl. Ex E].)

51.   SRO Talbut did not perform a threat assessment based on the intimidation allegations because in his opinion one was not warranted. (Deposition of Conor Talbut 29:16-30:2. ("Talbut Dep.") attached to Payne Decl. as Ex.Y.)

**Nature and Content of the Speech at Issue**

*Tweets*

52.   V.S. disagreed with his suspension, which he viewed as unfair and partly motivated by his identity as a student of color.  (V.S. Decl. ¶¶ 15-17.)

53.   Twitter is a social media app where people write messages also known as "tweets." *How to Tweet*, Twitter Inc., *available at* https://help.twitter.com/en/using-twitter/how-to-tweet, (last visited May 31, 2019.)

54.   Users of twitter can engage with other users' "tweets" by "liking" them or "retweeting" them.   This is accomplished by tapping the "retweet" icon to retweet a tweet or the heart icon to "like" a tweet. (*How to Like a Tweet*, Twitter Inc., *available at* https://help.twitter.com/en/using-twitter/liking-tweets-and-moments, (last visited May 31, 2019); *How to Retweet a Tweet*, Twitter Inc., *available at* https://help.twitter.com/en/using-twitter/how-to-retweet, (Last visited May 31, 2019).)

55.   After his meeting with Principal Penna on December 2, 2016, V.S. tweeted: "I love being discriminated and prejudiced in the vestal high school system. Crazy how racism will never fade away, we are stuck."  (V.S. Dep. 68:10-16; Plaintiff's Tweets that were recorded by SRO Talbut in the morning of December 8, 2016 ("V.S. Tweets") attached to Payne Decl. as Ex. CC.)

56.  Believing that  the way he and other students were being treated was a matter of public importance V.S. also tweeted WBNG News the following in one thread of tweets on December 2nd: "@WBNG12NEWS suspended from school for calling my teacher a racist after being separated with 4 other students because of our color"; "@WBNG12NEWS then she reported me after a day for feeling threatened by me after I attempted to report her, and I was told I wasn't going"; and finally "@WBNG12NEWS to be acknowledged because I have no say. Vestal High School is corrupt and unfair to its colored students. And we need help."  (V.S. Decl ¶ 20; V.S. Tweets.)

57.  Between December 2 and December 5, 2016, V.S. also "retweeted" a magic trick he thought was cool. (V.S. Decl. ¶ 21; V.S. Tweets.)

58.  Also, on December 2, V.S. tweeted, "How can you allow racism to brew within your staff and discipline the one to shine attention to the racism going on #truthwillprevail."  (V.S. Tweets.)

59.  Three days later, on December 5th V.S. tweeted "End racism within our schools, how are you supposed to teach the young minds while yours is stuck in such an evil way #vestalhighschool." (V.S. Tweets.)

60.  V.S.'s tweets do not name any School District student, teacher, or administrator. (Ahearn Dep. 131:17-24; Caddick Dep. 60:15-20; Penna Dep. 168:11-15; V.S. Tweets.)

61.  V.S.'s tweets do not contain any threats of violence against Vestal High School, its students or staff. (V.S. Tweets; Ahearn Dep. 131:4-15; Caddick Dep. 60:2-3, 60:21-23; Talbut Dep. 62:9-10.)

62.  V.S. did not threaten anyone in any of his postings. (Talbut Dep. 62:9-10; Penna Dep. 216:1-8; Kasson Dep. 150:3-7.)

63.  V.S.'s tweets do not reference any snapchat videos, a gun, or any weapon. (V.S. Tweets; Caddick Dep. 61:2-7; Penna Dep. 167:23-168:4.)

64.  V.S.'s tweets do not contain any vulgar language. (V.S. Tweets.)

65.  V.S.'s tweets do not contain any calls to action for students to disrupt school activities. (V.S. Tweets.)

66. V.S. was not on school grounds or at a school function when he sent out the tweets. (V.S. Dep. 68:10-16.)

*SnapChat Video*

67.   Snapchat is a social media platform on which users can post videos to share with their friends.  Snapchat users can share videos with specific friends in which case the video disappears after it is viewed.  Or, they can post videos onto their "SnapChat Story."  Videos on SnapChat stories remain for 24 hours and then disappear from the platform. (V.S. Dep. 78:9-12; *SnapChat Support*, "About Stories", SnapChat Inc., *available at*  https://support.snapchat.com/en-US/a/about-stories, (Last Visited May 31, 2019); *SnapChat Support*, "View a Snap", SnapChat Inc., *available at*  https://support.snapchat.com/en-US/a/view-snaps, (Last Visited May 31, 2019).

68.  V.S.'s adult sister Brittany became a licensed private investigator in December 2016 and then purchased a new handgun with a fingerprint safe. (V.S. Decl. ¶ 22; Relevant Excerpts of Deposition of Brittany Spero, 22:1-4, (B. Spero Dep.) attached to Payne Decl. as Ex. EE.)

69.   V.S.'s mother Debra did not like the idea of guns in the house, so on December 7, 2016, Brittany showed her mother how she checks to make sure the gun is unloaded and safely stores the gun in her safe.  (B. Spero Dep. 21:4-9, Relevant Excerpts of Deposition of Debra Spero 42:9-23 (D. Spero Dep.) attached to Payne Decl. as Ex FF.)

70.   V.S. filmed that interaction and posted the 10 second video to his SnapChat story with the caption "guidette with a strap."  That caption is the only writing on the video.  (V.S. SnapChat Video ("SnapChat") attached to Payne Decl. as Ex. B and Defs' Motion Ex. 17 as "spero video copy".)

71.  There is no threat to use a weapon in the video. (SnapChat; Penna Dep. 216:3-8, Ahearn Dep. 130:11-20.)

72.  No audible dialogue can be heard in the video. (SnapChat.)

73.  The SnapChat video does not reference V.S.'s tweets about the school district, racism, any students at the district, or any administrators at the school district.  (SnapChat.)

74.  V.S. is not in the Snapchat video and, he does not say anything in the clip. (SnapChat; Caddick Dep. 67:19-21; Penna Dep. 215:3-5.)

75.  The SnapChat video was not made on school property nor was V.S. at a school event when he took the SnapChat video of his sister. (D. Spero Dep. 42:2-8; SnapChat.)

**Alleged Disruption on December 8th Prior to Principal Penna's Decision to Suspend**

76.  On December 8, 2016, at approximately 11 a.m. J.P. a senior at Vestal High School discussed V.S.'s tweets and snapchat video in the "commons" with other students. (Talbut Dep. 30:12-24; (Caddick Testimony from 1/25/17 Superintendent hearing p. 20:19-25 attached to Payne Decl. as Ex. E.)

77.  The commons area at Vestal High School is a large cafeteria type space used by upperclassmen. (Caddick Dep. 58:12-15.)

78.  Around this time, untrue rumors were being discussed about V.S.'s social media posts in the commons and hallways of the school.  (Dauber Dep. 13:18-24, 14:15-25-15:1-5, 19:13-16, 73:8-18; Holloway Decl. ¶ 7.)

79.  For example, on December 8, 2016, M.D., who did not see V.S.'s tweets or SnapChat video until her deposition, nevertheless thought that the tweets stated V.S. disliked the people of Vestal. She also thought the SnapChat video included a gun with the caption "I'm coming for you Vestal" or "watch out Vestal." (Dauber Dep. 14:15-25-15:1-5, 73:8-18.)

80. M.D. did not see V.S.'s tweets and the Snapchat video until she sat for her deposition in this case on March 22, 2019. (Dauber Dep. 59:4-8, 75:6-13.)

81. After viewing V.S.'s tweets for the first time at her deposition, M.D. was overwhelmed by emotion and began to cry. (Dauber Dep. 95:20-97:10.)

82. Because she had never previously seen the tweets, M.D. did not know that one of V.S.'s tweets asked for help for the students of color at Vestal School. (Dauber Dep. 95:16-19.)

83. M.D. stated that viewing the tweets for the first time "made her sad." because she "just had no idea that that's what the tweets were. I don't know. It just seems like they weren't angry at all, which makes me sad." (Dauber Dep. 96:14-97:2.) She later reaffirmed her belief the tweets from December 2nd to December 5th are not "angry", but rather "emotional." (Dauber Dep. 100:4-15.)

84.   J.P., the student who initially brought the postings to people's attention, told her friend M.D. that V.S. had posted "pictures of guns" and was saying "threatening things on twitter". (Dauber Dep. 19:13-16.)

85. V.S. social media postings did not make any threats and did not contain "pictures of guns". (SnapChat; V.S. Tweets.)

86.  Aja Holloway heard the untrue rumors circulating about V.S. and his social media posts then contacted V.S. to let him know. V.S. was at the hospital visiting his girlfriend when he received Aja's call. (Holloway Decl. ¶¶ 5, 7; V.S. Dep. 74:24-75:4, 81:12-82:15, Notes taken by Deborah Caddick on December 8, 2016 of her meeting with Aja Holloway ("Caddick/Holloway Meeting Notes") attached to Payne Decl as Ex. ZZ.)

87.  V.S. called his father and informed him of what Aja Holloway had said. V.S.'s father then called Principal Penna at 12:27 p.m. to inform him about the rumors circulating about V.S.. (V.S.

Dep. 83:5-16; Phone note showing Mr. Spero's call to Principal Penna at 12:27 p.m. on December 8, 2016 attached to Payne Decl. as Ex AAA; Ms. Caddick Notes from the Call between Principal Penna and Mr. Spero ("Caddick/Mr. Spero Phone Notes") attached to Payne Decl. as Ex. D)

88.   At approximately 11:11 am, J.P. reported V.S.'s tweets and SnapChat video to the school resource officer Connor Talbut (SRO Talbut).  She was accompanied by two other female students, C.G. and S.C., who were in student government. (Talbut Dep.34:5-15; Incident Report of SRO Talbut (Dec 8, 2016) attached to Payne Decl. As Ex. F.)

89.   SRO Talbut recorded the Snapchat video and took pictures of the tweets on his work phone. (Talbut Dep. 33:17-18; Email from Talbut to Administrators (Dec. 8, 2016) ("Talbut Email") attached to Payne Decl. as Ex. C.)

90.   At the time Officer Talbut took pictures of the tweets, V.S.'s tweets to WBNG news referenced in paragraph 56 had no "likes" or "retweets", V.S.'s tweet referenced in paragraph 55 had two "likes", V.S.'s tweet referenced in paragraph 58 had three "likes" and one retweet and V.S.'s tweet referenced in paragraph 59 had three "likes."  (V.S. Tweets.)

91.   SRO Talbut's conversation with J.P., C.G. and S.C. took approximately 10 minutes. (Talbut Dep. 34:5-15.)

92.   Following his conversation with the three students, SRO Talbut went to the assistant principals' office to inform them about V.S.'s social media posts.  Ms. Caddick and Mr. Kasson were not in the office so he called Ms. Caddick on her cell phone.  (Talbut Dep. 35:6-12.)

93.   The administrators were at a District K-12 leadership council meeting when Ms. Caddick received SRO Talbut's phone call. (Caddick Dep. 56:11-14.)

94.   On December 8, 2016, the K-12 leadership council meeting was scheduled from 8:30 a.m.

to 11:00 a.m. Following the K-12 meeting there was an Elementary Leadership meeting for

grades K-5 from 11:15 to 12:30 p.m. (Minutes and Schedule from Dec. 8, 2016 Leadership Team

Meeting attached to Payne Decl. as Ex. II.)

95.   Ms. Caddick received the call from SRO Talbut at approximately 11:20 a.m. (Caddick Dep.

56:13-14; Talbut 36:1-2.)

96.   After receiving the phone call from SRO Talbut, Ms. Caddick, Mr. Kasson, and Principal

Penna drove back to the High School (Caddick Dep. 56:19-20.)

97.   When the administrators arrived at the High School, they went directly to Ms. Caddick's

Office where they were joined by SRO Talbut. (Caddick Dep. 57:2-11, Kasson Dep. 102:18-23.)

98.   During this meeting, SRO Talbut showed the administrators V.S.'s "tweets" and the

Snapchat video. (Talbut Dep. 37:15-19; Kasson Dep. 102:18-23.)

99.   After ten to fifteen minutes, SRO Talbut returned to his office, but the administrators

remained. (Talbut Dep. 38:5-12.)

100.   At 12:21 p.m. SRO Talbut e-mailed the Tweets and Snapchat video to the administrators.

(Talbut Email, [Payne Decl. Ex. C.])

101.   At around 12:25 p.m. SRO Talbut received a call from the father of M.D. Mr. Dauber is a

New York State Trooper. (Talbut Dep. 39:18-40:5; Caddick Notes attached to Payne Decl. as Ex.

EEE.)

102.   M.D. had texted her father during the school day to let him know the rumors she heard

about V.S.'s social media posts. Mr. Dauber called SRO Talbut after his daughter texted him.

(Dauber Dep. 35:19-36:3.)

103.   The mother of J.P. called SRO Talbut shortly after Mr. Dauber. (Talbut Dep. 41:8-10.)

104.   The administrators stayed in Ms. Caddick's office for about forty-five minutes to an hour. (Kasson Dep. 109:9-20.)

**Principal Penna's Decision to Suspend V.S. for Five Days**

105.   As principal of the school Mr. Penna had the ability to suspend V.S. for up to 5 days. (Penna Dep. 288:19-22; Kasson Dep. 24:23-24.)

106.   Principal Penna did not agree with V.S.'s opinion that the School District is racist and was upset by the content of V.S.'s tweets, which he viewed as damaging to the School District (Penna Dep. 174:20-22; 175:17; 176:8-10; 178:14-15.)

107.   Principal Penna found the content of V.S.'s tweets to be slanderous, defaming, alarming, concerning, disparaging and untrue.  He wrote that V.S. had violated his own FERPA rights and placed a large "Star" next to this notation in his notes. (Penna Dep. 235:3-12, 235:14-15, Penna Notes taken on December 9, 2016 attached to Payne Decl. Ex. I.)

108.   Principal Penna interpreted V.S.'s tweets to mean that he was personally corrupt and racist because he was the principal and therefore leader of the school. (Penna Dep. 178:10-15.)

109.   While still in the meeting with the other administrators, Principal Penna returned Mr. Spero's phone call. (Caddick Dep. 77:1-22; Kasson Dep. 102:18-23, 104:2-5,167:8-10; Penna Dep. 184:1-10.)

110.   During this phone call, Mr. Spero informed Principal Penna that (1) there was no cause for concern (Penna Dep. 186:12-25-187:1-3), (2) V.S.'s girlfriend had a procedure done at the hospital that morning and Vincent was there with her (Caddick Dep. 82:13-16, 83:20-22); (3) the firearm was in their home under lock and key (Caddick Dep. 84:15-20); (4) the female in the

video was V.S.'s adult sister Brittany (Caddick Dep. 84:2-4), and (5) the gun belonged to her and was permitted. (Caddick Dep. 83:24-25-84:19-20; Penna Dep. 186:12-25, 190:15-25; Caddick/Mr. Spero Phone Notes, [Payne Decl.  Ex. D].)

111.   Principal Penna told Mr. Spero that he was suspending V.S. for an additional five days because (1) the posting of the firearm showed that V.S. was violent; (2) V.S. had violated Penna's directive not to speak about his suspension and violated FERPA, by discussing his suspension and (3) V.S. accused the school of racism on social media (Caddick/Mr. Spero Phone Notes, [Payne Ex. D].)

112.   At the end of the phone conversation, Principal Penna told Mr. Spero to "Get the phone away from [VS]."  (Penna Dep. 197:14-19; Caddick/Mr. Spero Phone Notes, [Payne Ex. D].)

113.   Principal Penna told Mr. Spero to get the phone away from V.S. because he wanted V.S. to stop calling the Vestal School District racist, which he viewed as defamation. (Penna Dep. 202:3-21.)

114.   Principal Penna did not speak with V.S. prior to making the decision to suspend him for 5 days. (Kasson Dep. 105:21-25, 117:18-25; Penna Dep. 178:16-25-179:1-2.)

115.   Prior to issuing a punishment or consequence, it is normal procedure at Vestal High School for the principal or assistant principal to talk to the student accused of the misconduct. (Caddick Dep. 13:21-25; Penna Dep. 40:14-20; Kasson Dep. 15:14-22.)

116.   Principal Penna did not review V.S.'s disciplinary history prior to making the decision to suspend him for five additional days.  (Penna Dep. 119:14.)

117.   Principal Penna was not aware of V.S.'s disciplinary history from his prior schools when making the decision to suspend V.S. (Request for Records from Defendants' Counsel attached to Payne Decl. as Ex. JJJ.)

118.   The administrators did not speak to students or staff prior to Principal Penna informing Mr. Spero he was suspending V.S. for five additional days. (Kasson Dep. 112:21-24; 113:1-4; 166:2-18.)

119.   The decision to suspend V.S. was made before the 12:44 p.m. phone call with Mr. Spero. (Caddick Dep. 77:11-78:1.)

120.   Principal Penna did not know when or on what day any of the postings were made when he suspended V.S. for posting them. (Penna Dep. 201:8-18.)

121.   Principal Penna was also not aware that SnapChat postings disappear in 24 hours. He thought the videos remained on the platform indefinitely. (Penna Dep. 193:4-25.)

**Vestal High School on December 8, 2016 After V.S. was Suspended**

122.   Officer Talbut estimates eight to ten students approached him in the hallways or his office with concerns about V.S.'s social media posts prior to his visit to the Spero household.  He had a brief conversation with the students telling them the District was aware of the situation and looking into it.  (Talbut Dep. 42:2-9.)

123.   SRO Talbut visited the Spero household approximately an hour after the conversation in which Principal Penna informed Mr. Spero V.S. would be suspended for five additional days. (Talbut Dep. 43:23-44:9.)

124.   During the visit, SRO Talbut determined that Brittany's firearm was properly registered and safely stored. The Speros fully cooperated with him.  (Talbut Dep. 45:5-12; B. Spero Dep. 22:16-21; "Hearing Transcript", [Payne Ex. E], at Bates No. V.S. 204.)

125.   No charges were filed against anyone involved, and after the visit SRO Talbut returned to the high school. (Talbut Dep. 45:20-46:3.)

126.   SRO Talbut conveyed his findings to the administrators when he returned to the high school. He informed them that the weapon was locked and was registered to V.S.'s sister and described the general discussion he had with the Spero family. (Talbut Dep. 50:1-6.)

127.   After SRO Talbut's visit to the Spero household, three or four students approached him in the hallway to discuss the social media posts.  He informed them, as he did the other students, that the District was looking into the issue.  (Talbut Dep. 46:11-14; 48:23-49:2.)

128.   At least two other students approached SRO Talbut because they were concerned for V.S. and disagreed with the way the school was handling the matter. (Talbut Dep. 46:16-18.)

129.   After returning to the high school from the Spero house, SRO Talbut met with two of the girls who initially approached him about the social media posts that morning.  They told him that other students were giving them a hard time for reporting V.S.'s social media postings.   (Talbut Dep. 46:19-23.)

130.   Speaking with students and parents, investigating student concerns about weapons, and visiting students' homes are all a part of SRO Talbut's job duties. (Talbut Dep. 18:7-23.)

131.   It is SRO Talbut's job to investigate complaints even if it means him working after his normal scheduled hours.  SRO Talbut is not an employee of the District. (Talbut Dep.10:12-24 11:5-14.)

132.   Mr. Kasson had brief interactions with approximately five to ten students who came into the Assistant Principal's office to report V.S.'s social media posting. (Kasson Dep. 111:13-15; 112:1-7; 113:8-12.)

133.   Ms. Caddick met with Aja Holloway on the afternoon of December 8th. At that meeting Aja expressed concern for V.S. and not concern about his posts. (Caddick 85:22-86:3, 87:7-8; "Caddick/Holloway Meeting Notes", [Payne Decl. as Ex. ZZ].)

134.  She conveyed to Ms. Caddick that she felt his suspension was racist and that people were making "assumptions" about V.S. that were untrue. (Caddick Dep. 87:1-9; Caddick/Holloway Meeting Notes, [Payne Decl. Ex. ZZ].)

135.   Other than her meeting with Aja Holloway, Ms. Caddick did not have meetings with students on December 8th. (Caddick 87:16-88:3.)

136.   Other than Mr. Dauber and J.P's mother, the District has no record or independent recollection of any of the names of parents who allegedly complained about V.S.'s postings on December 8, 2016.  (Talbut Dep. 67:15-23; Ahearn Dep. 146:2-150:25; Defs' Interog. Response attached to Payne Decl. as Ex. JJ and Defs' Suppl. Interog. Response attached to Payne Decl. as Ex. KK.)

137.   At approximately 3:00 p.m. on the 8th of December, the administrators held another meeting, which they referred to as their "wrap up meeting." During this meeting the administrators decided to cancel an unannounced lockdown drill scheduled for the next day. (Penna Dep. 219:16-21, 220:1-10; Ms. Caddick's Notes from a 3 p.m. meeting on 12/8/16 ("Wrap up Meeting Notes") attached to Payne Decl. as Ex. G.)

138.   During an unannounced lockdown drill, all teachers stop teaching and the students must hide in corners or under tables. Students and staff must cease all activity and remain quiet and motionless. The school day continues only after a full check of the entire school and completion of the drill. (Penna Dep. 257:20-261:9; Talbut Dep. 26:4-25.)

139.   The purpose of not announcing a lockdown drill is to ensure that students and staff react "spontaneously," and that the drill can be evaluated in "real-time". (Penna Dep. 254:6-19, 255:3-6.)

140.   During lockdown drills, the District wants students to believe there is an active shooter in the school to give them practice for an actual incident. (Caddick Dep. 37:7-14.)

141.   The District suffered no consequences from the New York State Education Department due to the cancellation, the drill was rescheduled, and the District did not have to report to New York State that they had cancelled a drill. (Penna Dep. 246:8-13)

142.   The lockdown drill was rescheduled and held only three school days after the originally scheduled date, on December 14, 2016. (Record of lockdown drills held at Vestal attached to Payne Decl. as Ex. LL.)

143.   No classes were cancelled on December 8, 2016. (Talbut Dep. 51:3-4; Penna Dep. 262:8-25-263:1; Kasson Dep. 144:14-16.)

144.   No after school activities were cancelled on December 8, 2016. (Talbut Dep. 51:5-6; Penna Dep. 262:20-22, 263:1; Kasson Dep.144:17-19.)

145.   No teachers left school on December 8, 2016. (Talbut Dep. 51:23-25.)

146.   Even though there may have been discussion about V.S. in one English class, it was no more discussion than usually takes place. (Dauber Dep.22:8-23:16.)

147. The false rumors that V.S. may do something involving violence at school were only present for one day and the speculation he may be planning an attack was not renewed any time after. (Dauber Dep. 35:4-13.)

148.   The District has a text message system that sends alerts to notify parents and students of any event or occurrence.  (Ahearn Dep. 137:16-18.)

149.   Neither the District nor the high school sent a text message alert to parents or students regarding V.S.  (Ahearn Dep. 137:22-25.)

150.   The District can post statements on its website to let the community know there is no credible threat to the school or district. (Ahearn Dep. 138:6-7.)

151.   No posting was made on the District website letting the parents and the community know V.S.'s social media postings posed no threat. (Ahearn Dep. 138:17-19.)

152.   Notifications to the community, parents or students are approved by the office of the superintendent. (Ahearn Dep.139:6-9.)

153.   The District never sent any notification of any kind to students, parents, or the community regarding V.S.'s social media posts. (Ahearn Dep. 138:20-139:4; Kasson Dep. 144:20-145:4.)

**V.S. Disciplinary History Prior to the Suspension at Issue**

154.   At all times relevant to his claims V.S. had no arrests or convictions for any crimes. (V.S. Dep. 17:10-20.)

155.   V.S. had no history of making threats against the school or its administrators. (Discipline Report, [Payne Decl. Ex. DDD].)

156.   Prior to December 1, 2016, at Vestal High School, V.S. had no out-of-school suspensions. (Discipline Report, [Payne Decl. Ex. DDD].)

157.  M.D. had never heard that V.S. was intimidating or had "gang affiliations." (Dauber Dep. 43:9-20.)

158.   There are 21 entries in V.S.' disciplinary record from January 16, 2014, through November 21, 2016.  Fourteen are for being late to class, not being in class, or leaving class early, two are for illegal parking, one for throwing paper balls with another student, and two were for incidents V.S. was not disciplined for.  (Discipline Report, [Payne Decl. Ex. DDD])

159.   There is a section on V.S.' disciplinary record labeled "incident category" where the school district can record whether an incident qualifies as a "VADIR" incident.  VADIR is a state code meaning "violent and disruptive incident report."  (Caddick Dep. 42:8-9; Discipline Report, [Payne Decl. Ex. DDD].)

160.   At the end of the school year the school district sends a report to the State of any incidents that fall under the VADIR category. (Caddick Dep. 42:12-20.)

161.   Prior to December 1, 2016, V.S. had no "VADIR" incidents in his disciplinary record. (Disciplinary Report, [Payne Decl. Ex. DDD]; Caddick Dep. 43:6-10.)

162. No administrator at Vestal School District was aware of the specifics of V.S.'s disciplinary history at his prior school when they made their respective decisions to suspend V.S. (Record Request, [Payne Decl Ex. JJJ].)

163.  The altercation between V.S. and another unidentified student at a gas station occurred off school grounds and not at a school function. V.S. was neither investigated nor disciplined by the school for the incident. (V.S. Disciplinary History attached to Payne Decl. as Ex. DDD.)

**Investigation by Assistant Principals Caddick and Kasson**

164. On December 8, 2016, Superintendent Ahearn tasked Ms. Caddick and Mr. Kasson with interviewing each of the students who were in Ms. Dyer's math class with V.S. (Wrap up Meeting Notes, [Payne Ex. G]; Caddick Dep. 93:10-24; Ahearn Dep. 105:25-106:3.)

165. In anticipation of the investigation Ms. Caddick and Mr. Kasson created a uniform questionnaire on December 8, 2016. (Caddick Dep. 95:17-96:23; Investigation Questionnaire ("Questionnaire") attached to Payne Decl. as Ex. O.)

166. The purpose of the investigation was to look into the allegations V.S. made about Ms. Dyer's classroom and the disruption they caused and not into V.S.'s social media posts. (Kasson Dep. 86:3-87:4; Ahearn Dep. 110:10-13; Hearing Transcript, at Bates No. VS 180.)

167. Of the ten questions on the questionnaire one addressed V.S.'s social media activities. (Questionnaire, [Payne Ex. O].)

168. None of the responses to the questionnaire submitted by students mention that V.S. was a threat to the school. (Caddick Dep. 122:3-6, Student Responses to District Questions ("Investigation Results") attached to Payne Decl. as Ex. P.)

169. None of the students' responses mention V.S. being intimidating or claim that students were fearful of him. (Caddick Dep. 122:3-10; Investigation Results, [Payne Ex. P].)

170. In response to the question about social media postings, most of the students in the class indicated they did not see V.S.'s social media posts. (Caddick Dep. 122:11-19; 125:4-11; Investigation Results, [Payne Ex. P].)

171. Only eight students who were in Ms. Dyer's class with V.S. indicated they saw his social media posts. (Caddick Dep.110-121.) Of the eight students who indicated they saw V.S.'s social

media posts only three indicated they saw his snapchat video.  (Investigation Results at Bates No. V.S. 916, 919, and 922.)

172. H.R. indicated he saw V.S.'s snapchat and the tweets and wrote that it was his opinion there was no threat made and nothing threatening posted. ("Investigation Results" (student H.R.) at Bates No. 922.)

173. R.T. responded that he saw both V.S.'s snapchat and the tweets and wrote "[i]t didn't really bother me because I've grown up around guns." (Investigation Results, (student R.T.), at Bates No. 916.)

174. The results of Ms. Caddick and Mr. Kasson's investigation were shared with Superintendent Ahearn. (Caddick Dep. 125:12-19; Ahearn Dep. 109-113:18.)

**After December 8th**

175. On December 9, 2016, Principal Penna sent the Spero household, pre-suspension and suspension letters. (Dec 9, 2016 pre-suspension and suspension letters attached to Payne Decl. as Ex. UU and Ex. H.)

176. Principal Penna signed off on the letters, which were prepared by the Assistant Principals' Office. (Caddick Dep. 16:9-13; Penna Dep. 43:2-4.)

177. According to Ms. Caddick, a pre-suspension letter sets forth the general violations of the code of conduct, and the facts which support the alleged violations. The purpose of putting the facts in the letters is to state the reasons for the suspension. The main difference between the pre-suspension and suspension letters is that the suspension letter contains the length of the suspension the principal is considering. (Caddick Dep. 14-18:12.)

178. The pre-suspension letter outlines the specific sections of the Code of Conduct that V.S.'s alleged behavior violated. They include:

- Section VI: B.1 Failing to comply with the directive of a teacher, school administrator, school employee, or other authorized agent in charge of students; or otherwise demonstrating disrespect.

- Section VI:C.1: Failing to comply with the directions of a teacher, school administrator, school employee, or other authorized school agent in charge of students.

- Section VI:D.5: Threatening to use any weapon as noted in the definition of weapon in Section II.

- Section VI:E.6: Intimidation, which includes engaging in actions or statements that put an individual in fear of bodily harm.

- Section VI:E.20: Any willful act which disrupts the normal operation of the school community. (Pre-Suspension Letter, [Payne Ex. UU])

179. In the first paragraph, V.S.'s pre-suspension letter states that Principal Penna was "considering a suspension," but then at the end states "due to the violent nature of (redacted) behavior, an immediate suspension is implemented, effective December 9, 2016." (Pre-Suspension Letter, [Payne Ex. UU]).

180. V.S.'s December 9, 2016, suspension letter states the following general violations of the Code of Conduct:

> Engaged in conduct that was insubordinate, disruptive, violent and endangered the education, safety, morals, health or welfare of himself or others. This may include

bullying, cyberbullying, discrimination, and/or harassment as defined in the

Vestal Code of Conduct. (Suspension Letter, [Payne Ex. H])

181. After describing the code of conduct violations, the letter recounts that on December 2,

2016, after V.S. was told not to discuss his suspension, several students reported to the

administration that V.S. had told them that his suspension was "unfair" and for "no reason".

(Suspension Letter, [Payne Ex. H].)

182. "Failing to comply with the directions of a teacher, school administrator, school employee,

or other authorized school agent in charge of students," as set forth in the suspension letter, refers

to V.S.'s having said that his suspension was unfair after Principal Penna told him not to discuss

it. Principal Penna believed that by talking about his own suspension V.S. violated his own rights

under the Family Educational Rights and Privacy Act (FERPA). (Penna Dep. 180:1-25.)

183.  The suspension letter also describes V.S.'s social media posts and the disruption they

allegedly caused. (Suspension Letter, [Payne Ex. H].)

184.    The School District received no e-mails from anyone concerning V. S's social media

activities from December 2, 2016, through December 17, 2016.  (Defs' Interog. Response ¶ 4;

Emails Referenced in Interrogatories ("Community Emails") attached to Payne Decl. as Ex.

NN.)

185. On December 18, 2016, V.S.'s prior attorney, Ron Benjamin, sent out a press statement.

(Email from Erin Hamm and Press Statement sent by Ron Benjamin attached to Payne Decl. as

Ex. TT.)

186. The first news story covering the incident was released shortly after the press statement on

December 18, 2016. (WBNG News Story by Erin Hamm attached to Payne Decl. as Ex OO.)

187. All the emails received by the District from community members concerning V.S. were received after the initial news coverage on December 18th. (Defs' Interog. Response Interog.¶ 4; Community E-mails, [Payne Ex. NN].)

188. All the e-mails the District received were in response to their decision to suspend V.S. and not in response his social media posts.  (Defs' Interog. Response Interog.¶ 4; Community E-mails, [Payne Ex. NN].) In fact, only one of the e-mails mentions V.S.'s social media activities and it states "I have read the tweets in question that you all have cited in official correspondence and not a one suggests or incites violence." (Community Emails, [Payne Ex. XX] at Bates No. V.S. 955.)

189. All of the e-mails sent to the School District regarding V.S.'s suspension were supportive of V.S. (Defs' Interogg. Response ¶ 4; "Community Emails", [Payne Ex. NN].)

190. The School District has no record or independent recollection of the identity of any parent, student or community member, other than Mr. Dauber and Ms. Padavona, who contacted the school. Their do not show any calls until after December 18, 2016. (Phone Message Chart and "while you were out" notes attached to Payne Decl. as Ex. SS.)

**Superintendent's Hearing and Imposition of 18 Month Suspension**

191. Superintendent Ahearn is solely responsible for the decision of whether a student discipline issue will result in a Superintendent's hearing. (Ahearn Dep. 33:8-24.)

192. He does not participate in the investigation into the student conduct and relies solely on the information set forth in the initial suspension letter. (Ahearn Dep. 34-35:24.)

193. After reviewing the December 9, 2016 suspension letter, Superintendent Ahearn determined that V.S.'s alleged conduct warranted a Superintendent's Hearing.  On December 14, 2016, a

letter notifying V.S. that a hearing would be held was sent to the Spero household. (December 14, 2016 Notice of Superintendent Hearing ("Hearing Notice") attached to Payne Decl. as Ex. J.)

194. The notice accused V.S. of posting a video of a girl "loading and unloading" a gun. (Hearing Notice, [Payne Ex. J].)

195. V.S. did not post a video of anyone "loading" a gun on SnapChat. (SnapChat; Ahearn Dep. 126:17-19.)

196. The hearing notice accuses V.S. of "harassment" and "defamation" based upon the content of his tweets. (Hearing Notice, [Payne Ex. J].)

197. The hearing notice accuses V.S. of being "violent" by "threatening to use a weapon". (Hearing Notice, [Payne Ex. J].)

198. A superintendent's hearing was held on December 20, 2016, January 17, 25, 20 and 31, 2017. (Ahearn Dep. 203:20-204:4.)

199. On January 5, 2017, during the pendency of the hearing, V.S. returned to Vestal High School.  (Contract allowing Plaintiff to return to school, dated January 4, 2017 attached to Payne Decl. as Ex. K.)

200. Plaintiff's previous counsel filed this lawsuit in New York State Supreme Court on December 21, 2016, the day after the Superintendent's hearing began. The lawsuit was subsequently removed to federal court. (Original Summons and Complaint filed by Ron Benjamin under Index No: EFCA-2016-002914 attached to Payne Decl. as Ex. CCC.)

201. Michael Sherwood, the hearing officer, is also the attorney for the District. (Ahearn Dep. 237:22-25)

202. Mr. Sherwood remained as the hearing officer after the filing of the lawsuit against his client, the District. (Recommendation of Hearing Officer Michael Sherwood February 3, 2017 ("Sherwood Decision") attached to Payne Decl. as Ex. L.)

203. On December 22, 2016, two days after the start of V.S.'s Supt. Hearing, and one day after the initiation of this lawsuit against the District, the District Clerk sent an email notifying the Vestal Board of Education members and Supt. Ahearn that the "Complaint" had been shared with Hearing Officer Sherwood, among others. (12/22/16 e-mail attached to Payne Decl. As Ex. QQ.)

204. Wendy Dewind represented the School District during the hearing and recommended in her closing argument that V.S. receive an 18- month suspension. (Ahearn Dep. 209:21-25; Hearing Transcript, [Payne Ex. E], at Bates No. V.S. 325.)

205. Ms. Dewind said she recommended this significant punishment because "[V.S.] has not only refused to accept consequences but really up (sic) the ante by going out into social media and, you know, harassing and defaming the teacher and the school district with intent to harm because he was unhappy at being held accountable in math class...coupled with the seven-page disciplinary history and the pattern of insubordination and retaliation that discipline history show for Vincent." (Hearing Transcript, [Payne Ex. E], at Bates No. V.S. 325.)

206.  Hearing Officer Sherwood adopted Ms. Dewind's recommendation on length of suspension. He recommended to Superintendent Ahearn that V.S. be suspended for the remainder of the 2016-2017 school year and all the 2017-2018 school year. (Sherwood Decision, [Payne Ex L.].)

207.  Superintendent Ahearn testified that he reviewed the hearing officer's recommendations, the hearing transcripts and all the exhibits that were presented in V.S.'s Superintendent hearing. (Ahearn Dep. 229:17-25); Affidavit of Supt. Ahearn ¶ 25, dated May 15, 2017, attached to Payne Decl. as Ex. XX.)

208. Quoting directly from the hearing officer's decision, he found that V.S. was guilty of violating the Code of Conduct by, "(B) engaging in conduct that is **insubordinate**, specifically--(1) failing to comply with the directions of a school administrator or otherwise demonstrating disrespect, (C)  Engaging in conduct that is **disruptive**, specifically--(1) failing to comply with the direction of a school administrator or otherwise demonstrating disrespect, (D) Engaging in conduct that is **violent**, specifically—threatening to use a weapon, (E) engaging in conduct that endangers the education, safety, morals and health of others—specifically (3) engaging in **defamation**, (5) engaging in **harassment**, (6) engaging in **intimidation**, and (20) engaging in a willful act which disrupts the normal operation of the school community.  (Sherwood Decision, [Payne Ex. L].)

209. Superintendent Ahearn issued a decision accepting in all respects the findings of the hearing officer and imposed an 18-month suspension on V.S. (Ahearn Dep. 203:20-204:4; Ahearn's Sup't Decision, Defs' Motion Exhibit 33.)

210. The definition of "violent student" in the Vestal Code of Conduct is:

"A student under the age of 21 who: (1) commits an act of violence upon a school employee, or attempts to do so; (2) commits, while on school property or at a school function, an act of violence upon another student or any other person lawfully on school property or at the school function, or attempts to do so; (3) possesses, while on school property or at a school function, a

weapon; (4) displays, while on school property or at a school function, what appears to be a weapon; (5) threatens while on school property or at a school function, to use a weapon; (6) knowingly and intentionally damages or destroys the personal property of any school employee or any person lawfully on school property or at a school function; (7) or knowingly and intentionally damages or destroys school district property. (Vestal Student Code of Conduct ("Vestal COC") p. 12 attached to Payne Decl. as Ex. MM.)

211. V.S. was accused of and found guilty of being violent for threatening to use a weapon. (Sherwood Decision, [Payne Ex. L]; Defs' Motion Ex. 33.)  None of V.S.'s speech meets the definition of "violent student" in the Vestal School District's Code of Conduct, nor did he threaten to use a weapon. (Vestal COC p. 12, [Payne Ex. MM]; Talbut Dep. 62:9-10; Penna Dep. 216:1-8; Kasson Dep. 150:3-7.)

212. V.S. was accused of and found guilty of harassment. The Code of Conduct definition of harassment limits "harassment" to "intentional act against any student, on school property or at a school function." (Vestal COC p. 12, [Payne Ex. MM].)

213. Mr. Sherwood found that V.S. was instructed not to talk about his previous suspension but did so anyway.  Because he spoke about his suspension V.S. was found guilty of insubordination. Specifically, "failing to comply with the directions of a school administrator or otherwise demonstrating disrespect." This finding was adopted by Superintendent Ahearn. (Sherwood Decision, [Payne Ex. L]; Defs' Motion Ex. 33.)

214. Among the exhibits admitted at the hearing and thus before Superintendent Ahearn for his review were photos posted on social media of Caucasian students at Vestal High School posing

with various guns. Some of the students holding guns are wearing masks that obscure their faces. (Photos of Caucasian students attached to Payne Decl. as Ex. N.)

215. Superintendent Ahearn testified that these photos were not presented in V.S.'s Superintendent hearing. He stated this emphatically in at least five different paragraphs in his affidavit dated May 15, 2017. (Supt. Ahearn Aff. ¶¶ 29-33, [Payne Ex. XX].)

216. At his deposition, Superintendent Ahearn admitted that the photos were in fact submitted at V.S.'s Superintendent hearing --contrary to the affidavit he submitted. (Ahearn Dep. 230:1-234:9.) He viewed them as innocuous and innocent. (Ahearn Dep. 234:9-236.)

217. Superintendent Ahearn always imposes additional punishment after reviewing a recommendation of the hearing officer. In V.S.'s case, it was an 18-month suspension. (Ahearn Dep. 78:11-15.)

218. V.S. was suspended commencing February 7, 2016, through and including the remainder of the 2016-2017 school year including summer school and the entire 2017-2018 school year, also including the summer school period. (Ahearn Dep. 205:10-22.) The total period of V.S.'s suspension was 18 months. (Ahearn Dep. 206:14-16.)

219. Superintendent Ahearn's first reaction after viewing V.S.'s twitter postings was that he was "disappointed". He felt disappointed that "things would escalate from the classroom to the social media so quickly…and that one of our students would take that approach." (Ahearn Dep.177-178:20.)

220. Superintendent Ahearn felt that V.S.'s "offensive attack alleging racism in Vestal schools caused the District to be besieged by an avalanche of negative press and publicity, which substantially disrupted school operations." (Supt. Ahearn Aff. ¶17, [Payne Ex. XX].)

221. Superintendent Ahearn's decision to suspend V.S. was based in part on conduct for which V.S. was previously disciplined including calling Ms. Dyer a "fucking racist" and allegedly intimidating her.  (Ahearn Dep. 207:18-22.)

222.  V.S.'s alleged "defamation of the teacher's position and career" was considered by Superintendent Ahearn in making his decision to suspend V.S.  (Ahearn Dep. 206:20-21.)

223. One of the reasons for Superintendent Ahearn's imposition of an 18-month suspension was V.S.'s allegations of racism against the District. (Ahearn Dep. 207:15-25; 285:11-25.)

224. If the tweets had the same tone but were on a subject other than racism, Superintendent Ahearn believes the punishment would not have risen to the same level.  (Ahearn Dep. 286:19-287:3.)

225. Superintendent Ahearn also considered V.S.'s grades.  He believed V.S. was "taking low level programs" and his grades were "not particularly good."  (Ahearn Dep. 208:8-12.)

226. He also considered V.S.'s disciplinary record prior to issuing his decision on the suspension. (Ahearn Dep. 207:9-15.)

227. The final reasons for imposing an 18-months suspension was the alleged disruption to the school district and the cancellation of the lockdown drill scheduled for December 9th. (Ahearn Dep. 206:14-207:8.)

228.   At the time he made his decision to suspend V.S., Superintendent Ahearn was unaware most students in Ms. Dyer's class had not seen V.S.'s social media posts. He was also unaware that some students in the class verified V.S.'s allegation that the students of color were seated together in the back of the classroom. (Ahearn Dep. 112:14-22; 113:15-18.)

229. Superintendent Ahearn found it "disturbing" that V.S. never apologized for any of his actions. (Ahearn Dep. 208:1-7.) He wanted V.S. to apologize to the student body and the teacher. (Ahearn Dep. 213:2-20.)

230. Superintendent Ahearn also took into consideration a video of V.S. off school property that shows V.S. having a verbal altercation with another individual.  Superintendent Ahearn did not know the source of the video or when the altercation took place.  V.S. was not disciplined for that altercation. (Ahearn Dep. 210:20-211:16.)

231. Prior to taking the position as Superintendent, Mr. Ahearn had never held a position with responsibility for student discipline. (Ahearn Dep. 74:12-15.)

232. Prior to taking the position as Superintendent, Mr. Ahearn had never received any training on how to discipline students or the superintendent's hearing process. Nor did he receive any training on this subject after he took the job. (Ahearn Dep.  240:25-241:1-9.)

233. Mr. Ahearn's employment history does not include any teaching positions. He has never taught in a high school classroom.  He has never been a principal or assistant principal. His employment history is limited to the business side of school administration. (Ahearn Dep. 16:15-19:3, 237:13-21.)

234. V.S. appealed his suspension to the Vestal Board of Education, which affirmed Superintendent Ahearn's decision on March 18, 2017.  (Decision of the District Board of Education is attached to the Payne Decl. as Ex. GGG.)

**Other Suspensions by Superintendent Ahearn**

235.  Superintendent Ahearn suspended A.K., a student in the Vestal Central School District' for eight months for: writing out the chemical formula for a bomb; calling a black student a

"nigger"; sending a picture depicting Hitler pointing to baked cookies with the phrase "randomly

decided to bake something": sending another picture disparaging immigrants; and retaliating

against a student for reporting some of his conduct.  Although, he was suspended for eight

months, he was offered a "contract of conduct" that would allow him to return earlier.

(Superintendent Decisions attached to Payne Decl. As Ex. YY at Bates No. V.S. 1699-1703.)

236. Superintendent Ahearn suspended another student for 16 months for: posting a video

discussing blowing up the school; referring to another student or employee as a "dumb bitch";

stating she "fucking hates the school so much," "is fucking done with this school," and "it's

fucking retarded"; posting harassing remarks and comments in text messages and on social

media using the words "crybaby", "dumbass" and "fucking pussy" in regard to students; and

threatening to throw an object at a student in her class. (Superintendent Decisions; at Bates No.

V.S. 1705-1708.)

237. The student referenced in paragraph 236 had a history of cyber-bullying other students and

was twice referred to law enforcement because of the bullying and had a prior out of school

suspension for inappropriate social media use. However, because she was of compulsory school

age, the District provided her with alternative education. (*Id*.)

238.   A group of Vestal High School football players exchanged racially derogatory text

messages about players from another team.  The texts included a picture of a burning cross.

Local media covered the story of the text messages and the District had to provide extra security

for a football game.  There was a lot of discussion in the community and the school about the

text messages. The District did not suspend any students from school as a result of these texts.

At most, the District suspended students from football games or removed them from the team. (Ahearn Dep. 186:11-200.)

239.  Superintendent Ahearn suspended another student for twelve months for the following explicit threats: "you just wait until I become a serial killer, you'll be sorry"; "if you touch me I will stab you in the throat with my pencil"; "I'm going to fucking kill all of you and your family. You can watch me kill your family"; "if not today than (sic) the next day, I'm going to come to school with a 12 gauge and put it to your fucking head." The student had to be restrained by six staff members. (Superintendent Decisions at Bates No. V.S. 1709-11)

240. Superintendent Ahearn suspended a student who assaulted a male student in a manner that could have caused permanent physical injury and then sent threatening messages to his girlfriend for an academic year. However, Superintendent Ahearn allowed this student to return to school on a contract of conduct.  The student elected to transfer to another school. (Superintendent Decisions at Bates No. V.S. 1739-41.)

Dated: June 17, 2019
Syracuse, New York

Respectfully submitted,

S/Willa S. Payne

Willa S. Payne, Esq. (Bar No: 517751)

Susan M. Young, Esq. (Bar No: 102862)

Joshua Cotter, Esq.  (Bar No:518217)

LEGAL SERVICES OF CENTRAL NEW YORK

221 S. Warren Street, Suite 300

Syracuse, NY 13202

wpayne@lscny.org